638 F.2d 283
 Neil LEIST, Philip Smith and Incomco, Plaintiffs-Appellants,
v.
John Richard SIMPLOT, J. R. Simplot & Co., Simplot Products
Co., Inc., Simplot Industries, Inc., Simtag Farms, Inc.,
Peter J. Taggares, P. J. Taggares & Co., Henry A. Pollack,
Harvey B. Pollack, Harvey B. Pollack Company, Gerald
Rafferty, Pressner Trading Corp., Benjamin Pressner, Stephen
Sundheimer, Jules Nordlight, Edelstein & Co., Inc., Charles
Edelstein, Robert Edelstein, Murial Edelstein, Meierfeld &
Company, Inc., Gilbert Meierfeld, David Meierfeld, Robert
Reardon, F. J. Reardon, Inc., Harold Collins, Caspar
Mayerson, Lynnewood Exporting Company, Alex Sinclair,
Manning Stoller, Hornblower & Weeks-Hemphill, Noyes Inc.,
MFX Commodities, Inc., Donald Silver, Duane South, Kenneth
Ramm, A & B Farming Inc., Hugh Glenn, Gearheart Farming,
Inc., Edward McKay, "John" Humphreys, Frank Fullmer, Defendants,
Clayton Brokerage Co. of St. Louis, Inc., Heinold
Commodities, Inc., Thomson & McKinnon, Auchincloss,
Kohlmeyer, Inc., New York Mercantile Exchange, Richard B.
Levine, Howard Gabler, Alfred Pennisi, Defendants-Appellees.
INCOMCO, Plaintiff-Appellant,
v.
WAYNE COUNTY PRODUCE CO., and Harold Collins, Defendants,
New York Mercantile Exchange, Defendant-Appellee.
NATIONAL SUPER SPUDS, INC., William R. Buster, Jr., Willard
C. Chiner, Eugene P. Weismen, Richard Welts, Raymond
Rothberg, Arthur S. Armstrong, Theodore Brinek, Capgain
Holdings, Inc., and Heiz Romminger, individually and on
behalf of all persons similarly situated, Plaintiffs-Appellants,
v.
NEW YORK MERCANTILE EXCHANGE, Clayton Brokerage Co. of St.
Louis, Inc., Pressner Trading Corp., Jack Richard Simplot,
J. R. Simplot Co., Simplot Industries, Inc., Peter J.
Taggares, P. J. Taggares Co., C. L. Otter, Simtag Farms,
Kenneth Ramm, A & B Farms, Inc., Hugh V. Glenn, Gearheart
Farming, Inc. and Ed McKay, Defendants,
Heinold Commodities, Inc., Thompson & McKinnon, Auchincloss,
Kohlmeyer, Inc., Defendants-Appellees.
 Nos. 402-404, Dockets 79-7402, 79-7464 and 79-7482.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 16, 1980.
Decided July 8, 1980.
Certiorari Granted Feb. 23, 1981.
See 101 S.Ct. 1346.
 
 Leonard Toboroff, Robson & Toboroff, New York City, for plaintiffs-appellants Neil Leist, Philip Smith and Incomco.
 Pomerantz, Levy, Haudek & Block, New York City, Hollinshead & Mendelson, Pittsburgh, Pa., for class plaintiffs-appellants.
 William E. Hegarty, New York City (Cahill Gordon & Reindel, Charles Platto and Peter Leight, New York City, of counsel), and Rein, Mound & Cotton, New York City (Maurice Mound, New York City, of counsel), for defendants-appellees New York Mercantile Exchange, Richard B. Levine, Howard Gabler and Alfred Pennisi.
 Lawrence H. Hunt, Jr., Sidley & Austin, Chicago, Ill., and Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant-appellee Heinold Commodities, Inc.
 W. Stanley Walch, St. Louis, Mo. (Thompson & Mitchell, Gerard K. Sandweg, Jr., and Kenton E. Knickmeyer, St. Louis, Mo., of counsel), for defendant-appellee Clayton Brokerage Co. of St. Louis, Inc.
 Hall, McNicol, Hamilton, Clark & Murray, New York City, for defendant-appellee Thomson & McKinnon, Auchincloss, Kohlmeyer, Inc.
 Mark D. Young, Washington, D. C. (John G. Gaine, Gen. Counsel, Pat G. Nicolette, Deputy Gen. Counsel, and Gregory C. Glynn, Associate Gen. Counsel, Washington, D. C., of counsel), for amicus curiae Commodity Futures Trading Commission.
 Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 Plaintiffs in three consolidated actions in the District Court for the Southern District of New York appeal from an order of Judge, now Chief Judge, MacMahon, 470 F.Supp. 1256 (1979), granting appellees' motions for partial summary judgment. The court struck from the complaints all claims based on the Commodity Exchange Act, (CEA), 7 U.S.C. §§ 1-19, as amended in 1974, as distinguished from other claims under the antitrust laws. The actions were to recover damages allegedly suffered by the plaintiffs as a result of what Judge MacMahon characterized as
 
 
 2
 the much publicized default in May 1976 of Maine potato futures contracts, when the sellers of almost 1,000 contracts failed to deliver approximately 50,000,000 pounds of potatoes, resulting in the largest default in the history of commodities futures trading in this country. 470 F.Supp. at 1258 (footnote omitted).
 
 
 3
 The basis for the court's order was that no private cause of action exists for breach of the CEA. Since this important issue has divided the district courts, including those within our circuit, we feel constrained to discuss it in some detail.[1] We think it desirable, as did the district court, to begin with an explanation of the nature of the commodity futures markets.
 
 I. COMMODITY FUTURES MARKETS
 
 4
 A commodity futures contract is simply a bilateral executory agreement for the purchase and sale of a particular commodity. The seller of the contract commits himself to deliver the commodity at a fixed date in the future, while the buyer commits himself then to accept delivery and pay the agreed price. 1 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud § 4.6(421) (1979); H.R.Rep.No.93-975, 93d Cong., 2d Sess. 130 (1974), U.S.Code Cong. & Admin. News 1974, p. 5843. Every aspect of the futures contract is standardized except price. For example, the contract involved in this case, the May 1976 Maine potato futures contract, is for 50,000 pounds of Maine grown potatoes of a specified quality to be delivered at specified points in cars of the Bangor & Aroostook Railroad, between May 7 and May 25, 1976. Since price is the only variable, negotiations can readily proceed and the agreed prices can be speedily disseminated to other traders. Standardization also makes the contracts fungible. Original sellers and buyers can therefore offset their positions by acquiring opposite contracts, either paying or gaining any price differential. H.R.Rep.No.93-975, supra, at 130.
 
 
 5
 The person who has sold a futures contract, i. e., someone committed to deliver the commodity in the future, is said to be in a "short" position. Conversely, someone committed to accept delivery is "long". It is a rare case, however, in which actual delivery takes place pursuant to a futures contract.[2] Save in these rare instances, the short and the long must liquidate their positions prior to the close of trading in the particular futures contract. Although the means by which this is done is routinely referred to as futures trading, futures contracts are not "traded" in the normal sense of that word. Rather they are formed and discharged. Clark, Genealogy and Genetics of "Contract of Sale of a Commodity for Future Delivery" in the Commodity Exchange Act, 27 Emory L.J. 1175, 1176 (1978). A person seeking to liquidate his futures position must form an opposite contract for the same quantity, so that his obligations under the two contracts will offset each other. Thus, a short who does not intend to deliver the commodity must purchase an equal number of long contracts; a long must sell an equal number of short contracts. Money is made or lost in the price different between the original contract and the offsetting transaction. If the price of the future has declined, usually because of market information indicating a drop in the price of the commodity, the short will realize a profit; if the futures price has risen, the long will realize a profit. See Cargill, Inc. v. Hardin, 452 F.2d 1154, 1157 (8 Cir. 1971), cert. denied, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972). Futures trading is a zero-sum game. Since money is made from the change in futures contract prices, and every contract has a long and a short, every gain can be matched with a corresponding loss. See Melamed, The Mechanics of a Commodity Futures Exchange: A Critique of Automation of the Transaction Process, 6 Hofstra L.Rev. 149, 166 & n.39 (1977).
 
 
 6
 The mechanics of the commodity futures market, and the roles of the various participants, can be illustrated by tracing a typical transaction. An individual wishing to invest in the futures market approaches a "futures commission merchant" (FCM). FCM's are defined in the Commodity Exchange Act as individuals or associations "engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery ... on ... any contract market ...," § 2(a)(1), 7 U.S.C. § 2, and they are registered with the Commodity Futures Trading Commission (CFTC). The FCM will demand a "margin" payment from the customer, which is simply a security deposit designed to protect against adverse price movements. The amount of the margin is based upon the amount which the customer can lose in a day or two; when the margin is exhausted the FCM will call the customer for additional payment. The margin is generally only a small percentage of the value of the contract. See Melamed, supra, 6 Hofstra L.Rev. at 167 & n.41. FCM's are paid a commission on their customer's business.
 
 
 7
 The FCM relays its customer's order to one of its "floor brokers" trading on the exchange. The broker stands on the outside of a "pit" or "ring" around which are gathered other persons trading in the same contract. Some of the traders are brokers acting on behalf of customers, while others trade on their own account. Contracts are made by "open outcry". The broker with an order will indicate his position at the pit by shouting and gesticulating with standardized hand signals. Someone willing to enter the contract responds across the pit in similar fashion, and the deal is made. Observers on raised pulpits alongside the pit record the transaction and feed the information into a communications system, publicizing it to other traders who, in any event, had an opportunity to witness the transaction in the pit. The broker relays the particulars of the deal to the FCM, who informs the customer.
 
 
 8
 When two traders have reached an agreement on the floor of the exchange, the role of the clearinghouse comes into play. The clearinghouse, a key link in the futures trading system, operates as the seller to all buyers and the buyer from all sellers, thus facilitating the interchangeability of the contracts and the cancelling of positions. H.R.Rep.No.93-975, supra, at 149; S.Rep.No.93-1131, 93d Cong., 2d Sess. 17 (1974), U.S.Code Cong. & Admin.News 1974, p. 5843; Cargill, Inc. v. Hardin, supra, 452 F.2d at 1156. Not all FCM's are clearinghouse members; those that are not must deal through one that is. The clearinghouse treats FCM's as principals in trading transactions and demands margin payments from them. The clearinghouse requires FCM's to "mark to the market" at the close of every trading day. Any net gain or loss which the FCM has sustained in the course of the day's trading is computed and margin adjustments are made accordingly. Melamed, supra, 6 Hofstra L.Rev. at 167-68.
 
 
 9
 Generally speaking there are two classes of traders in commodity futures contracts, although, as some of the facts of the instant cases indicate, the distinctions between them are often quite blurred. A "hedger" is a trader with an interest in the cash market for the commodity, who deals in futures contracts as a means of transferring risks he faces in the cash market. See H.R.Rep.No.93-975, supra, at 131, 133, 162. See also the complicated definition of "bona fide hedging transactions and positions" promulgated by the CFTC, 17 C.F.R. § 1.3(z). The owner of a commodity can hedge against declining prices by entering into equivalent short futures contracts for the month when he expects to be able to sell, and a processor (e. g., a miller) can hedge against increasing prices by going long for the month when he will need the commodity. Losses caused by a decline in prices on the cash market in the former case or an advance in the latter will be offset by profits in the futures transactions. See generally H.R.Rep.No.93-975, supra, at 130-34; Cargill, Inc. v. Hardin, supra, 452 F.2d at 1157-58; Note, supra, 73 Yale L.J. at 171-73. The benefits of hedging extend beyond the immediate participants in the transactions. "Because hedging of price risks in a futures market enables a merchant to reduce the exposures he has in doing business, he is able to operate on a lower profit margin with consequent lower prices to the consumer." H.R.Rep.No.93-975, supra, at 132-33; see also S.Rep.No.93-1131, supra, at 18; Valdez, Modernizing the Regulation of the Commodity Futures Markets, 13 Harv.J.Legis. 35, 40 (1975).
 
 
 10
 The system would not function, however, if only hedgers sold and purchased commodity futures contracts.[3] While hedging performs an insurance function, it is actually quite different from insurance. The risks faced by those dealing in the "cash" market, the market for the actual commodity, are not spread among those similarly situated, as with insurance, but rather are shifted to others. Bianco, The Mechanics of Futures Trading: Speculation and Manipulation, 6 Hofstra L.Rev. 27, 32 (1977); Cargill, Inc. v. Hardin, supra, 452 F.2d at 1158. The speculative investor, with no underlying interest in the cash market, is essential to take on the risks which the hedgers want to shift. The critical role of the "speculator" was described at some length in the House Report on the 1974 amendments:
 
 
 11
 The principal role of the speculator in the markets is to take the risks that the hedger is unwilling to accept. The opportunity for profit makes the speculator willing to take those risks. The activity of speculators is essential to the operation of a futures market in that the composite bids and offers of large numbers of individuals tend to broaden a market, thus making possible the execution with minimum price disturbance of the larger trade hedging orders. By increasing the number of bids and offers available at any given price level, the speculator usually helps to minimize price fluctuations rather than to intensify them. Without the trading activity of the speculative fraternity, the liquidity, so badly needed in futures markets, simply would not exist. Trading volume would be restricted materially since, without a host of speculative orders in the trading ring, many larger trade orders at limit prices would simply go unfilled due to the floor broker's inability to find an equally large but opposing hedge order at the same price to complete the match. H.R.Rep.No.93-975, supra, at 138.
 
 
 12
 As commentators have noted, "Congress itself has recognized that the investor-although he is commonly referred to as a speculator in this context-is what makes the commodity futures market work ...." Bromberg & Lowenfels, supra, at § 4.6(462).
 
 
 13
 Indeed, there is no bright-line difference between hedgers and speculators. Hedgers frequently do not merely balance their cash market risks in the futures market but engage in some speculation as well, buying or selling more or less futures contracts based on price expectations. Note, Abuses in the Commodity Markets: The Need for Change in the Regulatory Structure, 63 Geo.L.J. 751, 768-70 (1975); Valdez, supra, 13 Harv.J.Legis. at 64-65. On the other hand, speculators can become involved in the cash market as the activities of the plaintiff Incomco will demonstrate.
 
 
 14
 II. THE ALLEGED FACTS AND THE PROCEEDINGS BELOW
 
 
 15
 The facts alleged in the three complaints here before us are broadly as follows:[4]
 
 
 16
 John Richard Simplot is an Idaho potato entrepreneur who controls J. R. Simplot and Co., Simplot Products Co., Inc., and Simplot Industries, Inc. These corporations are responsible for the processing of approximately 50% of all Idaho potato products processed and sold in the United States. Peter J. Taggares is a Washington potato entrepreneur. He and his company, P. J. Taggares Co., process approximately 30% of all the Washington potatoes processed and sold in this country. Simplot and Taggares are equal partners in the ownership of Simtag Farms, a large farm in the State of Washington for the growing and warehousing of potatoes. Together Simplot, Taggares, and the companies they control are the largest purchasers of potatoes throughout the western potato region of Washington, Idaho and Oregon.
 
 
 17
 According to the complaints, Simplot, Taggares, and the companies controlled by them, together with numerous co-conspirators, embarked in the spring of 1976 on a conspiracy to depress the price of the May 1976 Maine potato futures contract traded on the floor of the New York Mercantile Exchange (the "short conspiracy"). As stated by one of the complaints, "(b)y virtue of their position in the potato processing field and the quantity of potatoes purchased by them, (the conspirators) would be in a position to control the prices paid for potatoes but for the existence of the Exchange and the activity ... in buying and selling potato futures contracts." Simplot had encountered difficulties in the course of his customary negotiations with the Idaho Potato Growers Association (IPGA), because the IPGA believed that the price of potatoes, including Maine potatoes, would be much higher than what Simplot was offering. Futures prices supported this view. A report issued on April 13, 1976 by the United States Department of Agriculture indicated that total potato stocks were down 11%, and that Maine stocks totalled only 7.4 million cwt. compared with 13.0 million cwt. on hand the previous year. An earlier report issued in August 1975 estimated that national potato acreage would be down 8% from the previous year with an even greater drop in Maine. The effect of this latter report, and other generally available information, was to drive the price of the May 1976 Maine contract from $9.75 per cwt. to a record high of $19.15 per cwt. by October 3, 1975. The activities of the short conspirators were designed to counteract the impact of these reports and other market information and rumors tending to raise the price of Maine futures. A decline in the price of potato futures would suggest to those dealing in the cash market, such as the IPGA, that supplies of Maine potatoes would be greater than earlier anticipated, and that prices in spot transactions or negotiations for all potatoes should correspondingly recede.
 
 
 18
 The primary means by which the short conspirators sought to depress the futures price was the accumulation of a large net short position in the May contract. The conspirators allegedly agreed to sell a large number of contracts short and to refuse to liquidate these shorts at a price higher than that agreed among themselves and, if necessary, to default on the obligation to make delivery on all unliquidated contracts. Such short purchases would give the impression of the existence of a large supply of deliverable Maine potatoes and drive down the price of the contract.
 
 
 19
 Simplot made $1 million available to Simtag Farms, which Simtag used to open a credit balance on March 29, 1976, with Pressner Trading Corp., a member of the New York Mercantile Exchange (the Exchange or NYME), for the purpose of buying and maintaining short positions in the May contract. At the same time, Simplot, Taggares and their other companies also began to accumulate a large number of short contracts. The brokers through which the conspirators acquired their positions included Clayton Brokerage Co. of St. Louis, Inc. (Clayton), Heinold Commodities, Inc. (Heinold), and Thomson & McKinnon, Auchincloss, Kohlmeyer, Inc. (Thomson). These three brokerage firms were, like Pressner Trading, clearing members of the Exchange and appropriately registered with the CFTC. The firms allegedly knew, or should have known, that their customers neither intended to nor would be able to cover the large number of short positions the brokers acquired for them.
 
 
 20
 On May 4, 1976, Simplot and Taggares were warned by the CFTC that it was aware of their large short position and that price manipulation was a violation of the Commodity Exchange Act. The telegram concluded that although this "is not an allegation of price manipulation, if prices of the May 1976 potato future ... should become artificial during liquidation due to your action or inaction, we will consider whether you and your firm should be charged with price manipulation under the Commodity Exchange Act." In the face of this warning, and the impending close of trading on May 7, the conspirators not only failed to take steps to liquidate their large short position but actually increased it, again with the help and support of the named brokerage firms. On the last day of trading they consolidated all the short positions they controlled in the hands of Pressner. Clayton, Thomson and Heinold knowingly acquiesced in this consolidation designed to concentrate the force of the manipulation.
 
 
 21
 In addition to the accumulation of a large net short position which they refused to liquidate at higher than an agreed price, the conspirators also allegedly manipulated the futures price by shipping large quantities of unsold Idaho potatoes to the Maine markets for immediate sale at the going price. The use of such so-called "roller cars", railroad cars of potatoes shipped although there is no pre-determined buyer, tends to depress the market price, and thus affect futures prices.
 
 
 22
 Simplot and Taggares were not the only group manipulating the price of the May future. A second group of eastern conspirators thought they could beat the western producers at their own game. Harold Collins and Caspar Mayrsohn are Maine potato merchants and traders in Maine futures. MFX Commodities, Inc., with Donald Silver as its president, is a foreign corporation engaged in business as a FCM. This group learned of the conspiracy of Simplot and Taggares and conspired to squeeze them. Pursuant to this conspiracy (the "long conspiracy"), the "long" group purchased as many contracts as it could, and then at the same time maneuvered to tie up the cash potato market so that the shorts could not make delivery. The longs reasoned that if the shorts had no access to deliverable potatoes, the longs would be able to dictate the price the shorts would have to pay to liquidate their contracts. The main way in which the longs tied up the cash markets was by tying up all of the rail cars of the Bangor & Aroostook Railroad, which alone could deliver potatoes to satisfy May futures contracts. This was done by using the cars for phony export shipments and leaving them loaded or only partially unloaded when they reached appropriate destinations.
 
 
 23
 Neither the longs nor the shorts would give in to the other. The shorts refused to liquidate their position by buying offsetting long contracts at higher than the price agreed among them; the longs refused to come down to the unreasonably low price demanded by the shorts. At the end of trading on May 7, the short conspirators controlled 1893 open short positions. The long conspirators controlled 911 open long positions. There are usually only approximately 200 open contracts at the end of trading on the May potato future.
 
 
 24
 The plaintiffs were caught in the middle between these two competing conspiracies. Neil Leist is a duly licensed member of the Exchange engaged in the business of trading commodities and futures for his own account. Incomco, a partnership, is a duly licensed FCM. Philip Smith is Incomco's managing partner. The class action plaintiffs are traders and dealers representing all persons "who held a net long position in Contracts and who liquidated their long position in said contract between April 13, 1976 and the close of trading on the Exchange on May 7, 1976."
 
 
 25
 On the basis of the same sort of information which motivated Simplot and Taggares to conspire to depress the price of the contract, plaintiffs believed there was an investment opportunity on the long side of the contract. If there was going to be a shortage of deliverable Maine round whites, those committed to deliver potatoes at a set price might well find this price to be under what the potatoes were worth. The shorts would then have to sustain a loss, either by purchasing potatoes in the cash market for the higher price and delivering them for the lower futures contract price, or by purchasing an offsetting long position. The price of the long position should have gone up due to the shortage, so that the shorts would lose the differential in liquidating. The shorts' loss would be the longs' gain, and it is this gain which the plaintiffs sought to realize by their investment.
 
 
 26
 All the plaintiffs invested heavily on the long side of the May contract. In addition, Incomco developed a position in the cash market. It had accepted 1,500,000 pounds of Maine potatoes delivered to it pursuant to the March futures contract, and planned to sell these potatoes to those short the May contract who needed supplies to satisfy their delivery obligations. Anticipating a cash market shortage, Incomco expected to sell its potatoes at a handsome premium.
 
 
 27
 Because of the conspiracies, however, plaintiffs not only did not realize the gains they claim they would have had in an unmanipulated market but suffered losses. The short conspirators continued to accumulate short positions when they should have been trying to liquidate by purchasing long contracts from plaintiffs, and refused to liquidate above a set price. In the face of the unnaturally falling price, the plaintiffs were forced out of the market at a loss. Because the long conspirators had successfully tied up all the freight cars of the Bangor & Aroostook, Incomco was unable to deliver its warehoused potatoes to persons seeking delivery to fulfill short contracts. As the warm weather set in, the 1,500,000 pounds of potatoes became rotten, and Incomco's total investment was lost.
 
 
 28
 The Exchange allegedly figured in this debacle almost from the start. In March, Richard Levine, president of the Exchange, told plaintiff Leist that the Exchange was investigating the large number of open positions in the May contract. On April 28, two members of the CFTC eastern region office, Howard Bodenhamer and Marshall Horn, met with Levine and Howard Gabler, vice-president of the Exchange, to express their concern over the problems developing with the May contract. Levine recognized the problem and expressed the view that Simplot might be trying to create difficulties in the contract. A second meeting took place two days later, at which Bodenhamer told Levine that the Commissioners felt that "the Exchange should take more action than less to bring about orderly liquidations of the maturing futures."
 
 
 29
 Levine did not report these meetings with the CFTC to the Exchange's Board of Governors until after the close of trading on the May contract. Although the Exchange knew, or should have known, of both the short and the long conspiracies, it took no action to prevent manipulation of the market. The Exchange failed to declare an emergency situation pursuant to its rules to facilitate orderly liquidation, and, once trading had closed, failed to take appropriate steps such as permitting delivery by truck or buying potatoes to cover the default of the shorts.
 
 
 30
 The complaint in Leist v. Simplot was filed in the District Court for the Southern District of New York on September 30, 1976. Count I, directed against the short conspirators and their brokers, charged that the activities of the group constituted violations of 7 U.S.C. §§ 1-13 and, more specifically, that the group used and employed manipulative devices and contrivances in violation of 7 U.S.C. § 13, which makes such action a felony, and of rules promulgated by the CFTC. In addition to naming the brokers as conspirators, Count I specifically alleged that they "failed and neglected to enter liquidating orders" for the short conspirators prior to the close of trading "even though they knew that such short positions could not be covered and that there would be a default if the accounts were not closed out", permitted the short sales to be made and cooperated in making such short sales "although they knew or should have known that the sellers did not intend to and would be unable to cover such short positions." Count II of the complaint charged various violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, which are not subject to the present appeal. Count III was directed against the long conspirators, describing the facts outlined above and charging that such conduct violated 7 U.S.C. §§ 1-13. Count IV was directed against the Exchange and its officials. After repeating the earlier general allegations against the short conspirators, the complaint charged that these defendants "negligently failed to maintain an orderly market for trading in Maine Futures in violation of the duties imposed upon them under the provisions of the Act." The Exchange was also charged with failing to report the various violations alleged by the plaintiffs, and with failing to direct the entry of liquidating orders for the account of members with net short positions prior to the close of trading even though the Exchange officials knew or should have known that the sellers would not and could not make delivery if the positions remained open.
 
 
 31
 The complaint in Incomco v. New York Mercantile Exchange was filed in the District Court for the Southern District of New York on June 16, 1976. This complaint was directed at the long conspirators and the Exchange, "acting separately and also in concert with" the long conspirators, for "blocking the availability of railroad cars, thereby creating an artificial and manipulative railroad car shortage" in violation of the Commodity Exchange Act, and against the Exchange for failing to follow its own regulations requiring it to buy in the cash market for the account of delinquent sellers so that outstanding obligations will be fulfilled. As in Leist v. Simplot, plaintiffs also included an antitrust charge.
 
 
 32
 The complaint in National Super Spuds v. New York Mercantile Exchange was filed in the District Court for the Southern District of New York on May 26, 1976. After consolidation with other actions and amendment, this class action complaint charged that the activities of the short sellers described above "violated the applicable provisions of the Commodity Act (and) acted as a manipulative force which artificially lowered the price of the Contract." Count II charged the short sellers with exceeding position and trading limits set by the CFTC in 17 C.F.R. § 150.10. Count IV was directed against the brokers for the short sellers, charging them with violating Exchange Rule §§ 44.02[5] by failing to have liquidating orders placed although they knew or should have known that their customers could not deliver potatoes, permitting their customers to exceed position and trading limits imposed by the Act, and failing to report these and other violations of the Act, regulations, and Exchange rules by their customers of which they knew or should have known. Count V generally charged that the brokers, "with knowledge of intent of short Sellers to deflate the price of the Contract acquiesced and/or participated in the acts of Short Sellers." Count VI was directed at the Exchange, charging that it failed and neglected to report and concealed violations of the Act, regulations, and its own rules; failed and neglected to direct that liquidating orders be entered with respect to members which the Exchange knew or should have known would default; generally failed and neglected to perform its duties as a contract market; and failed and neglected to exercise due care to halt manipulative practices. The three actions, all claiming extensive compensatory and punitive damages, were consolidated.
 
 
 33
 After answers had been filed and extensive discovery had been had, one phase of which has occupied the attention of this court, see National Super Spuds v. New York Mercantile Exchange, 591 F.2d 174 (2 Cir. 1979), three brokers, Clayton, Heinold and Thomson, and the Exchange and Exchange officials moved in the different actions for judgment on the pleadings under Fed.R.Civ.P. 12(c) or, in the alternative, for partial summary judgment under Fed.R.Civ.P. 56(b). Since he believed that all the parties had submitted factual material outside the pleadings, the judge considered the motions under Rule 56(b), although in fact the dispositive reasons so far as concerned the claims under the Commodity Exchange Act, which were all that were raised by the Exchange, the Exchange officials and Thomson, seem to have been wholly ones of law which could have been raised as well when the complaints had been filed two years earlier. In a thoughtful opinion issued on May 29, 1979, 470 F.Supp. 1256, Judge MacMahon held that there was no private right of action for damages under the Commodity Exchange Act, and granted summary judgment in favor of the moving defendants on those counts seeking recovery under that Act.[6] Partial final judgment was entered under Fed.R.Civ.P. 54(b) in favor of the moving defendants, and the plaintiffs took the instant appeal.
 
 
 34
 III. THE HISTORY OF CONGRESSIONAL REGULATION OF COMMODITY
 
 FUTURES TRADING
 
 35
 Although our immediate concern is with the Commodity Exchange Act (CEA) as it now stands, it will be useful at this point to review the long history of Congressional regulation of commodity futures trading.
 
 
 36
 The first effort at such regulation was the Future Trading Act, 42 Stat. 187 (1921). This established the basic pattern of all regulation to follow, concentrating trading on central exchanges subject to the supervision and control of the federal government. The 1921 act levied a tax on all grain futures contracts not traded on a designated contract market. The Secretary of Agriculture was authorized to designate a board of trade as a "contract market" when the board, inter alia, "provides for the prevention of manipulation of prices." § 5(d), 42 Stat. 188. This provision has remained virtually unchanged to the present day, and is one of the provisions upon which plaintiffs seek to base a private right of action against the Exchange. The act also empowered a commission composed of the Secretary of Agriculture, Secretary of Commerce, and the Attorney General to suspend or revoke the designation of any board of trade failing to comply with the conditions of its designation, § 6(a), 42 Stat. 188, and to preclude any person violating the act or attempting to manipulate prices from trading on designated contract markets, § 6(b), 42 Stat. 189. Failure to pay the appropriate tax or keep required records made the violator guilty of a misdemeanor with a fine of up to $10,000 and/or imprisonment for up to one year. § 10, 42 Stat. 191.
 
 
 37
 The Future Trading Act was declared to be an unconstitutional exercise of the taxing power in Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922). It was redrafted immediately and enacted as the Grain Futures Act, 42 Stat. 998 (1922). The offending tax provision was deleted, and Congress, relying now on the commerce power, simply made it unlawful for any person to deal in futures contracts off a designated contract market, § 4, 42 Stat. 999-1000. The other operative provisions of the 1921 act were retained, with the aforementioned penalties now activated by violation of § 4 rather than the failure to pay a tax. A section on purposes was added, § 3, 42 Stat. 999. This section has been carried over virtually unchanged to the present day, see 7 U.S.C. § 5. The 1922 act was declared a constitutional exercise of the commerce power in Board of Trade v. Olsen, 262 U.S. 1, 43 S.Ct. 479, 67 L.Ed. 839 (1923). The 1921 and 1922 acts established the basic pattern of limiting trading to designated exchanges and regulating that trading by controlling designation of and access to the contract markets. The fine and imprisonment scheme for violations was also established.
 
 
 38
 Major additions, rather than revisions, were enacted by the Commodity Exchange Act, 49 Stat. 1491 (1936). Coverage was extended beyond grains to include commodities such as cotton, butter, and eggs. Section 4a was added, empowering the commission of the Secretary of Agriculture, Secretary of Commerce, and Attorney General to fix quantitative limits on speculative trading.[7] Here the short conspirators, with the knowledge of the appellee FCM's, are alleged to have violated limits promulgated pursuant to this section. 17 C.F.R. § 150.10. The 1936 revisions also added § 4b, 49 Stat. 1493, the antifraud provision, essentially in its present form.[8] New section 4d required the registration of FCM's and section 4e of floor brokers, while section 4g provided for the suspension or revocation of these registrations for violation of the Act or rules adopted thereunder. Section 5a added new duties of reporting for contract markets and some substantive obligations as well. Fines and imprisonment sanctions were extended to cover violations of the newly enacted provisions as well as old § 4, and were also applied to anyone attempting to manipulate or manipulating the price of any commodity. 49 Stat. 1501.
 
 
 39
 By 1936, then, the major provisions which assertedly form the bases of the implied right of action against the FCM's, the trading limit, antifraud, and antimanipulation provisions, were already in place. One of the two additional provisions allegedly affording the basis for an action against the Exchange, § 5(d), had been law since 1921 and the other, § 5a(8), would be added in 1968.
 
 
 40
 The 1968 amendments, 82 Stat. 26, extended regulation to new commodities such as live cattle and pork bellies. The amendments added § 5a(8), as noted above, requiring a contract market to enforce all of its rules not disapproved by the Secretary of Agriculture.[9] Corresponding § 8a(7) was added empowering the Secretary to disapprove rules which violate or will violate the act or regulations. The penalty provision was altered somewhat, making FCM embezzlement and price manipulation felonies instead of misdemeanors, with a maximum prison term of five years instead of one. 82 Stat. 33-34. Section 6b was added, granting the Secretary the power to issue cease and desist orders against a contract market not enforcing its rules or violating the act. 82 Stat. 31-32.
 
 
 41
 In contrast to the limited scope of the 1968 amendments, the 1974 amendments, 88 Stat. 1389 (1974), constituted a complete overhaul of the Act. They broadened its coverage from the agricultural commodities with which it had historically been concerned to include "all other goods and articles ... and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in", subject to certain exceptions designed primarily to exclude securities. Consistently with this expansion in coverage, enforcement was transferred from the Department of Agriculture to a newly constituted Commodity Futures Trading Commission (CFTC). However, the amendments did not substantially alter any of the provisions which assertedly form the bases of an implied right of action. The antifraud and trading limits sections were basically unchanged. Maximum fines were increased from $10,000 to $100,000 in the penalty section.[10] Section 5(d), requiring a contract market as a condition of designation, to prevent manipulation and cornering, remained unchanged, and § 5a(8) was altered so that exchanges were required to enforce their rules approved by the CFTC rather than those rules not disapproved by the Secretary.
 
 
 42
 The 1974 amendments required contract markets to provide arbitration procedures for settlement of customer grievances and claims not exceeding $15,000, § 5a(11). The CFTC was vested with power to compel exchanges to adopt additional rules, § 8a(7), and to bring actions to enjoin violations of the Act and compel compliance through writs of mandamus, § 6c. Finally, the reparations procedure in § 14 was established, of which more hereafter.
 
 
 43
 The history of congressional concern with commodity futures trading has thus been one of steady expansion in coverage and strengthening of regulation. In 1936, 1968, and 1974 new commodities came under the CEA. In each of these years the power of the regulatory authority were augmented, and penalties were either extended, increased, or both. The question of Congressional intent with respect to private sanctions under the Act must be considered against this background of increasingly strong regulation designed to insure the existence of fair and orderly markets.
 
 
 44
 IV. PRIVATE CAUSES OF ACTION UNDER THE COMMODITY EXCHANGE
 
 ACT PRIOR TO THE 1974 AMENDMENT
 
 45
 During the late 1940's, the 1950's, the 1960's and the early 1970's there was widespread, indeed almost general, recognition of implied causes of action for damages under many provisions of the Securities Exchange Act, including not only the antifraud provisions, §§ 10 and 15(c)(1), see Kardon v. National Gypsum Co., 69 F.Supp. 512, 513-14 (E.D.Pa.1946); Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 (2 Cir. 1951) (Frank, J.); Fratt v. Robinson, 203 F.2d 627, 631-33 (9 Cir. 1953), but many others. These included the provision, § 6(a)(1), requiring securities exchanges to enforce compliance with the Act and any rule or regulation made thereunder, see Baird v. Franklin, 141 F.2d 238, 239, 240, 244-45 (2 Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944),[11] and provisions governing the solicitation of proxies, see J. I. Case Co. v. Borak, 377 U.S. 426, 431-35, 84 S.Ct. 1555, 1559-61, 12 L.Ed.2d 423 (1964). The Baird case is of special importance since the claim was of failure of the New York Stock Exchange to perform its duties-a claim paralleling that asserted here against NYME. Writing in 1961, Professor Loss remarked with respect to violations of the antifraud provisions that with one exception "not a single judge has expressed himself to the contrary." 3 Securities Regulation 1763-64. See also Bromberg & Lowenfels, supra, § 2.2 (462) (describing 1946-1974 as the "expansion era" in implied causes of action under the securities laws). When damage actions for violation of § 10(b) and Rule 10b-5 reached the Supreme Court, the existence of an implied cause of action was not deemed worthy of extended discussion. Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).[12] Implied private causes of action under other statutes administered by the SEC were also widely recognized, see, e. g., Goldstein v. Groesbeck, 142 F.2d 422, 426-27 (2 Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590 (1944) (Public Utility Holding Company Act); Cogan v. Johnston, 162 F.Supp. 907 (S.D.N.Y.1958); Schwartz v. Bowman, 156 F.Supp. 361 (S.D.N.Y.1957), appeal dismissed but holding on this point approved, Schwartz v. Eaton, 264 F.2d 195, 197-98 & n.5 (2 Cir. 1959); Brown v. Bullock, 194 F.Supp. 207, 220-21 (S.D.N.Y.), aff'd, with appellant conceding this point, 294 F.2d 415, 418 (2 Cir. 1961) (Investment Company Act);[13] see also Caplin v. Marine Midland Grace Trust Co., 439 F.2d 118, 123 n.5 (2 Cir. 1971) (dictum), aff'd, 406 U.S. 416, 426 n.17, 92 S.Ct. 1678, 1684 n.17, 32 L.Ed.2d 195 (1972) (Trust Indenture Act). These statutes contained a panoply of other remedies-enforcement by the SEC, suspension, civil fines, criminal penalties, and some express private actions-which, with the exception of the administrative reparations remedy against one type of violator, were every bit as or more extensive than those in the CEA, but arguments that such provisions negated an implied private cause of action were regularly and firmly rejected, see, e. g., Judge Clark's much cited opinion in Baird v. Franklin, supra, 141 F.2d at 244-45; Goldstein v. Groesbeck, supra, 142 F.2d at 426-27; Fratt v. Robinson, supra, 203 F.2d at 632; Dann v. Studebaker-Packard Corp., 288 F.2d 201, 208-09 (6 Cir. 1961). The question here is not whether all these decisions were wrong in the light of Supreme Court opinions of the past four years, as the dissent necessarily implies, but whether the 1974 Congress was not justified in assuming they would be followed with respect to the CEA.
 
 
 46
 Neither the generality and near unanimity of such interpretations of statutes regulating unfair securities practices, for which the CEA was the analogue with respect to futures trading,[14] nor similar decisions in other fields, e. g., Reitmeister v. Reitmeister, 162 F.2d 691 (2 Cir. 1947) (action for damages implied from statute making interception of telephone calls a crime) (L. Hand, J.); Fitzgerald v. Pan American World Airways, 229 F.2d 499 (2 Cir. 1956) (action for damages implied from anti-discrimination provision of Civil Aeronautics Act although express remedies were complaint to CAB and criminal sanctions), were at all novel. They rested on principles recognized in a line of Supreme Court decisions going back to Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916). Rigsby sustained the right of a switchman to recover damages for violation of the Federal Safety Appliance Acts although the only express sanctions were penal. The Court there stated:
 
 
 47
 A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover damages from the party in default is implied according to a doctrine of the common law expressed in 1 Com. Dig., tit. Action upon Statute (F), in these words: "So, in every case, where a statute enacts, or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of a wrong done to him contrary to the said law." (Per Holt, C. J., Anon., 6 Mod. 26, 27.) 241 U.S. at 39, 36 S.Ct. at 484.
 
 
 48
 Following Rigsby the Supreme Court recognized implied causes of action on numerous occasions, see, e. g., Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967) (sustaining implied cause of action by United States for damages under Rivers and Harbors Act for removing negligently sunk vessel despite express remedies of in rem action and criminal penalties); United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960) (sustaining implied cause of action by United States for an injunction under the Rivers and Harbors Act); Tunstall v. Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944) (sustaining implied cause of action by union member against union for discrimination among members despite existence of Board of Mediation); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 336 (1969) (sustaining implied private cause of action under 42 U.S.C. § 1982); Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (sustaining implied private cause of action under § 5 of the Voting Rights Act despite the existence of a complex regulatory scheme and explicit rights of action in the Attorney General); and, of course, the aforementioned decisions under the securities laws. As the Supreme Court itself has recognized, the period of the 1960's and early 1970's was one in which the "Court had consistently found implied remedies." Cannon v. University of Chicago, 441 U.S. 677, 698, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560 (1979); id. at 718, 99 S.Ct. at 1968 (Rehnquist, J., concurring) ("Cases such as J. I. Case Co. v. Borak ... and numerous cases from other federal courts, gave Congress good reason to think that the federal judiciary would undertake this task"). See generally Note, Implying Civil Remedies from Federal Regulatory Statutes, 77 Harv.L.Rev. 285 (1963).
 
 
 49
 Given so many cases implying private rights of action under a broad range of statutes, both cognate (as in the instance of the securities legislation) and otherwise, supported by a goodly number of Supreme Court decisions and the reasoning behind them,[15] it was scarcely surprising that the courts that considered the question prior to the 1974 amendments unanimously upheld the implication of a private cause of action under the CEA. Indeed in the climate then prevailing it would have been almost unthinkable for the lower courts to have held that administrative and penal remedies were adequate for the enforcement of private claims for economic loss caused by violation of this important effort by Congress to regulate the commodity futures markets. And they did not. The first reported case, frequently cited in later decisions, was Goodman v. H. Hentz & Co., 265 F.Supp. 440 (N.D.Ill.1967).[16] The unbroken line of decisions upholding a private right of action under pre-1974 law includes cases from all of the major centers of activity in the commodity futures field. Anderson v. Francis I. duPont & Co., 291 F.Supp. 705, 710 (D.Minn.1968); Hecht v. Harris, Upham & Co., 283 F.Supp. 417, 437 (N.D.Cal.1968), modified, 430 F.2d 1202 (9 Cir. 1970); United Egg Producers v. Bauer International Corp., 311 F.Supp. 1375, 1384 (S.D.N.Y.1970); Booth v. Peavey Company Commodity Services, 430 F.2d 132, 133 (8 Cir. 1970); McCurnin v. Kohlmeyer & Co., 340 F.Supp. 1338, 1343 (E.D.La.1972), aff'd, 477 F.2d 113 (5 Cir. 1973); Gould v. Barnes Brokerage Co., Inc., 345 F.Supp. 294, 295 (N.D.Tex.1972); Johnson v. Arthur Epsey, Shearson, Hamill & Co., 341 F.Supp. 764, 766 (S.D.N.Y.1972); Arnold v. Bache & Co., 377 F.Supp. 61, 65 (M.D.Pa.1973); Deaktor v. L. D. Schreiber & Co., 479 F.2d 529, 534 (7 Cir.), rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973) (per curiam); Seligson v. New York Produce Exchange, 378 F.Supp. 1076, 1084 (S.D.N.Y.1974), aff'd sub nom. Miller v. New York Produce Exchange, 550 F.2d 762 (2 Cir.), cert. denied, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).
 
 
 50
 It is true that most of these cases concerned fraud by a broker against his customers or churning of a customer's account, which was clearly within § 4b of the Act, but none stressed the broker-customer relation as either the basis or the limit of liability. And several did not involve fraud practiced by a broker on his customers. The most important of these is Deaktor v. L. D. Schreiber & Co., 479 F.2d 529 (7 Cir.), rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973). Two cases were before the court. Plaintiffs in the first case sued the Exchange and various members alleging that the defendants manipulated the futures market for frozen pork bellies, a violation of CEA § 9(b), 7 U.S.C. § 13(b), artificially raising the price and thereby injuring those who, like the Deaktor plaintiffs, had sold short and were forced to liquidate their positions at higher prices (the converse of the situation of the plaintiffs in our case). The Exchange was also charged with violating CEA § 5a(8), 7 U.S.C. § 7a(8), the provision requiring an exchange to "enforce all bylaws, rules, regulations, and resolutions". Plaintiffs in the second case charged the Exchange with monopolizing trading in the fresh egg futures market, causing the price to fall and forcing plaintiffs to sell at artificially depressed prices. This conduct was alleged to violate the notice and hearing provisions in Rule 217(D) of the Exchange, CEA §§ 5a(8) and 9(b) (the criminal penalty provision for manipulation), 7 U.S.C. §§ 7a(8), 13(b), and the Sherman Act. The case reached the Seventh Circuit on denials of motions by the Exchange and other defendants to stay district court action pending the exercise of primary jurisdiction by the Commodity Exchange Commission. Having declined to defer to the primary jurisdiction of the Commission, the court reached the question whether private damage actions were allowable under the CEA. Citing numerous cases, the Deaktor court stated that "courts which have considered the question ... have apparently uniformly concluded that such an action exists." Id. at 534. The court noted that the purpose of the Act was, in the language of the congressional reports, "to insure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers and the exchanges themselves." The court further noted that § 9(b) of the Act made it a felony to manipulate prices, and concluded that in light of this provision and the general purpose of the Act, "we think the enactment is at least in part intended to protect the interests of the plaintiffs-traders in these actions," and therefore held that plaintiffs had a cause of action. Id. Thus, immediately before consideration of the 1974 amendments began, and only one year prior to their enactment by the Congress, the Court of Appeals with jurisdiction over the center where approximately 80% of all futures contracts were traded in the United States had clearly held that a private cause of action existed under the CEA-not simply for fraud by a broker on his customer but for manipulation as well. The notion, strongly emphasized by the dissent, that such a decision escaped the knowledge of those framing the amendments, seriously underrates the expertise of our lawmakers and their staffs in subjects of particular concern to them.
 
 
 51
 Far from undermining the Seventh Circuit's recognition of an implied cause of action, the Supreme Court's reversal, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973) (per curiam), on the ground that the court should have deferred to the primary jurisdiction of the Commission implicitly affirmed this recognition. Noting that " 'Congress has established a specialized agency that would determine either that a ... rule of the Exchange has been violated or that it has been followed ...' ", the Court emphasized that " 'Either judgment would require determination of facts and the interpretation and application of the Act and Exchange rules ...' " and that " 'either determination will be of great help to the ... court ....' " Id. at 115, 94 S.Ct. at 467, quoting Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 307, 93 S.Ct. 573, 583, 34 L.Ed.2d 525 (1973). Thus the Court's reason for insisting on a determination by the Commission "in the first instance", 414 U.S. at 116, 94 S.Ct. at 467, was that it would assist a court in hearing plaintiff's claims "in the second instance". The Court did not "decline to reach the issue" whether plaintiffs' claims were cognizable in federal court, as the dissent asserts (p. 343); it simply assumed that they were, as the Seventh Circuit had held.16a
 
 
 52
 Other cases upholding an implied cause of action outside the broker-customer relationship were United Egg Producers v. Bauer International Corp., supra, 311 F.Supp. 1375, which recognized an implied cause of action under § 9(b) on behalf of various egg producers against an import-export firm, and Seligson v. New York Produce Exchange, supra, 378 F.Supp. 1076. Seligson arose out of the much-publicized "Salad Oil Swindle", and recognized an implied cause of action on behalf of the trustee in bankruptcy of a brokerage firm against the exchange, exchange officials, and the clearinghouse.[17]
 
 
 53
 While cases based on pre-1974 facts decided after the 1974 amendment, apparently under pre-1974 law, are of less pertinence since the 1974 Congress could not have known of the decisions,[18] they deserve mention as indicative of the uncontradicted view of the law prevailing when Congress acted. In Case & Co., Inc. v. Board of Trade, 523 F.2d 355 (7 Cir. 1975) (Cummings, Stevens, and Tone, JJ.), plaintiff sued the Board and its governors for violating §§ 5a(1) and 5a(8) of the CEA in suspending trading limits on soybean futures. The court began its discussion of liability by stating that "(i)t is undisputed that a private cause of action may be maintained under the Commodity Exchange Act. See Deaktor ...." Id. at 360. In Hirk v. Agri-Research Council, Inc., 561 F.2d 96, 103 n.8 (7 Cir. 1977), the same court flatly stated that "(p)rivate damage actions are allowable under the CEA. See, e. g., Deaktor ...." See also Bartley v. P. G. Commodities Associates, Inc., CCH Com.Fut.L.Rep. P 20,123 (1975-77 Transfer Binder) (S.D.N.Y.1975) (churning complaint under § 4b).
 
 
 54
 We see no need to burden this opinion with detailed examination of district court decisions concerning whether the 1974 amendments eliminated the private cause of action theretofore unanimously recognized. The courts have divided although the weight of authority is in favor of continued implication.[19] As noted, the only court of appeals to have considered the issue has held that a private cause of action should be implied. Curran v. Merrill Lynch, note 1 supra.
 
 
 55
 V. THE CONTINUED EXISTENCE OF THE PRIVATE CAUSE OF ACTION
 
 
 56
 In deciding the issue here before us, we follow the analysis set forth in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).[20]
 
 
 57
 There is, however, one differentiating factor of such transcendent importance as to demand mention at the outset. As shown in Part IV of this opinion the decisions prior to the 1974 amendments had uniformly upheld the existence of a private cause of action under the provisions of the Commodity Exchange Act, and as will be shown in this part, the 1974 Congress was well aware of the existing state of the law. Even without more, the question thus would not be whether Congress intended to create a new private right of action in 1974, but rather whether it intended sub silentio to alter the significance that had long been given these provisions by making other changes in the Act. Beyond this, however, we do not need to assume, as the Court stated would be "appropriate" in upholding a private cause of action in Cannon v. University of Chicago, 441 U.S. 677, 696-97, 99 S.Ct. 1946, 1957, 60 L.Ed.2d 560 (1979), "that our elected representatives, like other citizens, know the law" or to "presume" that they "were aware of the prior interpretation" of a related statute. See Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 869, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute"). Here the existence of an implied right of action under the Commodity Exchange Act as it stood in 1974 was repeatedly called to the attention of and implicitly approved by Congress. This alone sufficiently answers appellees' claim that if the 1974 Congress wished to create a private cause of action, it would and should have said so and that it is implausible to suppose that "Congress absentmindedly forgot to mention an intended private action." Cannon, supra, 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J., dissenting). Whether rightly or wrongly in light of recent Supreme Court jurisprudence, the courts had read a private cause of action into the statute, just as they had done with statutes of similar import in related fields, and Congress knew that they had done so. The burden thus lies on those who urge that the 1974 amendments demonstrate an intention to change prior law, or, paraphrasing the language from Mr. Justice Powell's Cannon dissent, supra, that, in making the changes that it did, Congress "absentmindedly forgot" to repeal the private cause of action. The silence of the 1974 Congress with respect to private causes of action for violations of the CEA, on which the dissent leans so heavily, is no more significant than the similar silence of the 1975 Congress which extensively amended the Securities Exchange Act, 89 Stat. 97. When a principle has become settled through court decisions, there is no occasion for Congress to speak unless it wishes a change.[21]
 
 
 58
 1. Taking the first of the Cort factors, we have no difficulty in concluding, despite appellees' claims to the contrary, that the plaintiffs were among "the class for whose especial benefit the statute was enacted," a phrase going back to Texas & Pacific R. Co. v. Rigsby, supra, 241 U.S. at 39, 36 S.Ct. at 484. Although Congressional committees and sponsors of the ill-fated 1921 legislation devoted most of their eloquence to injuries suffered by producers at the hands of wicked speculators, the Senate Report on the 1922 Act recognized that:
 
 
 59
 Transactions in grain futures are utilized by the public for speculation and by the grain trade for the purpose of eliminating or reducing, as far as practicable, the hazards in the merchandising of grain and its products and by-products due to price fluctuations. Public speculation helps to carry the risk for the producers, dealers, and millers who wish to hedge their cash grain transactions. S.Rep. No. 871, 67th Cong., 2d Sess. 3 (1922).
 
 
 60
 It is true that much of the debate on the floor of the House consisted of vituperative attacks on those "gambling" in the grain trade to the detriment of the producers and the consumer. However, these attacks were generally directed at big speculators, i. e., those in a position to manipulate the market, and there was always the recognition that "legitimate trade" was acceptable and indeed beneficial.[22] The emphasis on producers in § 3, the statement of purposes in the 1922 Act, was due to a desire to state a basis clearly within then existing notions of the commerce power rather than to risk invalidation by including classes whom the Supreme Court might not think to come within it; Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), then lay twenty years in the future.[23] At that time, moreover, the importance of the speculator in the efficient functioning of the futures market had not yet been so fully recognized by Congress as it has now become.
 
 
 61
 It is plain in any event that by the time of the 1936 amendments, as was later to be stated in the House Report on the 1978 amendments, "the community protected under federal commodities law was expanded to include speculators." H.R.Rep.No.95-1181, 95th Cong., 2d Sess. 84 (1978). As described in the 1935 House Report, "The fundamental purpose of the measure is to insure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers and the exchanges themselves." H.R.Rep.No.421, 74th Cong., 1st Sess. 1 (1935). "Fair practice and honest dealing" are, of course, beneficial not only to farmers but also to legitimate speculators using the market. The concern expressed in the last clause of the quotation, to avoid injury to "the exchanges themselves", certainly encompassed protection for those using the exchanges. This was made clear in a later passage from the same report: "(The bill) simply provides for honesty in the conduct of what are important public markets. This affects vitally the interests of the people, whether they be producers or consumers of the commodities covered by the bill or whether they belong to that class of citizens who have a fondness, and perhaps some aptitude for speculative investment in commodities and who like to test their judgment concerning values and price trends by occasional and moderate speculation therein." Id. at 2-3. While the debates in Congress, like those in 1922, did contain many attacks on speculative investors, again there was a recognition of the necessary role of speculators, and the focus of the attacks was on the big manipulator, whose activity was perceived to be detrimental not only to producers and consumers but also to those referred to as "legitimate" traders and dealers.[24] The clearest indication of Congress' concern to regulate the large-scale market operator is, of course, the authorization of trading limits in § 4a.
 
 
 62
 The legislative history of the 1968 amendments continued the recognition of the critical role played by speculative investors and the attack on big or powerful manipulators rather than speculators in general. Both the House and Senate reports explicitly recognized that most futures trading was done by speculators. H.R.Rep.No.743, 90th Cong., 1st Sess. 2 (1967); S.Rep.No.947, 90th Cong., 2d Sess. (1968), reprinted in 2 U.S.Code Cong. & Admin.News, pp. 1673, 1675 (1968). The House Report noted that such speculative activity carried with it "the danger that on occasion powerful traders will attempt to influence prices," H.R.Rep.No.743, supra, at 2, but also recognized the necessary role of the legitimate speculator: "This speculative activity provides a means of reducing price risks by persons handling the actual commodity and thus makes possible higher prices to producers and lower prices to consumers." Id.
 
 
 63
 Finally, and most important, the concern to protect the speculator as well as the hedger was clearly evident in the enactment of the 1974 amendments. The House Report noted the large influx of speculators into the commodity futures market as one of the "specific situations mandat(ing) a comprehensive rewrite of futures trading regulation". H.R.Rep.No.93-975, supra, at 39. The beneficial, indeed indispensable, role of such speculators was recognized not only in the House Report, in the language quoted in Part I of this opinion, id. at 138, but also in the debate on the floor of the House. Introducing the bill, Chairman Poage of the Committee on Agriculture observed that speculators "provide a very real service to the market and its users, by providing liquidity." 119 Cong.Rec. 41332 (Dec. 13, 1973). Representative Wampler, the ranking minority member of the House Committee and a supporter of the bill, stated that:
 
 
 64
 While the speculator has been much maligned to the point where critics of the present marketing system have tried to make "speculator" a dirty word, we must not forget that the speculator performs an important economic function in futures markets. He is, in effect, the risk bearer who assumes the risks which the hedger seeks to avoid. 120 Cong.Rec. 10739 (April 11, 1974).
 
 
 65
 The debates reveal that one problem prompting the amendments was the catastrophic losses suffered by futures traders, mostly "speculators", who were dealing in commodities not regulated by the old act. See 119 Cong.Rec. 41332 (Dec. 13, 1973) (Remarks of Chairman Poage). In extending regulation to previously unregulated futures markets, the House Report specifically stated that "(t)here is no reason why a person trading in one of the currently unregulated futures markets should not receive the same protection afforded to those trading in the currently regulated markets." H.R.Rep. No. 93-975, supra, at 76. In other words, the old act protected those trading in the markets-not merely producers or consumers of the commodity-and the new act would extend this protection of traders to new markets in which even fewer of the traders produced or consumed the actual commodity.
 
 
 66
 Senate consideration of the 1974 amendments reinforced the views evident in the House. The Senate Report opened with a quotation from Justice Holmes, Board of Trade v. Christie Grain & Stock Co., 198 U.S. 236, 247-48, 25 S.Ct. 637, 648-649, 49 L.Ed. 1031 (1905), recognizing the virtues of speculation:
 
 
 67
 People will endeavor to forecast the future and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophes, equalizing prices and providing for periods of want. S.Rep.No.93-1131, supra, at iii.
 
 
 68
 Like the House Report, the Senate Report recognized the role of "the competitive effect of many speculative buyers and sellers in the market" in reducing merchandising price margins. Id. at 12, U.S.Code Cong. & Admin.News, 974 at 5854. The Senate changed the House bill to provide for an independent CFTC, rather than one under the USDA, since it was concerned that the USDA's historic role as the spokesman for farm interests might affect its policing of commodity markets. See id. at 21-22. This clearly evinces a concern to protect those trading on the commodity futures markets, and not simply agricultural producers. Accord, 120 Cong.Rec. 30467 (Sept. 6, 1974) (Remarks of Sen. Taft). Senator Dole considered the purpose of the 1974 amendments to be "to protect any individual who desires to participate in futures market trading," id. at 30466, and Chairman Talmadge of the Senate Committee on Agriculture and Forestry wrote that "all of the members of the committee who worked on this legislation had one goal in mind-to develop a strong, but fair regulatory scheme that will protect investors, businessmen and consumers." 120 Cong.Rec. 34996 (Oct. 10, 1974) (emphasis supplied).
 
 
 69
 It is true, of course, that the CEA was enacted for the benefit of the entire public, as hopefully most regulatory legislation is. But, as is the case with respect to all such legislation, criminal as well as civil, some classes are more in need of protection than others. It is almost self-evident that legislation regulating future trading was for the "especial benefit" of futures traders.[25] Hence it is not surprising that the courts have thus been nearly unanimous in concluding that "speculators", now long recognized to be legitimate investors, as well as hedgers, are within the class for whose especial benefit the CEA was enacted, see especially Smith v. Groover, 468 F.Supp. at 113; Gravois v. Fairchild, Arabatzis, et al., supra, CCH Com.Fut.L.Rep. P 20,706. Indeed, even those courts finding no implied right of action under the Act as amended in 1974, including the district court in this case, 470 F.Supp. at 1259, have generally concluded that the first prong of the Cort test was satisfied. See, e. g., Berman v. Bache, Halsey, Stuart, Shields, Inc., supra 467 F.Supp. at 322 ("little question"); cf. Fischer v. Rosenthal & Co., supra (assuming arguendo that plaintiff met the first Cort test, "as indeed he may"). More importantly, this court itself is on record to that effect. In Ames v. Merrill Lynch, Pierce, Fenner & Smith, supra, 567 F.2d 1174, where we refused to grant a stay of plaintiff's private damage action and compel arbitration, the parties having agreed that an implied cause of action existed under the Act, Judge Gurfein wrote that "(w)e have no doubt that the Act itself, enacted as it was for the protection of investors, prohibited a surrender of private remedies through an agreement to arbitrate which was not voluntary in the sense that the penalty for refusal was exclusion from the market." Id. at 1179 (emphasis supplied).[26] See also Silverman v. CFTC, 562 F.2d 432, 438 (7 Cir. 1977) ("We must be mindful of a Congressional purpose, clearly evidenced at least since 1933, to protect the American investing and speculating public not only from fraud and fraudulent practices, but from those whose past actions indicate that they might be tempted to engage in such practices") (quoting Moore, J., in Savage v. CFTC, 548 F.2d 192, 197 (7 Cir. 1977).[27]
 
 
 70
 2. We turn now to the second and evidently the most important, see Touche Ross & Co. v. Redington, supra, 442 U.S. at 575, 99 S.Ct. at 2489, of the Cort factors, "is there any indication of legislative intent, explicit or implicit, either to create such a (private) remedy or to deny one?" 422 U.S. at 78, 95 S.Ct. at 2088. This inquiry requires an intensive examination of the legislative history of the 1974 amendments. We conduct this, of course, with full awareness of the cautions in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 204 n.24, 96 S.Ct. 1375, 1386 n.24, 47 L.Ed.2d 668 (1976) and Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 31-32, 97 S.Ct. 926, 944, 51 L.Ed.2d 124 (1977), against the dangers of undue reliance on "passing references" by others than the Congressional committees or sponsors or on general statements not directly relevant to the issue at hand.
 
 
 71
 In our view the legislative history amply demonstrates the 1974 Congress' awareness of the uniform judicial recognition of private rights of action under the Commodity Exchange Act and a desire to preserve them. We are not, as the dissent suggests, "presuming" that Congress was aware of these decisions; the evidence of its awareness is overwhelming.
 
 
 72
 We begin with the House Report. This noted that when exchange self-regulation first developed, "(V)ery little thought was probably given to whether the failure to meet (stated) ideals would expose the exchanges to legal liability ...." H.R.Rep.No.93-975, supra, at 45. The report stated that this view began to change early in the 1920's. "Perhaps the adoption of federal regulatory legislation spurred this total reorientation of the relationship between exchanges and the public. Slowly, the courts began to look upon exchange regulation as a guarantee to the public that its members would not violate its code of conduct." Id. In 1968, the report continued, amendments to the CEA required exchanges to enforce their rules, § 5a(8). The existence of private rights of action was thought to have had a perverse effect on the effectiveness of this legislation which the report explicitly noted:
 
 
 73
 In the few years this provision has been in the present Commodity Exchange Act, there is growing evidence to indicate that, as opposed to strengthening the self-regulatory concept in present law, such a provision, coupled with only limited federal authority to require the exchanges to make and issue rules appropriate to enforcement of the Act-may have actually have worked to weaken it. With inadequate enforcement personnel the Committee was informed that attorneys to several boards of trade have been advising the boards to reduce -not expand exchange regulations designed to insure fair trading, since there is a growing body of opinion that failure to enforce the exchange rules is a violation of the Act which will support suits by private litigants. (emphasis in original).
 
 
 74
 Later in the Report the Committee noted that one of the specific problems "brought to (its) attention" was the:
 
 
 75
 Growing difficulties facing exchanges in self-regulatory actions as a result of private plaintiffs seeking damages against the markets. As examples, exchanges are sued for actions taken in emergency situations even when the action has been taken at the request (or order) of the CEA. Id. at 48 (emphasis supplied).
 
 
 76
 Nothing in the report, however, indicated dissatisfaction with the private right of action; the objective was to deal with the attendant reduction in exchange rulemaking. This was to be accomplished by empowering the CFTC to require exchanges to adopt rules, § 8a(7).[28]
 
 
 77
 The existence of an implied private right of action was also clearly revealed to Congress in the debate on what became the 1974 amendments. Introducing the bill, Chairman Poage used the language quoted above, which eventually appeared in the House Report, about the change in the legal posture of exchange self-regulation. He then remarked that "when the Commodity Exchange Act was enacted, courts implied a private remedy for individual litigants in the Commodity Exchange Act." 119 Cong.Rec. 41333 (Dec. 13, 1973).28a He went on to note, as would the House report, that as "the judgment of the board of directors of many of the exchanges in implementing decisions under self-regulatory functions is becoming increasingly a justiciable issue," attorneys were advising exchanges to prune out rules they might not be able to enforce in order to avoid the threat of liability in private actions. This threat was described as providing the exchanges with a "solid reason" for retrenching on self-regulatory efforts. Id. At the outset of consideration by the whole House, then, the legislators were informed by the Chairman of the Committee considering the bill that private rights of action were implied under the Act.[29] This was not a mere passing reference, but a critical statement of fact that was a necessary step in explaining why new legislation was needed. The 1974 amendments signaled a dramatic shift from the theory of exchange self-regulation to authorization of the CFTC to compel the exchanges to alter or adopt rules, § 8a(7), and the proponents of the amendments were at pains to explain the need for such a shift. This explanation centered on the existence of an implied private right of action. Amendments were required to force exchanges to adopt beneficial rules because the threat of the judicially implied private right of action had led them to shirk this responsibility. Congress could not have understood why it was changing the underlying theory from exchange self-regulation to compulsory regulation without recognizing that the private rights of action that had been judicially implied under the Act demanded this change. It opted to cure the problem that had developed not by abolishing the private right of action but by empowering the CFTC to require the exchanges to adopt appropriate rules. No amount of labored parsing can obscure the self-evident truth that Congress knew the courts were implying private rights of action and did nothing to alter this. It matters little whether this be called recognition or approval.
 
 
 78
 The House hearings are replete with references to the maintenance of private causes of action under the Act. A representative of various New York commodity exchanges informed the House Committee on Agriculture that the Chicago Board of Trade was at that very moment the target of a $200 million class action,[30] and urged Congress to "take steps to insure that federally regulated exchanges are not exposed to this sort of astronomical civil liability suits ...", Hearings on Review of Commodity Exchange Act and Discussion of Possible Changes Before the House Committee on Agriculture, 93d Cong., 1st Sess. 121 (1973), something which Congress did not do. Another exchange representative and FCM, discussing the arbitration procedures to be required of contract markets, told the House Committee that "In addition to these arbitration procedures, complainants of course have access to the courts." Hearings on H.R. 11955 Before the House Committee on Agriculture, 93d Cong., 2d Sess. 249 (1974) (emphasis supplied). A letter sent in the course of the just-cited hearings from Continental Grain Co. indicates that the cases cited in Part IV of this opinion may well have been only the tip of the iceberg-the cases where the private cause of action was challenged and was sustained in a published opinion. The letter calls to the committee's attention "one recent class action settlement proceeding in court" which required the mailing of 339,000 legal notices and resulted in legal fee claims of over $2,250,000. Id. at 321. The letter advocated requiring complainants to choose between arbitration or settlement procedures and resort to courts "which have already held they have jurisdiction over private complaints based on violations of the present law." Id.
 
 
 79
 The existence of a private right of action also was repeatedly indicated during the Senate hearings on the four bills to amend the CEA. Hearings on S. 2485, S. 2578, S. 2837, and H.R. 13113 Before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess. (1974). Senator Clark and a commodities law expert, Professor Schotland of Georgetown University, expressed the view that private actions were available under the Act, id. at 205, 737, 746. A representative of the Minneapolis Grain Exchange objected to the settlement procedure contemplated for contract markets because the claims which exchanges would be required to adjudicate were not limited by any dollar amount and wished these to be confined to cases where the smallness of the claim entailed an "economic impediment to Court litigation." Id. at 415. Such a limit appeared in the bill as enacted, § 5a(11)(ii). The President of the Kansas City Board of Trade urged the Senators to protect exchanges "from unnecessary and costly defenses of lawsuits" brought under the Act. Id. at 317. He had made the same request before the House, with similar lack of success. Hearings on H.R. 11955, supra, at 123.[31] We shall have more to say about Congress' awareness of the private cause of action and its desire to preserve it when we come to discuss the provision preserving the jurisdiction of the courts. However, what we have developed up to this point is alone sufficient to invoke "the well-recognized canon of construction that the reenactment of a statute incorporates preceding judicial interpretations", Van Vranken v. Helvering, 115 F.2d 709, 710 (2 Cir. 1940) (L. Hand, J.), cert. denied, 313 U.S. 585, 61 S.Ct. 1095, 85 L.Ed. 1540 (1941)-a canon which, as shown by the Van Vranken case, is not limited to interpretations by the Supreme Court. See Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 14, 59 S.Ct. 675, 684, 83 L.Ed. 1071 (1930); Lorillard v. Pons, 434 U.S. 575, 580-81, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978); Bennett v. Panama Canal Co., 475 F.2d 1280, 1282 (D.C.Cir.1973) (Wyzanski, J.) ("the almost irrebuttable presumption which followed from reenactment with knowledge (of the Fifth Circuit's interpretation of "may" as permissive)"). This canon applies with particular force to the instant case, where the 1974 amendments constituted "the first complete overhaul of the Commodity Exchange Act since its inception," H.R.Rep. No. 93-975, supra, at 1, the relevant substantive provisions were left unchanged, and Congress had been made acutely aware of the prior judicial construction that these provisions gave rise to a private cause of action.[32]
 
 
 80
 The Supreme Court has applied this principle on numerous occasions. In Lorillard v. Pons, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), Justice Marshall, writing for a unanimous Court, said that when Congress has passed a new statute incorporating sections of a previously construed statute, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change"-even though, as indicated above, the interpretations were by lower federal courts and not by the Supreme Court. It was considered significant that the judicial construction of the previous statute had been unanimous, id. at 580-81, 98 S.Ct. at 869-70, as was the judicial implication of private rights of action prior to 1974 in our case. In Georgia v. United States, 411 U.S. 526, 532-33, 93 S.Ct. 1702, 1706-07, 36 L.Ed.2d 472 (1973), the Court was confronted with a question concerning interpretation of the Voting Rights Act, enacted in 1965 and extended after "extensive deliberations" in 1970, with changes and additions in areas other than the section before the Court. The Court had reached a decision on a related question in the 1969 case of Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Justice Stewart reasoned that "(h)ad Congress disagreed with the interpretation of § 5 in Allen, it had ample opportunity to amend the statute. After extensive deliberations in 1970 on bills to extend the Voting Rights Act, during which the Allen case was repeatedly discussed, the Act was extended for five years, without any substantive modification of § 5." 411 U.S. at 533, 93 S.Ct. at 1707. A footnote to this quotation indicated that the "repeated discussions" were in Congressional hearings. Id. n.5. While we have here no Supreme Court decision of the stature of Allen construing the CEA, since the Court's opinion in Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344, was not an express holding of the existence of a private cause of action under the CEA, all the pre-1974 CEA cases, including the Seventh Circuit's decision under review in Deaktor, reached the same result in favor of implication, and decisions sustaining private rights of action were called to the attention of Congress not only in Congressional hearings as in Georgia v. United States but in the House report and in floor debates.
 
 
 81
 The presumption just referred to is, of course, rebuttable and appellees insist it has been rebutted by changes made in the CEA in 1974. Before taking these up in detail, we note certain circumstances in addition to those already discussed that require an exceedingly strong showing of an intention to abolish the private cause of action for fraud, manipulation and violations by exchanges that had been universally recognized in order to justify a conclusion that this was Congress' intent. The 1974 Congress repeatedly expressed its view that the changes were designed to strengthen commodity futures regulation, a goal that would be ill-served by abolishing the private right of action that everyone had thought to exist. The bill that became the 1974 amendments was described on its face as "an act to amend the Commodity Exchange Act to strengthen the regulation of futures trading ...." H.R. 13113, 93d Cong., 2d Sess. 1 (1974) (emphasis supplied). The original hearings in the House on the bill were called by the Committee on Agriculture "with a view toward strengthening and revising the existing law." H.R.Rep. No. 93-975, supra, at 53-54. The remarks on the floor of the House by the Committee chairman and the ranking minority member repeated this theme. See 120 Cong.Rec. 10736 (April 11, 1974) (Remarks of Rep. Poage) ("to strengthen the regulation of futures trading); id. at 10739 (Remarks of Rep. Wampler) ("to inform and strengthen the laws"). The goal in the Senate was the same. See, e. g., S.Rep.No.93-1131, supra at 18 (section entitled "Need for Better and Extended Regulation"). See also Curran v. Merrill Lynch, supra, note 1, 622 F.2d at 232 ("the legislative history of the CFTC Act ... indicates that Congress intended to extend further protection to the exchange customer, rather than to extinguish existing forms of protection"). Yet the appellees would have us take the forbidden course of ascribing to Congress an intent with respect to private sanctions completely at odds with this clear legislative purpose. See National Petroleum Refiners Association v. Federal Trade Commission, 482 F.2d 672, 690 (D.C.Cir.1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974) (Wright, J.) ("where a statute is said to be susceptible of more than one meaning, we must not only consult its language; we must also relate the interpretation we provide to the felt and openly articulated concerns motivating the law's framers"), and generally Cox, Judge Learned Hand and the Interpretation of Statutes, 60 Harv.L.Rev. 370 (1947).
 
 
 82
 In support of this endeavor to rebut the presumption that the 1974 Congress approved the previous interpretation of the CEA, the appellees point to the new reparations procedure of § 14. This authorizes any person complaining of any violation of the Act or any rule, regulation or order by any person registered or required to be so,[33] to apply to the CFTC. If the Commission thinks there are reasonable grounds for investigating the complaint, it shall do so. The Commission may, if in its opinion the facts warrant such action, serve the respondent, who is entitled to a hearing before an Administrative Law Judge except where the amount claimed does not exceed $5,000 in which event the Commission may proceed on the basis of depositions or verified statements of fact. A reparations order is enforceable by suit in a district court. However, this is subject to a right of the respondent to seek a prompt review of the reparations order in a court of appeals.
 
 
 83
 Quite apart from the provision explicitly preserving judicial remedies which we shall discuss later, the argument that Congress intended this to be the sole private remedy under the CEA is totally unconvincing for several reasons. The first and perhaps the most important reason is the limited scope of the reparations remedy. It is available only against persons who have or should have registered. On appellees' argument, the exchanges which, to the clear knowledge of Congress, had been held subject to private suits before the 1974 amendments, would be wholly relieved of private liability, although Congress failed to heed their repeated pleas for explicitly granting such relief.[34] So too would large unregistered operators, alleged to have committed the most flagrant kind of manipulation, like Simplot and Taggares in the instant case-the very type of persons whose activities had been the subject of particular Congressional concern from the outset. We find it unimaginable that after a half century's devotion to the regulation of futures trading, thirty years of exposure to the liberal implication of private causes of action under the related subject of securities regulation, and knowledge that the courts had consistently applied the same principle to the CEA, the 1974 Congress could have meant that the only federal remedies for persons claiming to have been wronged by such defendants to the extent of millions of dollars should be the small solace of having the Government collect civil fines and enforce administrative or criminal penalties. The dissent cannot paper over this gaping hole by saying, fn. 3, that such operators are not before us. They are defendants, probably the principal defendants, in these actions. While they have understandably chosen to stay in the background in the present argument, acceptance of the dissent's position would compel the district court to dismiss the CEA claims against them. Even with respect to registered persons, the one class of defendants to whom the reparations procedure applies, the remedy hinges upon the Commission's preliminary determination, apparently unreviewable, that the complainant has a prima facie case, and there is no assurance that this will afford the procedural benefits available in a civil trial. The case differs fundamentally from instances such as National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers (Amtrak), 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), and Touche Ross & Co. v. Redington, supra, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82, where Congress, operating on a tabula rasa, provided a new duty and certain express remedies to enforce that duty, and the Court applied the maxim expressio unius est exclusio alterius. When as here Congress adds a new remedy to enforce a preexisting duty, where other remedies had been clearly recognized, it would be expected to say so if it meant the new remedy to be exclusive. In fact, as will be seen, it said the opposite. It is just as much "judicial legislation" for a court to withdraw a remedy which Congress expected to be continued as to improvise one that Congress never had in mind.
 
 
 84
 These conclusions are strengthened by the legislative history of the reparations procedure. Chairman Poage, in an apparent reference to the reparations provisions, noted in the House that the Act "sets up new customer protection features." 120 Cong.Rec. 10737 (April 11, 1974). This language suggests that the "new" features are in addition to the "old" ones, and certainly not that they are exclusive. In the Senate, Chairman Talmadge remarked:
 
 
 85
 The vesting in the Commission of the authority to have administrative law judges and apply a broad spectrum of civil and criminal penalties is likewise not intended to interfere with the courts in any way. It is hoped that giving the commission this authority will somewhat lighten the burden upon the courts, but the entire appeal process and the right of final determination by the courts are expressly preserved. 120 Cong.Rec. 30459 (Sept. 9, 1974).
 
 
 86
 The first sentence strongly suggests that Congress did not intend to repeal private rights of action by enacting the reparations procedure, and the second sentence is not to the contrary. If the reparations procedure was intended to be exclusive, then it certainly would lighten the burden on the courts, even with review of reparations orders by the courts of appeals. But the Senator spoke in terms of "hope" and lightening the burden "somewhat"-as if reparations were an alternative he hoped had been made attractive enough to sway some aggrieved traders away from the courts. The second clause relating to judicial review simply noted that even for those who elected reparations there could still be court involvement. Again the House Report describes the reparations procedures as "intended as a separate remedy designed to supplement the informal 'settlement' procedures contemplated of the contract markets and registered futures associations which are required under other sections of the legislation ...." H.R.Rep.No.93-975, supra, at 22. These last two types of settlement procedures, however, are expressly made voluntary by the Act. See §§ 5a(11), 17(b)(10). It can therefore be inferred that the reparations remedy is of the same character, and that the aggrieved trader is in no sense compelled to resort to reparations to obtain relief. Commentators have relied on this reasoning, and the savings clause in § 2(a)(1), in concluding that "the victim of a CEA violation is free to ignore the reparations procedure and file a lawsuit." Bromberg & Lowenfels, supra, § 461 at 82.362 (1979). The CFTC is of the same view. See 41 F.R. 3994 (Jan. 27, 1976); id. at 18472 n.5 (May 4, 1976).[35]
 
 
 87
 The argument that the reparations procedure was intended to be the exclusive private remedy is further negated and the case for the continuance of the private cause of action is enhanced by the jurisdictional savings clause, § 2(a)(1).[36]
 
 
 88
 As passed by the House, the exclusive jurisdiction provision read as follows:
 
 
 89
 Provided, that the Commission shall have exclusive jurisdiction of transactions dealing in, resulting in, or relating to future delivery ... And provided further, that nothing herein contained shall supersede or limit the jurisdiction at any time conferred on the Securities Exchange Commission or other regulatory authorities under the laws of the United States ....
 
 
 90
 The purpose of this was to separate the functions of the new CFTC from those of the SEC and other regulators. As explained in the House Report, "All commodities trading in futures will be brought within federal regulation under the aegis of the new Commission, however, provision is made for preservation of Securities Exchange Commission jurisdiction in those areas traditionally regulated by it." H.R.Rep.No.93-975, supra, at 3. See generally Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand.L.Rev. 1 (1976); Russo & Lyon, The Exclusive Jurisdiction of the Commodity Futures Trading Commission, 6 Hofstra L.Rev. 57 (1977). The provision was not intended to limit the jurisdiction of the courts. See Jones v. B. C. Christopher & Co., supra, 466 F.Supp. at 218-19.
 
 
 91
 However, these was fear that it would do so and numerous objections were raised to the House provision in the Senate hearings. Admittedly some of these were not primarily concerned with the question of court jurisdiction to hear claims in private actions under the CEA. Chairman Rodino of the House Committee on the Judiciary was concerned that the House provision might be read as pre-empting state courts of their jurisdiction to enforce futures contracts under general commercial law and "to oust even federal courts of jurisdiction". Testifying before the Senate Committee, he suggested an amendment "to define the jurisdiction, including antitrust jurisdiction, of federal courts for commodity transactions." Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 Before the Senate Committee on Agriculture and Forestry, supra, at 259-60. While Chairman Rodino's remarks were focused on antitrust jurisdiction, they were not limited to that. He argued generally that federal courts retained jurisdiction, and cited antitrust jurisdiction as an example supporting this view. Other objections to the exclusive jurisdiction provision of the House bill were explicitly addressed to the preservation of private rights of action.[37] Senator Clark noted that treble damages actions, provided in bills which he and Senator McGovern had introduced, were often the most effective enforcement tools.[38] "Unfortunately, the House bill not only does not authorize them but section 201 of that bill may prohibit all court actions. The staff of the House Agriculture Committee has said that this was done inadvertently and they hope it can be corrected in the Senate." Id. at 205. Professor Schotland did not refer directly to the exclusive jurisdiction provision, but urged rather that the reparations provision, if retained at all, should be accompanied by "explicit language in the statute that Federal and State courts are still open if a complainant prefers to go to trial there." Id. at 737, 747.
 
 
 92
 The upshot of these various objections was the addition by the Senate of the "savings clause", now in § 2(a)(1):
 
 
 93
 nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or of any State S.Rep. No. 93-1131, supra, at 54, U.S.Code Cong. & Admin.News, 974 at 5870.
 
 
 94
 The purpose of this change was stated to be to "make clear that ... Federal and State courts retain their jurisdiction." Id. at 6, U.S.Code Cong. & Admin.News, 974 at 5848. The Conference accepted the Senate amendment, with the same stated purpose. S.Rep.No.93-1194, 93d Cong., 2d Sess. 35 (1974); H.R.Rep.No.93-1383, 93d Cong., 2d Sess. 35 (1974). The respective chairmen of the House and Senate committees reported that "the conferees wished to make clear that nothing in the act would supersede or limit the jurisdiction presently conferred on courts of the United States or any State. This act is remedial legislation designed to correct certain abuses which Congress found to exist in areas that will now come within the jurisdiction of the CFTC." 120 Cong.Rec. 34997 (Oct. 10, 1974) (Senator Talmadge); 120 Cong.Rec. 34737 (Oct. 9, 1974) (Representative Poage). When we couple this with Congress' recognition that jurisdiction over private causes of action have been held to have been conferred, the conclusion that Congress desired their continued recognition is nigh irresistible.
 
 
 95
 Appellees' primary answer to the foregoing discussion is that the pre-1974 cases upholding a private cause of action under the CEA were wrongly decided under the new trend in Supreme Court jurisprudence with respect to implication and that, in consequence, if Congress desired to preserve such a cause of action the savings clause was insufficient and nothing short of express statement would do. This argument might be somewhat impressive if we were dealing with legislation passed by Congress today. But the law here before us was enacted on October 23, 1974 and "the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the law was." Brown v. G.S.A., 425 U.S. 820, 82829, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), quoted with approval by the majority in Cannon v. University of Chicago, supra, 441 U.S. at 710-11, 99 S.Ct. at 1964. Here not only did the 1974 Congress perceive the state of the law as allowing implied causes of action under the CEA but its perception was correct. As already developed, the related area of securities regulation was dominated by J.I. Case Co. v. Borak, supra, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, which was cited with approval, subsequent to the 1974 amendments, in Cort v. Ash, supra, 422 U.S. at 78, 95 S.Ct. at 2087, and was distinguished but in no way disapproved in SIPC v. Barbour, 421 U.S. 412, 423-24, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263 (1975). While we of course follow the most recent pronouncements of the Supreme Court, those pronouncements focus our attention on the question of legislative intent, and "our evaluation of congressional action ... must take into account its contemporary legal context." Cannon, supra, 441 U.S. at 698-99, 99 S.Ct. at 1958.
 
 
 96
 The sole decision preceding enactment of the 1974 amendments to which appellees point as evidencing the new trend is the Amtrak case, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646, decided on January 9, 1974. Apart from the fact that Amtrak was decided when the amendments were well on the road to enactment and there is no evidence that those concerned with the amendments were aware of it, the decision would not in any event have been a warning flag to Congress to make its approval of a private right of action explicit. The clear language of the Amtrak Act and its legislative history manifested an intent to allow suit only by the Attorney General and affected employees, and not by others such as the plaintiff, a passenger association. The Secretary of Transportation had voiced this interpretation during the hearings and, as Justice Stewart reasoned, "it is surely most unlikely that the members of the Committee would have stood mute if they had disagreed with it." Id. at 460, 94 S.Ct. at 494. Here the sponsor of the bill in the House expressed his view, both when introducing the bill and in the House Report, that private actions were available under the CEA. It is "most unlikely" that the legislators considering the amendments "would have stood mute if they had disagreed with it."
 
 
 97
 Finally, Justice Stewart emphasized that allowing private suits would be inconsistent with the legislative purpose of the Amtrak Act, since Congress was deeply concerned with paring rail passenger routes efficiently and without time-consuming proceedings. Id. at 458, 94 S.Ct. at 493. This would have been reason enough not to imply a private cause of action even under Borak, 377 U.S. at 432, 84 S.Ct. at 1559. See also SIPC v. Barbour, 421 U.S. 412, 418, 421, 95 S.Ct. 1733, 1737, 1739, 44 L.Ed.2d 263 (1975) (Amtrak viewed as case where proposed right of action was inconsistent with legislative purpose). Here there is little dispute that the purposes of the CEA would be effectuated by private actions.
 
 
 98
 In light of this it is unnecessary to dwell on just how far the recent triad of Cannon, Redington and Transamerica, (Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146) may have gone in limiting the implied cause of action. We do think, however, that the rumors about the death of the implied cause of action which have been circulating in the wake of these decisions-an attitude strongly reflected in the dissent-are exaggerated, at least as far as previously enacted statutes are concerned, and that the effect of the decisions is simply to emphasize that the ultimate touchstone is congressional intent and not judicial notions of what would constitute wise policy. See Zeffiro v. First Pennsylvania Banking and Trust Company, 623 F.2d 290 (3 Cir., May 29, 1980) (No. 79-2259) (injured debenture holder can bring implied cause of action under Trust Indenture Act against indenture trustee who breaches agreement). Two of the decisions themselves recognized implied actions, Cannon under Title IX and Transamerica under § 215 of the Investment Advisers Act. Cannon is strong support for the result we have reached in this case, since the majority opinion recognized the earlier view on implying rights of action and expressly directed courts to consider Congressional action in light of this legal context. Both Redington, which found no implied right of action under § 17(a) of the 1934 Securities Exchange Act, and Transamerica, which found no implied action for damages under § 206 of the 1940 Investment Advisers Act, considered statutes which were enacted prior to the great explosion in judicial recognition of implied rights. Unlike the congressional action in 1974 involved in this case, or that in 1972 involved in Cannon, the congressional actions in 1934 and 1940 under review in Redington and Transamerica were not taken against a background of widespread judicial recognition of implied private causes of action for damages either as a general matter or with respect to the specific subject matter of those statutes. Further, the legislative history on private rights of action in both Redington and Transamerica was "entirely silent," 442 U.S. at 571-72, 99 S.Ct. at 2485-87, 444 U.S. at 17, 100 S.Ct. at 246, 62 L.Ed.2d at 153-quite unlike the instant case. Redington involved a mere reporting provision, as to which there was no history of the implication of private causes of action and which was "flanked by provisions" expressly according such a right, and Transamerica turned largely on the express declaration that certain acts should make contracts void, which was taken to grant a right of rescission but not of damages, and the corresponding history of the jurisdictional clause of the Investment Advisers Act. Far from foreclosing implication of private rights of action, Transamerica explicitly noted that the intent to provide such actions "may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment." Id. 444 U.S. at 18, 100 S.Ct. at 246, 62 L.Ed.2d at 154.
 
 
 99
 Even if we were to accept arguendo that the Cannon-Redington-Transamerica triad would call for affirmance if they had been rendered before the 1974 amendments to the CEA were enacted, the legislative history demonstrates beyond fair doubt that Congress relied on and approved the unanimous course of decisions recognizing private causes of action under the CEA, which in turn, were solidly based on the Supreme Court's decision in Borak. Even if that decision were now to be regarded as an aberration, see Cannon, supra, 441 U.S. at 735-36, 99 S.Ct. at 1977-78 (Powell, J., dissenting); Redington, supra, 442 U.S. at 576-77, 99 S.Ct. at 2489-2490, this affords no basis for thinking that the 1974 Congress had any idea there would be such a drastic change in the Court's thinking.
 
 
 100
 Appellees also argue that the statutory provisions at issue cannot support a private cause of action because they merely proscribe certain conduct or prescribe duties, rather than explicitly creating rights (§§ 4a, 4b, 5(d), 5a(8)). It is true that the form in which Congress casts a statutory provision may serve as some indicator of the propriety of implication, see Cannon, supra, 441 U.S. at 690 n.13, 99 S.Ct. at 1954 n.13; Transamerica, supra, 444 U.S. at 18, 100 S.Ct. at 246, 62 L.Ed.2d at 154, but this is by no means determinative. When, as here, the legislative history and the "circumstances of (a statute's) enactment" evince a clear intent to preserve a private cause of action, the form in which this intent is expressed cannot be permitted to become an obstacle to its realization. The cases do not purport to establish a linguistic test for implication and, in any event, the securities cases are an exception to the right/duty dichotomy. Cannon, supra, 441 U.S. at 690-92 n.13, 99 S.Ct. at 1954. Even if Congress were aware of the perceived significance of this dichotomy in 1974, which it was not, there would have been no reason for it to suppose that the CEA would not fall under this same exception.
 
 
 101
 The same considerations refute the claim that a criminal provision such as § 9(b) cannot support a private cause of action. Prior to 1974 courts had implied a cause of action under this provision, see, e. g., Deaktor, supra, 479 F.2d at 534, and the Supreme Court had implied such actions from other penal provisions, see, e. g., Borak, supra. There was no reason for Congress in 1974 to suppose that this would not continue. In Cort v. Ash, supra, decided after passage of the 1974 amendments, Justice Brennan declined to imply a private cause of action in favor of a shareholder suing derivatively from a criminal statute prohibiting corporations from making certain specified political contributions. He was careful to note, however, that "provision of a criminal penalty does not necessarily preclude implication of a private cause of action for damages," and he refused to "go so far as to say that ... a bare criminal statute can never be deemed sufficiently protective of some special group so as to give rise to a private cause of action by a member of that group." 422 U.S. at 79-80, 95 S.Ct. at 2088 (emphasis in original). He rested the decision on the basis that "the intent to protect corporate shareholders particularly was at best a subsidiary purpose of § 610, and the other relevant factors are all either not helpful or militate against implying a private cause of action." Id. In the case of the CEA we have found abundant evidence in the legislative history that the intent to protect traders in commodity futures was the dominant purpose and the other relevant factors also militate in favor of implying the cause of action. Moreover, the CEA cannot be characterized as a "bare criminal statute". It is replete with civil remedies which involve the courts either directly or on review of CFTC action. See, e. g., § 6(b) (civil fines for, inter alia, manipulation); § 6b (cease and desist orders); § 6d (state actions for damages on behalf of residents); § 5b (suspension or revocation of contract market designation); § 14 (reparations). This is not at all a case where a court should be held back from implying a private cause of action because of a legitimate fear that Congress intended only criminal sanctions to apply to certain prohibited conduct.
 
 
 102
 As previously noted, see note 38, supra, appellees and the dissent also argue that no right of action should be implied because Congress did not enact proposals containing explicit rights of action which were before it. Indeed, the dissent repeatedly refers to one house or another of Congress having "rejected" amendments, when it merely failed to act upon them. The effect of such a failure is quite different from the voting down of an amendment, something that the word "rejection" inevitably calls to mind. A house of Congress may have failed to act on an amendment for any number of reasons other than opposition to it-belief that the point was already covered by existing law, see Diamond Crystal Salt Co. v. P. J. Ritter Co., 419 F.2d 147, 148 (1 Cir. 1969); Burlington Truck Lines v. Iowa Employment Security Comm'n, 239 Iowa 752, 32 N.W.2d 792, 797 (1949); objection to the particular terms and inertia in the way of correction, see note 38, supra ; or just plain loss in the legislative shuffle. The language of United States v. United Mine Workers, 330 U.S. 258, 283, 67 S.Ct. 677, 691, 91 L.Ed. 884 (1947), with regard to the failure of the House to enact a bill specifically providing for the injunctive relief there sought by the United States is peculiarly apt-"the fact that the House version did not provide for the issuance of injunctions to aid in the operation of seized plants is not the issue here. Rather it is whether the House expressed any intent to restrict the existing authority of the courts." See also Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381-82 n.11, 89 S.Ct. 1794, 1801-1802, 23 L.Ed.2d 371 (1969) ("... unsuccessful attempts at legislation are not the best guides to legislative intent").[39]
 
 
 103
 Although the Supreme Court has very recently warned in Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 117, 102, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980), quoting from United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960), which, in turn, was quoted in United States v. Philadelphia National Bank, 374 U.S. 321, 348-49, 83 S.Ct. 1715, 1722, 10 L.Ed.2d 915 (1963), that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," see also the discussion at 447 U.S. at 118, n. 13, 100 S.Ct. at 2061, NYME, the opinion below and the dissent rely heavily on a 1978 amendment adding § 6d, which authorizes state officials to bring suits in federal courts to enjoin violations of the Act and to obtain monetary redress for their residents against violators other than exchanges. NYME asserts that the exception demonstrates a congressional desire that no private actions should exist against exchanges; the dissent takes broader grounds.
 
 
 104
 In fact, the evolution of § 6d actually supports rather than undermines the implication of a private cause of action against the exchanges. Section 6d was added during the reauthorization of the CFTC pursuant to the sunset provision in the 1974 amendments, 88 Stat. 1391. The period between 1974 and 1978 had seen the rise of widespread fraud off the regulated and supervised contract markets, particularly in the form of commodity options and leverage contracts. The CFTC was severely criticized for its failure to protect investors in this area, and the states were eager to take matters into their own hands and protect their residents. See generally Lower, State Enforcement of the Commodity Exchange Act, 27 Emory L. J. 1057 (1978); Young, A Test of Federal Sunset: Congressional Reauthorization of the CFTC, 27 Emory L. J. 853 (1978). Some had, see, e. g., Kelley v. Carr, supra, 442 F.Supp. 346 (W.D.Mich.1977), but others were hamstrung by perceived limitations in the parens patriae doctrine. H.R.Rep.No.95-1181, supra, at 14. The addition of § 6d was designed to remove these doubts and to enlist the prosecutorial and enforcement tools of the states to aid the CFTC in correcting abuses primarily off the contract markets. See id. at 15 (§ 6d "is intended, among other things, to provide the several states with the power ... to protect their citizens from persons, such as London options firms, vendors of dealer options and merchants of so-called leverage contracts who perpetuate fraudulent and other practices made unlawful by the Federal law"). See also Curran v. Merrill Lynch, supra, note 1, 622 F.2d at 232 n.24. Since this concern was largely with off-market abuses, contract markets, clearinghouses, and floor brokers were exempted from the coverage of § 6d. See S.Rep.No.95-850, 95th Cong., 2d Sess. 25-26 (1978) (activities of these persons "generally of the character of 'pit trading' rather than customer contact"); 124 Cong.Rec. S.10561 (July 12, 1978) (Remarks of Sen. Bellmon).
 
 
 105
 Indeed, the legislative history indicates that the perceived existence of an implied private cause of action against exchanges was actually one of the reasons for their exemption from § 6d. Explaining the exemption, Senator Leahy of the responsible committee noted that:
 
 
 106
 The exemption from State suits provided to contract markets is justified due to the deterrent effect on contract markets caused by Commission regulation, institution of Commission enforcement proceedings, and the implied private rights of action that may be brought against those contract markets that fail to discharge their duties under the Commodity Exchange Act. 124 Cong.Rec. S.16527 (Sept. 28, 1978) (emphasis supplied).
 
 
 107
 Since Congress explicitly relied on judicially implied rights of action in fashioning the exemption in § 6d, that exemption can hardly be cited as evidence of a desire to insulate exchanges from such actions. See also Smith v. Groover, supra, 468 F.Supp. at 117 ("We fail to see how an apparent congressional unwillingness to extend the liability of contract markets suggests an intention to abolish such liability altogether").[40]
 
 
 108
 This analysis is enough to answer NYME's major contention, namely, that the exemption of contract markets from the parens patriae actions newly authorized in 1978 is evidence that Congress did not mean them to be subject to private actions of any sort. The dissent adds two broader arguments. The first is that the 1978 amendment offered Congress an opportunity expressly to affirm the private right of action in the face of a few district court decisions that this no longer existed in the light of the 1974 legislation and what the dissent calls "the Supreme Court's recent but well-publicized adoption of somewhat stricter principles governing the implication of private causes of action." There are several answers. The first is that in 1978 Congress was concentrating on parens patriae suits; it was not considering a general revision of the CEA. "The logic of defendants' argument would be to require federal courts to prohibit private actions with respect to any statute amended in any way after the mid-1970's if Congress did not explicitly create a private right of action." Navigator Group Funds, supra, at 424 note 19. The second is that while Senator Huddleston cited two district court decisions which had denied a private right of action under the 1974 amendments, these were regarded as "unfortunate" and contrary to the many others he listed that had recognized the continued existence of such actions. 124 Cong.Rec. S.10537 (July 12, 1978). Indeed the Senator expected additional causes of action to be recognized under other provisions of the CEA in the future, a view that hardly comports with fear of a new restrictive trend in implication jurisprudence. The third is that the asserted new trend in Supreme Court decisions had not yet begun, let alone been "well-publicized". Cort, which cited with approval both Rigsby and Borak, 422 U.S. at 78, 95 S.Ct. at 2087, merely disallowed a private cause of action in the case sub judice. It did not indicate any new trend, and the courts have not so regarded it. As Mr. Justice Powell noted in his Cannon dissent of 1979, 441 U.S. at 741, 99 S.Ct. at 1980, "In the four years since we decided Cort, no less than 20 decisions by the Courts of Appeals have implied private actions from federal statutes." Piper v. Chris-Craft Industries, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), paid respectful attention to Borak, supra, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 as Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975) had also done, and to Superintendent of Insurance, supra, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128. The issue decided adversely to the plaintiffs in these cases was not whether an implied cause of action existed generally but whether the particular plaintiffs came within the protected class. The other cases cited are even less to the point. The first indication of a changed attitude that could be detected by anyone reading the Court's opinions without an exceedingly high powered magnifying glass, not possessed even by the courts of appeals, much less by the Congress, was the 1979 opinion in Cannon -and there not in the decision, which was favorable to the plaintiff, but in footnote 6 to Mr. Justice Stevens' opinion, and especially in the dissenting opinion of Mr. Justice Powell.
 
 
 109
 The dissent argues finally that the express conferring of a right of action upon the states in 1978 shows that Congress thought such action to be necessary before any private cause of action could exist. The assertion is belied by the very passage from the House Report from which the dissent quotes. There was no history of recognition of causes of action by the states on behalf of their residents; indeed the very existence of parens patriae actions for other than a state's own financial loss had been called into most serious question by Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The fact that only express legislation could overcome that decision does not at all suggest that Congress meant to destroy an implied cause of action by victims of proscribed practices which the courts had upheld since 1967 and Congress had recognized in 1974.[41]
 
 
 110
 3. Our answer to the second question posed by Cort largely determines that to the third, "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" Indeed, the question need hardly be asked in a case where, as we have found here, there is abundant evidence that Congress affirmatively intended the private remedy to continue. If Congress clearly thought the remedy to be consistent, it would be of no moment that a court should have doubts about this. Moreover, we have been pointed to nothing that would show how maintenance of suits such as these can impede the functioning of the CEA. If questions should arise in which a court would be aided by consideration by the CFTC, the procedure of a stay pending Commission consideration, which the Court directed in Deaktor, supra, 414 U.S. at 115, 94 S.Ct. at 467 is available. The Commission sees no inconsistency. To the contrary, it tells us in its amicus brief (p. 15) that:
 
 
 111
 private damage suits under the Act are consistent and may coexist with the forums expressly provided by Congress for the adjudication of complaints of futures traders-Commission reparation proceedings and contract market arbitration proceedings. The Commission has carefully harmonized these three rights that, in its view, have offered a commodity trader an election of remedies since 1974. (footnotes omitted).
 
 
 112
 The Commission also notes that it "is an agency with limited resources which are insufficient to permit it to police all commodity-related transactions" (p. 34), and that the private damage remedy, in the words of Cannon, "is necessary or at least helpful to the accomplishment of the statutory purpose," 441 U.S. at 703, 99 S.Ct. at 1961. Such expressions by the agency charged with the administration of the statute are entitled to substantial weight. Cannon, supra, 441 U.S. 706-08 & n.42, 99 S.Ct. 1962-63 n.42.
 
 
 113
 4. Fortunately, little space needs to be devoted to the fourth Cort factor, "is the cause of action one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law?", 422 U.S. at 78, 95 S.Ct. at 2088. The answer is clearly in the negative. The federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that § 2(a)(1) of the CEA preempts the application of state law. See International Trading, Ltd. v. Bell, 262 Ark. 244, 566 S.W.2d 420 (1977); Bromberg & Lowenfels, supra, at § 4.6 (471); Johnson, supra.
 
 
 114
 Having answered the first and third Cort questions in the affirmative and the fourth in the negative, and having found as to the second that there is ample evidence of legislative intent to preserve a private remedy, we conclude, in accordance with the Sixth Circuit's decision in Curran v. Merrill Lynch, see note 1 supra, that the district court was in error in holding that no private cause of action in damages for violation of the CEA existed. Since the district court struck all the claims under the CEA, we need not now consider which claims, if any, were within the antifraud provision, § 4b, as distinguished from the antimanipulation provision, § 9(b), relied on as to all defendants; § 4a, relied on as to the conspirators and their brokers; and §§ 5(d) and 5a(8), relied on as to the NYME. Although the other provisions are fairly straight-forward and clearly cover the activities alleged in the complaint, § 4b, to put it mildly, is not an easy provision to construe. Commentators have said of it that "While the intent to outlaw fraud is clear from the (A)-(C) subparagraphs, the syntactical mess which precedes them makes it difficult to answer some basic questions about coverage." Bromberg & Lowenfels, supra, § 452, at 82.286. Appellees are wrong in saying that § 4b by its terms only prohibits "any person" from defrauding "any other person" in connection with the making of a futures contract for or on behalf of that other person. Thus, if A defrauds broker B, who was making a futures contract for C, A would have defrauded C in connection with a futures contract made for C, although C is not A's customer.[42] The applicability of § 4b may well extend even further, since it could be argued that one trading for his own account makes a contract "for" himself, thus bringing fraud between two principals within the confused language of § 4b. The legislative history of the provision contains some statements which indicate an intent to protect "customers", see H.R.Rep.No.1522, 73d Cong., 2d Sess. 5 (1934), although this is never suggested as the limit of coverage, and other statements which suggest a broad construction, see H.R.Rep.No.1551, 72d Cong., 1st Sess. 1 (1932); 80 Cong.Rec. 6162 (April 27, 1936) (Remarks of Sen. Pope); id. at 7853 (May 25, 1936); H.R.Rep.No.743, 90th Cong., 1st Sess. 3 (1967); S.Rep.No.947, 90th Cong., 2d Sess., reprinted in 2 U.S.Code Cong. & Admin.News pp. 1673, 1678 (1968). When clarification of the section was suggested in 1974, Senator Clark read § 4b as an example of archaic language, but took it as "simply try(ing) to convey the idea that it is unlawful for any person to cheat or defraud another person." Hearings on S. 2485, S. 2578, S. 2837, and H.R. 13113 Before the Senate Committee on Agriculture and Forestry, supra, at 687 (Sen. Clark). Senator Clark was echoing the views of a predecessor considering the section when it was proposed: "(T)he object of the legislation is, or should be, to prevent deceptive or fraudulent transactions. Any language which accomplished that end is worthy of consideration." 80 Cong.Rec. 7871 (May 25, 1936) (Remarks of Sen. Robinson). None of the cases recognizing an implied right of action under § 4b suggest limitation to the broker-customer relation. Their reasoning is broader, and they frequently cite non-s 4b cases such as Deaktor. In Hirk v. Agri-Research Council, Inc., supra, 561 F.2d at 104, the court suggested that, in line with Superintendent of Insurance v. Bankers Life & Casualty Co., supra, 404 U.S. at 12, 92 S.Ct. at 168, the language of § 4b must be read "flexibly, not technically and restrictively." The dissent is thus seriously mistaken in assuming that § 4b will necessarily be limited to cases coming within its crabbed language. We deem it inadvisable to rule on the applicability of § 4b without the benefit of evidence of the exact relations among the various parties; indeed plaintiffs may find it unnecessary to rely on this section. It is enough for present purposes that the CEA counts stricken from the complaints clearly charged a gross violation of the prohibition of manipulation, § 9(b), of the very type against which Congress had been legislating for half a century, as well as §§ 5(d) and 5a(8).
 
 
 115
 The order of the District Court is reversed.
 
 MANSFIELD, Circuit Judge (Dissenting):
 
 116
 I respectfully dissent for the reason that the Commodity Exchange Act (Act), when analyzed according to well-settled principles of construction established by the Supreme Court in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); and Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), fails completely to reveal any Congressional intent to approve, much less create, an implied private right of action in favor of these plaintiffs-appellants (1) against futures commission merchants and brokers (such as defendants Heinold Commodities Inc., Thompson & McKinnon, Auchincloss, Kohlmeyer Inc., and Clayton Brokerage Co. of St. Louis, Inc.), or (2) against contract exchanges (such as the New York Mercantile Exchange and its officers). On the contrary, Congress expressly provided a pervasive panoply of judicial and administrative means for enforcing compliance with the Act, including civil fines, compensatory reparations, arbitration, cease and desist orders, and criminal penalties, which may reasonably be viewed as exclusive.
 
 
 117
 None of the sections of the Act relied upon by appellants (such as §§ 4b, 9(b), 5(d), 5a(8) of the Act, 7 U.S.C. §§ 6b, 13(b), 7(d), 7a(8)) contain any language even remotely suggesting that they were enacted for the "especial" benefit of a particular class of which plaintiffs are members, a primary factor to be considered in determining Congress' intent. Cort v. Ash, supra, 422 U.S. at 78, 95 S.Ct. at 2087. On the contrary, § 4b, of the Act, 7 U.S.C. § 6b, the anti-fraud provision heavily relied on by plaintiffs as supporting their claims against the broker defendants, indicates that it was enacted for the benefit of a discrete class of which plaintiffs are not members, namely, customers claiming fraud against brokers with whom they have a broker-customer relationship. Section 9(b) of the Act, 7 U.S.C. § 13(b), a criminal statute also relied on by plaintiffs, reveals that it was enacted for the benefit of the general public, which is insufficient to meet the requirement that a statute creating an implied remedy be for the benefit of a "special class." Section 5 of the Act, upon which plaintiffs rely as the basis for their claim against the New York Mercantile Exchange, is essentially a licensing statute which, among other things, obligates contract markets to comply with certain requirements, including the prevention of price manipulation. It neither grants private rights to members of any class, identifiable or otherwise, nor proscribes any conduct as unlawful.
 
 
 118
 The legislative history of the Act, which runs into hundreds of pages of Committee reports, testimony and debates, fails to contain one word approving a private right of action, despite reference by a couple of witnesses and a senator to the subject. On the contrary, in 1974 Congress failed, after exhaustive hearings, to enact any one of several bills which would have expressly provided a private right of action for violations of the Act, S. 2837, 93d Cong., 2d Sess. § 505(a) (1974) (Hart bill) and S. 2378, § 16 (McGovern bill). In 1968 Congress had rejected a bill which would have made contract markets liable to aggrieved persons for violations of the Act, H.R. 9178, 90th Cong., 1st Sess. § 32 (1967). Moreover, the enactment of a reparations procedure whereby any person injured by a violation of the Act can recover compensatory damages, § 14, and its legislative history, shows not only that "Congress knew how to confer a private right of action when it wished to do so," Transamerica, supra, 444 U.S. at 157 n. 13, 100 S.Ct. at 248 n. 13, but that Congress viewed the reparations procedure, along with the other expressly provided remedies, as sufficient to protect those aggrieved by violations of the Act. H.R.Rep.No.975, 93d Cong., 2d Sess. 22, 83 (1974). In this respect the Act differs sharply from the Securities Exchange Act of 1934, 78 U.S.C. §§ 78, et seq., relied upon by the majority, which does not provide for any administrative proceeding to recover damages.
 
 
 119
 Faced with this persuasive evidence against any intent to create or approve a private right of action, the majority relies on the fact that prior to the 1974 revision of the Act various lower federal courts, using the now-outmoded "tort theory" for implying a private right, had implied such rights under the Act as it then existed and contends that against this background (of which Congress is presumed by the majority to be aware) congressional silence in 1974 must be interpreted as congressional approval. I disagree. Congress is not under any duty to state that the various remedies provided by it are exclusive, much less to disavow or disassociate itself from prior lower court decisions as if they were statutes enacted by it. T.I.M.E. Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1958). The Supreme Court had never found implied rights under the Act. Virtually all of the lower federal court decisions, moreover, are irrelevant for the reason that they deal with rights of customers against their broker-dealers under § 4b, 7 U.S.C. § 6b, not suits by speculators such as plaintiffs against brokers with whom they have no relationship.
 
 
 120
 Only one pre-1974 decision, Deaktor v. L. D. Schreiber & Co., 479 F.2d 529 (7th Cir.), reversed on other grounds sub nom., Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973), decided less than one year before the 1974 revision of the Act, implied a private right in favor of a trader against an exchange. Neither this nor any other of the pre-1974 decisions relied on by the majority was ever cited to or discussed by Congress.[1] To presume under these circumstances that Congress was aware of and approved these prior cases is to substitute sheer speculation for hard evidence of intent.
 
 
 121
 In addition the majority errs in my view by presuming that Congress assumed that a private right may be implied in the absence of a Congressional statement of the opposite intent. On the contrary, the burden is on appellants to show an affirmative Congressional intent to favor an implied private right. Lacking any affirmative evidence of such approval, either on the face of the Act or in its legislative history, plaintiffs have failed to sustain that burden.
 
 
 122
 PRINCIPLES OF STATUTORY CONSTRUCTION TO BE APPLIED IN
 
 
 123
 DETERMINING WHETHER IMPLIED PRIVATE RIGHT OF ACTION EXISTS
 
 
 124
 As the Supreme Court has recently made clear, Transamerica, supra, 441 U.S. at 15, 100 S.Ct. at 245, Redington, supra, 442 U.S. at 568, 99 S.Ct. at 2483, Cannon, supra, 441 U.S. at 688, 99 S.Ct. at 1953, the question of whether a statute impliedly creates a private right of action is one of statutory construction requiring us to determine whether the plaintiff has sustained the burden of showing that Congress had an unexpressed intent in favor of such a remedy. See Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 419, 95 S.Ct. 1733, 1738, 44 L.Ed.2d 263 (1975); National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (hereinafter Amtrak ); Colonial Realty Corp. v. Bache & Co., 358 F.2d 178, 182 (1966), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966) (Friendly, C. J.). Absent evidence of clear intent, judicial creation of a private remedy amounts to an assumption or usurpation of the legislative function in violation of the separation of powers doctrine. Cannon, supra, 441 U.S. 743-47, 99 S.Ct. at 1981-83 (Powell, J., dissenting).
 
 
 125
 In construing a statute to ascertain Congress' intent "the court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary," Cort v. Ash, supra, 422 U.S. at 77, 95 S.Ct. at 2087 (quoting from Bradley v. Richmond School Board, 416 U.S. 696, 711, 74 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974)). Although the utility of a private remedy in achieving the apparent goal of legislation is a factor to be considered in seeking to divine Congress' intent and was at one time the dominant factor, e. g., J. I. Case Co. v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), it has been relegated to a lesser position by a series of decisions beginning with Cort v. Ash, supra. We are now instructed to look principally to the language and structure of the statute at issue in light of the circumstances surrounding its enactment rather than engage in judicial legislation supported only by our own view that a private suit would be a salutary enforcement weapon. As Mr. Justice Frankfurter has reminded us, "We must be wary against interpolating our notions of policy in the interstices of legislative provisions," Scripps-Howard Radio v. FCC, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942).
 
 
 126
 "As our recent cases-particularly Cort v. Ash, 422 U.S. 66 (94 S.Ct. 2080, 45 L.Ed.2d 26)-demonstrate, the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person. Instead, before concluding that Congress intended to make a remedy available to a special class of litigants, a court must carefully analyze the four factors that Cort identifies as indicative of such an intent." (Footnote omitted.) Cannon, supra, 441 U.S. at 688, 99 S.Ct. at 1953.
 
 
 127
 "While some opinions of the Court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute, e. g., J. I. Case Co. v. Borak, supra, what must ultimately be determined is whether Congress intended to create the private remedy asserted, as our recent decisions have made clear. Touche Ross & Co. v. Redington, supra (442 U.S.), at (568) (99 S.Ct. at 2485); Cannon v. University of Chicago, supra (441 U.S.) at (688) (99 S.Ct. 1953). We accept this as the appropriate inquiry to be made in resolving the issues presented by the case before us." Transamerica, supra, 444 U.S. at 15, 100 S.Ct. at 245.
 
 
 128
 If the language and structure of the statute clearly demonstrate Congress' intent, we need go no further. If not, we must attempt to fathom Congress' intent by applying the factors set forth in Cort v. Ash. The first of these is whether the statute indicates that it was enacted for the "especial" benefit of a particular identifiable class of which the plaintiff is a member. We may not, however, infer an intent to create a private remedy merely from Congress' expressed desire to benefit the public generally or even to benefit everyone engaged in an entire industry or line of commerce. As the Court stated in Cannon, supra, 441 U.S. at 690, 99 S.Ct. at 1954:
 
 
 129
 "The language in these statutes-which expressly identified the class Congress intended to benefit-contrasts sharply with statutory language customarily found in criminal statutes, such as that construed in Cort, supra, and other laws enacted for the protection of the general public.[13]"
 
 Footnote 13 reads in relevant part:
 
 130
 "Conversely, the Court has been especially reluctant to imply causes of actions under statutes that create duties on the part of persons for the benefit of the public at large. See Piper v. Chris-Craft Industries, 430 U.S. 1 (97 S.Ct. 926, 51 L.Ed.2d 124) ('unlawful' conduct); Cort v. Ash, supra ('unlawful' conduct); Securities Investor Protection Corp. v. Barbour, 421 U.S. 412 (95 S.Ct. 1733, 44 L.Ed.2d 263) (duty of SIPC to 'discharge obligations'); National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, 414 U.S. 453 (94 S.Ct. 690, 38 L.Ed.2d 646) (forbidding 'action, practice, or policy inconsistent' with the Amtrak Act); Wheeldin v. Wheeler, 373 U.S. 647 (83 S.Ct. 1441, 10 L.Ed.2d 605) (setting procedure for procuring congressional subpoena); T. I. M. E., Inc. v. United States, 359 U.S. 464 (79 S.Ct. 904, 3 L.Ed.2d 952) ('duty of every common carrier ... to establish ... just and reasonable rates ....'); Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246 (71 S.Ct. 692, 95 L.Ed. 912) (similar duty of gas pipeline companies)."
 
 
 131
 The term "especial" benefit refers to a specific, definable class, described by the Court in Cannon as "a special class of which the plaintiff is a member," 441 U.S. at 689, 99 S.Ct. at 1953. The broader that class, the weaker is any implication of intent to provide its members with a private remedy. Otherwise the "special class" would embrace everyone.
 
 
 132
 Thus, we must carefully search the language of the statutory provisions under consideration for any expression of intent to benefit a specific group, as distinguished from an intent to benefit an entire industry, line of commerce or the public at large. Absent such expression, the possibility that Congress intended to provide a private remedy is so slim as to be virtually non-existent.
 
 
 133
 Assuming that the statute on its face evidences a desire to benefit a special class of which plaintiff is a member, we must next examine the statute as a whole and such relevant circumstances surrounding its enactment as may shed light on Congress' intent with respect to remedies. An important consideration in this search is whether and to what extent that statute expressly provides remedies other than a private right of action for its enforcement. The failure to provide any remedies is obviously not helpful to a private plaintiff, since "implying a private right on the basis of congressional silence is a hazardous enterprise, at best," Redington, supra, 442 U.S. at 571, 99 S.Ct. at 2486. But this is not dispositive, since "the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make a private remedy available," Transamerica, supra, 444 U.S. at 18, 100 S.Ct. at 246. On the other hand, if the statute does contain other provisions for its enforcement, such as judicial or administrative remedies, which would secure most if not all of the relief sought in the private action, a private remedy will not ordinarily be implied. The Court has recently reiterated the principle of statutory construction in Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 148, 100 S.Ct. 960, 967, 63 L.Ed.2d 267 (1980), and in Transamerica, supra.
 
 
 134
 "Yet it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.' Botany Mills v. United States, 278 U.S. 282, 289 (49 S.Ct. 129, 132, 73 L.Ed. 379) (1929). See Amtrak, supra, 414 U.S. at 458 (94 S.Ct. 693); Securities Protection Investment Corp. v. Barbour, 421 U.S. 412, 419 (95 S.Ct. 1733, 1738, 44 L.Ed.2d 263); T. I. M. E., Inc. v. United States, 359 U.S. 464, 471 (79 S.Ct. 904, 908, 3 L.Ed.2d 952)." Transamerica, supra, 444 U.S. at 19, 100 S.Ct. at 247.
 
 
 135
 It is reasonably clear that the broader the scope and type of the expressly-provided remedies, the less is the need or justification for implying an unmentioned additional private remedy. In such circumstances it is highly unlikely that "Congress absentmindedly forgot to mention an intended private action." Transamerica, supra, 444 U.S. at 20, 100 S.Ct. at 247 (quoting Cannon, supra, 441 U.S. at 742, 99 S.Ct. at 247).
 
 
 136
 Next in our search for legislative intent we look to the legislative history of the statute. The most reliable and persuasive indicia of congressional intent, of course, are Senate and House Committee Reports. United States v. International Union (UAW-CIO), 352 U.S. 567, 585-86, 77 S.Ct. 529, 538, 1 L.Ed.2d 563 (1957); Banco Nacional de Cuba v. Farr, 383 F.2d 166 (2d Cir. 1967), cert. denied, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968); International Tel. & Tel. Corp. v. General Tel. and Electronics Corp., 518 F.2d 913, 921 (9th Cir. 1975); American Airlines, Inc. v. CAB, 365 F.2d 939, 949 (D.C.1966).
 
 
 137
 Absent definitive statements on the issue of private remedy by those solons vested with primary responsibility for the statute, certain surrounding relevant circumstances may shed light on Congress' intent as to remedies, such as its consideration and/or rejection of an express private remedy, its statements of understanding as to the necessity or lack of it for such a provision, whether an implied remedy is consistent with the statute's underlying purposes and with any other enforcement measures expressly provided by it and whether the private remedy is one traditionally relegated to other tribunals, such as administrative bodies or state courts. Most of these other circumstances, however, while of some relevance, usually offer but a weak reed upon which to rest a determination of Congress' intent. There comes a point where legislative history becomes so will-o'-the-wisp or far-fetched with respect to the matter in issue that we run the danger of attributing to Congress thoughts it never actually had. "The search for significance in the silence of Congress is too often the pursuit of a mirage." Scripps-Howard Radio v. FCC, supra, 316 U.S. at 11, 62 S.Ct. at 880. This ethereal process is particularly illusory, stultifying and unrealistic where, as here, we may reasonably expect, because the issue of a private damage remedy is so important that, had Congress approved or acquiesced in a private right of action, it would have said so somewhere in the thousands of pages of legislative history on the Act.
 
 
 138
 For these reasons, where it is claimed that Congress has created the significant and potentially devastating remedy of a private action for damages, under which liability could amount to hundreds of millions of dollars, primary weight should be placed on the language of the statute and on clear, unequivocal statements by those responsible for its enactment. As the Supreme Court has recently emphasized, "absent a clearly expressed legislative intention to the contrary," the plain language of a statute "must ordinarily be regarded as conclusive." Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Extrapolations based on gossamerthin fabric, requiring speculative assumptions as to Congress' intent are to be avoided. To rely upon such weak inferences is to indulge in judicial legislation. If, as the majority states (footnote 17) was the case with the 1974 amendments to the Commodity Exchange Act, Congress makes a "complete overhaul " of a statute, expressly creating other remedies, it is reasonable to expect that it will indicate any intent to create such an important right as that to bring a private suit by an express grant, which would take but one sentence, rather than by silence.
 
 
 139
 A GENERAL OVERVIEW OF THE COMMODITIES EXCHANGE ACT
 
 
 140
 Before turning to the specific language of the Commodity Exchange Act, 7 U.S.C. §§ 1, et seq., relied upon by appellants as the basis for their claim of implied private rights of action against (1) future commission merchants and brokers, §§ 4b, 9(b), 7 U.S.C. §§ 6b, 13(b), and (2) exchanges or contract markets, §§ 5(d), 5a(8), 7 U.S.C. §§ 7(d), 7a(8), a brief overview of the Act is helpful. Trading in commodity futures has dramatically increased over the last half-century, giving rise to problems of public importance, such as the dangers of price manipulation, cornering of markets and fraud by broker-dealers upon their customers. As these problems increased, more stringent public supervision and control of markets and brokers became necessary. From 1922, when Congress enacted the Grain Futures Act to give the Secretary of Agriculture supervisory power over grain exchanges, until 1974, when the Commodity Futures Trading Commission Act was enacted, creating a new independent agency, the Commodity Futures Trading Commission (CFTC) with plenary and exclusive authority over both futures markets and traders on those markets, Congress has gradually increased public control to the point where we now have an elaborate regulatory scheme designed to assure the public of honest and orderly futures trading, and to prevent price manipulation, fraud and sudden or unreasonable price fluctuations in commodity prices.
 
 
 141
 This extensive all-embracing system was described by House and Senate Reports as intended to create a "uniform," "comprehensive," "complete" and "coherent" regulatory structure. H.R.Rep.No.93-975, supra, at 1; S.Rep.No.850, 95th Cong., 2d Sess. 10, 13 (1978). The Act authorizes a wide variety of control mechanisms, including the licensing of contract exchanges and trading personnel, and a full panoply of enforcement powers, both administrative and judicial, including procedures for the award of damages in reparations proceedings, arbitration, imposition of civil fines of up to $100,000 for violations, issuance of cease and desist orders with fines of up to $100,000 per day for non-compliance, conduct of investigations with power to compel attendance of witnesses and production of documents, revocation of an exchange's designation, suspension of members of exchanges from trading privileges, institution of proceedings in federal court to compel compliance with orders or to enjoin violations of the Act, and the assessment of criminal penalties for violations of the Act and price manipulation, felonies punishable by a fine of not more than $500,000 or imprisonment up to five years, or both.
 
 
 142
 Provisions for Regulation of Contract Exchanges
 
 
 143
 Under the Act the CFTC is vested with exclusive power to designate contract exchanges for trading in particular commodities, § 5 of Act, 7 U.S.C. § 7. Futures contracts may lawfully be traded only on such "contract markets" as are designated for the commodity traded, §§ 4 and 4h of the Act, 7 U.S.C. §§ 6 and 6h. In order to be so designated as a contract market and to continue to conduct business as such, an exchange must meet rigid requirements, including the adoption of procedures for the prevention of price manipulation. § 5(d) of the Act, 7 U.S.C. § 7(d). Section 5a of the Act places additional requirements on a contract market, including the requirement that it enforce all of its rules that have been approved by the CFTC. § 5a(8) of the Act, 7 U.S.C. § 7a(8). The CFTC may disapprove rules violative of the Act or of its regulations and compel exchanges to adopt additional rules, § 8a(7) of Act, 7 U.S.C. § 12a(7).
 
 
 144
 If a contract market violates the Act or the conditions of its designation the CFTC is empowered to suspend or revoke its designation, §§ 5b, 6(a) of Act, 7 U.S.C. §§ 7b, 8. In addition it may conduct such investigations as it deems necessary to ascertain the facts, § 8 of Act, 7 U.S.C. § 12(a), issuing such compulsory process as is needed for production of witnesses and documents, § 6(b) of Act, 7 U.S.C. § 15. The CFTC is authorized to issue its own cease and desist orders against exchanges found after hearing to be violating the Act or any regulations thereunder, and assess civil penalties of up to $100,000 for each violation, § 6b of Act, 7 U.S.C. § 13a. Refusal to comply with a CFTC cease and desist order is a misdemeanor punishable by fine of up to $100,000 or imprisonment of not less than 6 months nor more than one year, or both, for each day of noncompliance. Id. The CFTC may seek federal relief against violation of the Act or regulations by anyone, including an injunction or restraining order to stop existing or threatened violations or a writ of mandamus compelling an exchange to comply. § 6c of Act, 7 U.S.C. § 13a-1. It may also direct contract markets to take emergency action to maintain an orderly market. § 8a(9) of the Act, 7 U.S.C. § 12a(9). Exchanges are also subject to criminal penalties for violations of the Act or price manipulation, felonies punishable by a maximum fine of $500,000 and prison term of 5 years. § 9(b) of Act, 7 U.S.C. § 13(b).
 
 
 145
 Provisions for Regulation of Futures Commission Merchants
 
 
 146
 The CFTC has equally awesome and pervasive powers over brokers and futures commission merchants (FCMs). It establishes requirements for registration of brokers as futures commission merchants, §§ 4d, 4f, 4g, 4k, 4p, 8a, of Act, 7 U.S.C. §§ 6d, 6f, 6g, 6k, 6p, 12a. Two substantive provisions of the Act are particularly relevant here. Section 4a authorizes the CFTC to fix quantitative limits on speculative trading, 7 U.S.C. § 6a, and by regulation the CFTC has fixed limits on short trading. 17 C.F.R. § 150.10. Section 4b prohibits any members of any exchange from defrauding his customer in connection with a sale. 7 U.S.C. § 6b.
 
 
 147
 The CFTC is authorized to deny trading privileges to any person violating the Act or attempting to manipulate commodity prices and may suspend or revoke the registration of a futures commission merchant for violations. § 6(b) of Act, 7 U.S.C. § 9. It may also suspend, expel or otherwise discipline any exchange member or deny him access to the exchange, § 8c(1) of Act, 7 U.S.C. § 12c(1), including aiders and abettors, § 13 of Act, 7 U.S.C. § 13c, and review, affirm, reverse or modify an exchange's discipline of its own members, § 8c(3) of Act, 7 U.S.C. § 12c(3). Violations of the Act and commodity price manipulation are felonies punishable by a maximum term of up to 5 years imprisonment or a fine of not more than $500,000, § 9(b) of Act, 7 U.S.C. § 13(b). In addition, the CFTC may issue cease and desist orders against a broker engaged in or attempting price manipulation, § 6(c) of Act, 7 U.S.C. § 13b. Non-compliance constitutes a misdemeanor punishable by a fine of up to $100,000, imprisonment of not less than 6 months nor more than 1 year, or both, for each day of refusal to obey. Id. The CFTC may also, as with exchanges, seek mandamus and injunctive relief in the federal courts, § 6c of Act, 7 U.S.C. § 13a-1.
 
 
 148
 Provisions for Compensation of Persons Injured by Violations
 
 
 149
 The Act also provides detailed procedures designed to compensate persons damaged by violations of the Act. Contract markets are required to provide voluntary arbitration procedures for settlement of customers' complaints up to $15,000 against any member or employee, § 5a(11) of Act, 7 U.S.C. § 7a(11). This, of course, contemplates a swift, inexpensive method of resolving smaller claims.
 
 
 150
 A much more comprehensive and complete compensatory remedy available to those with large claims is provided by § 14 of the Act, 7 U.S.C. § 18. Section 14 provides for the institution of an administrative "reparations" proceeding by "any person" (which includes plaintiffs here) against any person registered under §§ 6d, 6e, 6j and 6m of the Act, including a futures commission merchant, for damages caused by a violation of any provision of the Act or any rule, regulation or order thereunder. The CFTC is required first to review the facts set forth in the petition and, if it believes these warrant action, it must forward a copy of the complaint to the respondent for satisfaction or response. If the CFTC after hearing finds that the registered merchant or broker has violated the Act it must determine the amount of the damage and order the offender to pay the amount to the complainant. If its order is not satisfied the CFTC may seek enforcement in the federal district court where the complainant resides, which is expressly empowered to issue orders, writs and process anywhere in the United States. The respondent against whom the Commission has issued a reparations order may obtain review by a United States Court of Appeals upon posting of a bond in double the amount of the reparations awarded.
 
 
 151
 Unless the registrant against whom a CFTC reparations order has been issued shows within 15 days thereafter that he has satisfied the order or taken an appeal to a federal court of appeals, which is authorized to review the order, the Commission must prohibit him from trading on all contract markets and his registration is automatically suspended, § 14(f), 7 U.S.C. § 18(f). The Act thus provides an efficient and inexpensive method whereby any injured person may obtain compensatory damages in an unlimited amount against a broker for violations of the Act, thus avoiding much of the expense and delay involved in costly court actions, which necessitate extended use of scarce judicial resources.
 
 Applicability to the Present Case
 
 152
 The complaints in the present action, to the extent that they seek relief based on violations of the Act against the three broker-defendants registered as futures commission merchants with the CFTC (Heinold Commodities, Inc., Clayton Brokerage Co. of St. Louis, Inc., and Thompson & McKinnon, Auchincloss, Kohlmeyer, Inc.) pursuant to § 4d of the Act, 7 U.S.C. § 6d, are completely remediable under the express provisions of the Act itself. In addition the CFTC may conduct, and as to some short sellers and agents of certain brokers in this case has conducted, investigations leading to imposition of sanctions, including heavy fines and prohibitions against trading on a designated contract markets.[2]
 
 
 153
 To the extent that appellants seek relief against the designated contract exchange defendants (New York Mercantile Exchange and its officers) based on violations of the Act, the reparations procedure provided by § 14 of the Act is not made available. This omission, however, does not appear to have been an oversight, but rather a move deliberately designed to protect exchanges against ruinous damage recoveries which might seriously weaken them or drive them out of business. The existing administrative remedies, including the broad disciplinary action that the CFTC was authorized to employ, coupled with its power under § 6b to impose a fine of up to $100,000 on an exchange for each offense, were sufficient to remedy non-compliance by an exchange with the Act's stringent requirements.[3]
 
 
 154
 Thus the Act, far from being silent on the subject of remedies for its enforcement, provides a series of specific remedies, including administrative reparations in prescribed circumstances, enforceable through and reviewable by federal courts. This tends to negate the inference that Congress intended implied private rights of action to exist after its complete overhaul of the Act in 1974 and simply forgot to mention this remedy. The structure of the Act itself, therefore, affords no assistance to the plaintiffs but on the contrary supports the dismissal of their claims.[4]
 
 
 155
 THE SPECIFIC PROVISIONS OF THE ACT RELIED UPON BY THE APPELLANTS
 
 
 156
 (1) Sections relied on to support claims against the registered futures commission merchants. (§§ 4b, 9(b), 7 U.S.C. §§ 6b, 13(b))
 
 
 157
 The plain language of § 4b, 7 U.S.C. § 6b, upon which plaintiffs mainly rely as authority for their private action against the broker-defendants, shows that it does not refer to the obligations of broker-dealers toward third parties, such as the plaintiffs here, but to their obligations toward their own customers. Plaintiffs, who are speculators in the futures market, are not claiming fraud on the part of broker-dealers who handled their accounts but fraud on the part of other brokers with whom they had no relationship who allegedly participated in a conspiracy with short sellers and others to artificially depress the price of May 1976 potato futures through manipulation and excessive short sales in violation of the Act.
 
 Section 4b reads in pertinent part:
 
 158
 "It shall be unlawful (1) for any member of a contract market ... in or in connection with any order ... for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery ... for or on behalf of any other person ....
 
 
 159
 (A) to cheat or defraud or attempt to cheat or defraud such other person ;(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
 
 
 160
 (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person." (Emphasis added.)
 
 
 161
 Only the person on whose "behalf" a contract is made by a member is protected by § 4b from the fraud and deceit on the part of that member in the making of a futures contract. The "person" is the customer for whom the futures contract is made. The introductory paragraph defines the subject matter of the action in terms of a "contract of sale ... for or on behalf of any other person." Subsections (A), (B) and (C) then limit the prohibited activities to certain forms of fraud by the broker upon "such other person" (i. e., his customer). The offense, therefore, exists only when a member cheats or defrauds his own customer.
 
 
 162
 Nowhere does § 4b mention parties having no connection to the contract. Nor, despite the majority's effort to strain a broader coverage out of the section's language, is there any indication that Congress intended to create the massive liability that would result if broker-dealers were made liable to every trader active in the market at a given time. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733 n.5, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975) ("The wording of § 10(b), making fraud in connection with the purchase or sale of a security a violation of the Act, is surely badly strained when construed to provide a cause of action, not to purchasers and sellers of securities, but to the world at large" (emphasis in original)). The express mention of customers only as beneficiaries, just like the mention of purchasers and sellers in Blue Chip Stamps, negates any intent to include anyone else.
 
 
 163
 There is no support in the legislative history for the majority's broad reading of § 4b. To the contrary, language in relevant House Reports indicates just the opposite. The 1934 House Report on what was to become § 4b states:
 
 
 164
 "Section 4b prohibits traders in acting for customers in futures transactions to cheat, defraud, or deceive customers, or to bucket or offset such orders against orders for others." H.R.Rep.No.1637, 73d Cong., 2d Sess. 5 (1934). (Emphasis added).
 
 
 165
 The 1935 House Report confirms that interpretation:
 
 
 166
 "Section 4b makes it unlawful for members of contract markets, and correspondents, agents, and employees thereof, in connection with orders to make or the making of contracts of sale of any commodity in interstate commerce to cheat, defraud, or deceive the customer, or to bucket the order." H.R.Rep.No.421, 74th Cong., 1st Sess. 5 (1935). (Emphasis added).
 
 
 167
 The legislative history of the 1968 amendments also refutes the majority's contention. Speaking in support of legislation to amend § 4b, Representative Hathaway introduced the testimony of Assistant Secretary of Agriculture Mehrens, who had testified before the House Committee on Agriculture, stating in part: "We ask that this provision (§ 4b) be expanded to cover all persons who handle customer orders or funds.... The proposed legislation ... would ... give customers who deal in commodity futures with nonmembers the full protection of the Act." 113 Cong.Rec. 23651 (Aug. 22, 1967). See S.Rep.No.947, 90th Cong., 2d Sess. 6 (1968). There was no indication that non-customers, such as plaintiffs here, were entitled to invoke the section against third parties who were not their brokers or fiduciaries. See in accord, Chipser v. Kohmeryer & Co., 600 F.2d 1061, 1065 (5th Cir. 1979) ("Section 4b makes it unlawful for a commodities broker to 'cheat or defraud' a customer or willfully deceive or make false statements or reports to a customer in connection with transactions on the commodities exchange." (Emphasis added)).
 
 
 168
 Aside from the fact that § 4b is limited to protection of customers against fraud on the part of broker-dealers acting on their behalf, there is nothing in the section indicating that Congress intended to provide even these customers, much less others such as appellants, with a private civil remedy against broker-dealers. The Supreme Court has repeatedly stated that before a private right of action will be implied it must be shown to be "necessary" to effectuate Congress' purpose. Chrysler Corp. v. Brown, 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979) (private right of action not necessary since plaintiffs had an alternative remedy); Piper v. Chris-Craft Industries Inc., 430 U.S. 1, 41, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977); Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). Here a private remedy would not be necessary to enforcement of § 4b, since the existing administrative procedures provided by the Act, including the award of reparations, amply protect the customer. The creation of an implied private judicial remedy would not only be unnecessary but would run counter to Congress' established remedies, since the customer could hardly seek damages in a civil court action without waiving his right to recover the same damages in a reparations proceeding. A private right would therefore be duplicative.
 
 
 169
 Nor does the language of § 9(b) of the Act, 7 U.S.C. § 13(b),[5] the other section of the Act relied on by plaintiffs, sustain a private right of action here. It is a criminal statute to be enforced by criminal penalties, as was specifically recognized by Congress when it amended the provision in 1936. H.R.Rep.No.421, 74th Cong., 2d Sess. 9 (1935). There is no language in § 9(b) even remotely suggesting that it was enacted for the "especial" benefit of a special class of which plaintiffs are members. Indeed, the statute makes no reference to any beneficiaries at all. Like § 206 of the Investment Advisors Act construed in Transamerica, supra, it "simply proscribes certain conduct, and does not in terms create or alter any civil liabilities." 444 U.S. at 19, 100 S.Ct. at 247. To spell a private right of action out of such a general criminal statute would permit anyone who claimed to have been injured by a violation of the Act to sue, regardless of Congress' intent. The Supreme Court "has been especially reluctant to imply causes of action under statutes that create duties on the part of persons for the benefit of the public at large," Cannon, supra, 441 U.S. at 692 n.13, 99 S.Ct. at 1955 n.13; Cort v. Ash, supra, 422 U.S. at 79-80, 95 S.Ct. at 2088-2089 (18 U.S.C. § 610, prohibiting corporate contributions), and it has rarely implied a cause of action under a criminal statute. Chrysler Corp. v. Brown, supra, 441 U.S. at 316, 99 S.Ct. at 1725. Despite the majority's protestations, this is not one of those rare cases.
 
 
 170
 Nowhere else in the language or structure of the Commodity Exchange Act can one find any express or implied intent to benefit a special class, much less commodity speculators such as plaintiffs here. The reason is that the Act was not enacted for the "especial" benefit of any particular class but to protect the public and primarily producers and customers, against wide, sudden or unexplained fluctuations in the prices of commodities, which could ruin producers and cause serious hardship to consumers, processors, merchandisers, millers, dealers, and shippers. This was made clear by Congress in its declaration of purposes and policies underlying the Act, found in § 3 of the Act, 7 U.S.C. § 5, which has remained virtually unchanged since its enactment in 1922. Section 3 provides:
 
 
 171
 "Transaction in ... 'futures' are affected with a national public interest; ... the prices involved in such transactions are generally quoted and disseminated ... as a basis for determining the prices to the producer and the consumer of commodities and the products and byproducts thereof and to facilitate the movements thereof in interstate commerce; such transactions are utilized by shippers, dealers, millers, and others engaged in handling commodities and the products and byproducts thereof in interstate commerce as a means of hedging themselves against possible loss through fluctuations in price; the transactions and prices of commodities on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling commodities and products and byproducts thereof in interstate commerce and such fluctuations in prices are an obstruction to and a burden upon interstate commerce in commodities and the products and byproducts thereof and render regulation imperative for the protection of such commerce and the national public interest therein."
 
 
 172
 Congress' solicitude was recently summarized by testimony in 1974 of the Administrator of the Commodity Exchange Authority (the predecessor of CFTC), Alex Caldwell, before the Senate Committee considering proposed amendments to the Act:
 
 
 173
 "Originally back in 1922 it was the feeling of Congress that the Commodity Exchange Act was designed to protect producers. It is now recognized that it is not designed only to protect producers, but also the merchandisers and processors and ultimately the consumers." Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 Before the Senate Committee on Agriculture and Forestry, 93d Cong., 2d Sess. at 234 (1974).
 
 
 174
 The congressional debate on the 1974 amendments amply confirms that the Act was not designed for the especial benefit of speculators. Representative Mayne, a member of the Committee on Agriculture, for example, stated "The purpose of the legislation before us today can best be described as a means for providing the fairest possible market for legitimate hedgers. ... H.R. 13113 will provide those regulations which are reasonably necessary to guide the activities of speculators ... and no legitimate speculator ... should object to its provisions." 80 Cong.Rec. 10739 (April 11, 1974). Representative Zwach, also a member of the Committee, stated "This legislation creates an impartial umpire, a commission that will handle the public interests, the producers' interests, the consumers' interests." Id. at 10740. Representative Adams claimed that "Our experiences ... demonstrate the disastrous effects which unfair trading practices can have on consumers and producers alike." Id. at 10741. And Senator Scott claimed that "For the consumer, this bill will mean that commodity prices will more clearly reflect demands and actual available supplies. The kind of speculation which places artificial strains on prices will be under close scrutiny. This will mean more realistic prices for the farmer and the end products like break for the consumer will likewise be less subject to rapid increase and decrease in demand." 80 Cong.Rec. 30467 (Sept. 9, 1974).
 
 
 175
 Although speculators were recognized as necessary to the extent that they might, by increasing market volume and assuming market risks, provide more liquidity in the market for the benefit of producers and consumers and thus hopefully minimize price fluctuations to achieve some of the protection and price stability considered beneficial, Congress generally took a dim view of speculative activity in the commodity futures market because of the dangers speculators posed to farmers, producers, consumers, processors, shippers and hedgers. Unlike a hedger, who actually produces or handles the commodity, giving him an interest in the cash market for it, and trades in futures as a means of minimizing his risks, the speculator, such as plaintiffs here, has no underlying interest in the cash market. He merely attempts to profit on the rise or fall of prices for commodity futures. Congress' skeptical attitude toward the benefits of speculation and speculators is further demonstrated by the failure of § 3, which outlines the Act's purposes, to mention speculators or investors as beneficiaries. In contrast § 3 does refer expressly to the interest of the "producer," "consumer," "shippers, dealers, millers, and others engaged in the handling of commodities." Nor is this omission explained by the majority's suggestion that Congress desired to state a commerce power basis for the legislation. If speculators were viewed as a tempering and liquifying influence on an interstate market, reference to them in § 3 would have been consistent with a desire to invoke the Commerce Clause.
 
 
 176
 The various House and Senate reports on the Act and its various amendments over the years simply confirms the plain language of § 3. In 1921 the Senate Committee stated with respect to the proposed Grain Futures Act of 1922 (the first version of what was to become the Commodity Exchange Act):
 
 
 177
 "It is believed that this bill will, by wiping out obvious abuses that are practiced on grain exchanges, result in more stable markets, and thereby enable the producers to secure more nearly the market price for the grain that has been possible in the past.
 
 
 178
 "Its primary purpose is to eliminate from the market some of the undesirable practices of professional speculators.
 
 
 179
 "In addition to curbing excessive speculation and manipulation, the bill authorizes the Secretary of Agriculture to provide means to prevent members of the exchanges from disseminating false and misleading reports on the market or on crop conditions. This in itself will be a check of the activities of professional speculators." (Emphasis added). S.Rep.No.212, 67th Cong., 1st Sess. 4-5 (1921).
 
 
 180
 In 1936 the Senate Report on the proposed amendments stated:
 
 
 181
 "It is of utmost importance ... that means be adopted whereby the Government may be in a position to protect the producer and the public generally against abuses growing out of uncontrolled speculation on public markets." S.Rep.No.1431, 74th Cong., 1st Sess. 3 (1936).
 
 
 182
 The 1936 House Report opened with a quote from President Roosevelt's first message to Congress which urged Congress to eliminate "unnecessary, unwise and destructive speculation" and "restrict, as far as possible, the use of exchanges for solely speculative operations," H.R.Rep.No.421, 74th Cong., 1st Sess. 2 (1935), see 78 Cong.Rec. 2264 (1934), and went on to state
 
 
 183
 "The fundamental purpose of the measure is to insure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers and the exchanges themselves ...
 
 
 184
 "Since the passage of the Securities Exchange Act of 1934 there has been observed an increasing tendency on the part of professional speculators to transfer their activities from the securities markets, a tendency which makes the enactment of this bill without further delay of utmost importance." Id. at 2.
 
 
 185
 The 1974 House Report opened once again with President Roosevelt's attack on speculation, H.R.Rep.No.93-975, supra, at (iii) and the Senate reports in both 1974 and 1978 used as their statement of purpose the above quoted language from the 1936 House Report. S.Rep.No.1131, 93d Cong., 2d Sess. 1, 14 (1974); S.Rep.No.850, 95th Cong., 2d Sess. 12 (1978). The majority contends that Congress' concern about injury to the "markets themselves" evinces an intent to protect speculators. But the clear language of the legislative history refutes that contention. Congress intended to protect exchanges from the abuses of their own members and other traders, not to protect speculators from themselves. S.Rep.No.93-1131, supra, at 14; S.Rep.No.95-850, supra, at 8.[6]
 
 
 186
 Throughout all these years, as the majority recognizes, the congressional debates were replete with vituperative attacks on speculators, particularly in 1922 and 1936, e. g., 61 Cong.Rec. 4763, 4765, 4768 (1921) (Remarks of Senator Clapper that if the farmer is to survive, "the grain gambler must go"); e. g., 80 Cong.Rec. 7857 (1936) (Remarks of Senator Murray that "the grain producer's income will be materially increased if the wild orgies in grain speculation can be controlled"). Congressional hostility toward speculation, though tempered, continued in 1968 and 1974. E. g., 113 Cong.Rec. 34404 (Nov. 30, 1968) (Remarks of Representative Sullivan that "excessive speculation in futures ... has not only contributed to inflationary surges in the futures market but has caused spectacular increases in consumers prices"); 80 Cong.Rec. 30465 (Sept. 9, 1974) (Remarks of Senator Hart that "This bill gives the commission authority ... to prevent inflationary prices which do not reflect supply and demand-but are the result of speculation....").
 
 
 187
 Moreover, it has been the speculators and the Congressmen representing their interests who have consistently opposed the expansion of federal regulation of the commodity markets, since they realize that it is they who are being regulated. See, e. g., H.R.Rep.No.1522, 73d Cong., 2d Sess. 5 (1934) (minority report); H.R.Rep.No.93-975, supra, at 166 (1974) (minority report) ("We believe that the bill's premise displays ... a lack of faith in ... the importance of speculators. ..."); 120 Cong.Rec. 10744 (April 11, 1974) (Statement of Representative Symms that we need "more not less" speculation). It may well be that investors do benefit from an honest market, but that is a far cry from concluding that the Act was enacted for their "especial benefit." As put on the House floor "Speculation may not be evil, but neither is it a thing of beauty and a joy forever." 113 Cong.Rec. 10838 (August 11, 1967) (Statement of Assistant Secretary of Agriculture Mehrens before the House Committee on Agriculture, quoted on the House floor). And Representative Smith in 1974 summed up the prevailing view that speculation was a necessary evil:
 
 
 188
 "When these markets were first brought under Federal regulation back in 1922-Grain Futures Act-it was recognized that involving some gamblers would be necessary in order to provide the liquidity needed so dealers in commodities could readily hedge their transactions.
 
 
 189
 "The Commodity Exchange Act was designed to limit and regulate this form of gambling in tandem with hedging for the purpose of reducing 'sudden or unreasonable fluctuations in the prices ... which are detrimental to the producer or the consumer and the persons handling commodities....' Clearly, the primary purpose of the law which permits commodity markets to exist is to serve those who hedge, and speculation is to be permitted only to the extent that it serves the primary purpose." 120 Cong.Rec. 10750 (April 11, 1974).
 
 
 190
 Thus, given the general opposition of speculative interests to these bills and Congress' skepticism about the benefits of speculation and its keen awareness of the dangers posed by speculative excesses, it is disingenuous to claim that the Act was designed for the especial benefit of speculators. Speculators such as plaintiffs can hardly be said to be the "favored wards" of Congress. Nor is the language of the Act as a whole or of its provisions drafted with an "unmistakable focus on the benefited class." Cannon, supra, 441 U.S. at 691, 99 S.Ct. at 1955. The Court's language in Piper v. Chris-Craft Industries, Inc., supra, 430 U.S. at 37, 97 S.Ct. at 947, applies here:
 
 
 191
 "As previously indicated, examination of the statute and its genesis shows that Chris-Craft (a defeated tender-offerer) is not an intended beneficiary of the Williams Act, and surely is not one 'for whose especial benefit the statute was enacted.' Ibid. To the contrary, Chris-Craft is a member of the class whose activities Congress intended to regulate for the protection and benefit of an entirely distinct class, shareholders-offerees. As a party whose previously unregulated conduct was purposefully brought under federal control by the statute, Chris-Craft can scarcely lay claim to the status of 'beneficiary' whom Congress considered in need of protection."
 
 
 192
 Accord, Liang v. Hunt, 477 F.Supp. 891 (N.D.Ill.1979) (nothing in the language of § 9(b) or its legislative history indicates that it was enacted for the especial benefit of speculators). Stone v. Saxon and Windsor Group, Ltd., 485 F.Supp. 212 (N.D.Ill.1980) ("the entire history of commodities regulation" suggests that "ensuring the integrity of the market system rather than merely protecting individual customers" has been the motivating force behind the Act.").[7]
 
 
 193
 Thus § 9(b), like § 4b, does not disclose any desire to benefit a special class of which plaintiffs are members. When read in the light of the Act's overall purposes it appears to have been enacted for the benefit of the public, including producers and consumers of commodities, not that of speculators or investors.[8] In any event, even assuming arguendo that this criminal statute benefits speculators, there is not the slightest suggestion in the language or legislative history of § 9(b) that Congress impliedly intended it to be enforced by private civil suits for damages. The remedies provided by Congress are found elsewhere in the Act.
 
 
 194
 (2) Sections of Act relied on by plaintiffs to support claims against the contract market defendant. (§§ 5(d), 5a(8) and 9(b), 7 U.S.C. §§ 7(d), 7a(8) and 13(b))
 
 
 195
 Appellants rely upon portions of §§ 5 and 5a of the Act, 7 U.S.C. §§ 7 and 7a, and to a lesser extent on § 9(b), 7 U.S.C. § 13(b), already discussed above, as the source of an implied private right of action against New York Mercantile Exchange and its officers. Section 5 is a licensing statute which imposes upon the CFTC the duty of designating boards of trade as "contract markets" provided they comply with specified conditions and requirements, including in subdivision 5(d) "the prevention of manipulation of prices and the cornering of any commodity by the dealers and operators" upon the Exchange.[9] Section 5a, 7 U.S.C. § 7a, provides that each contract market shall comply with 12 requirements, including the enforcement of its own rules, regulations and resolutions which have been approved by the CFTC, § 5a(8) of the Act, 7 U.S.C. § 7a(8).[10]
 
 
 196
 Plaintiffs here allege that the New York Mercantile Exchange violated the Act and the Regulations by failing (1) to maintain an orderly market for trading, (2) to report violations, (3) to direct the entry of liquidating orders, (4) to declare an emergency, (5) to extend the period for delivery or to allow delivery by truck, (6) to buy potatoes for the account of short sellers who did not make delivery as required by their contracts, and (7) to perform its duties as a contract market, including exercise of due care to halt manipulative practices.
 
 
 197
 As the Court pointed out in Cannon, supra, 441 U.S. at 690 n.13, 99 S.Ct. at 1954, a statute will ordinarily be construed as creating an implied private remedy only where it "explicitly conferred a right directly on a class of persons including the plaintiff in the case." Here the prescriptive language of § 5 and § 5a, like the reporting statute in Redington, supra, 442 U.S. at 569, 99 S.Ct. at 2503, "does not by its terms, purport to create a private cause of action in favor of anyone." Neither provision "grants private rights to the members of any identifiable class, nor proscribes any conduct as unlawful," id. They therefore cannot support a private cause of action in favor of these plaintiffs.
 
 
 198
 Nothing in the foregoing sections of the Act provides any basis for an inference that they were enacted for the especial benefit of plaintiffs, much less that a private right of action was intended. Here again Congress' adoption of a battery of other express remedies indicates it had no intent to create or approve an implied private right of action against exchanges. See Transamerica, supra, 444 U.S. at 19-20, 100 S.Ct. at 247-48. Although exchanges may not be the subject of reparations proceedings, if they violate the Act the CFTC may suspend or revoke their designation as contract markets, §§ 5b, 6(a) of the Act, 7 U.S.C. §§ 7b, 8, sue in federal courts, which are expressly vested with jurisdiction, to enjoin violations, 6c of the Act, 7 U.S.C. § 13a-1, assess civil fines of up to $100,000 for each violation and issue cease and desist orders, non-compliance with which subjects the market and its officers to a $100,000 fine or imprisonment. § 6b of the Act, 7 U.S.C. § 13a. The exchanges, of course, are also subject to criminal penalties of up to a $500,000 fine and 5 years imprisonment for violations of the Act and price manipulation. § 9(b) of Act, 7 U.S.C. § 13(b).
 
 
 199
 Lastly, in 1968 Congress failed to enact a bill which would have made contract markets liable to aggrieved persons for violations of the Act. H.R. 9178, 90th Cong., 1st Sess. § 32 (1967); see Statement of Representative Fino introducing the bill, 113 Cong.Rec. 10839 (April 26, 1967). This indicates that Congress did not intend to sanction a private remedy against exchanges.[11]
 
 
 200
 OTHER CIRCUMSTANCES POSSIBLY BEARING ON LEGISLATIVE INTENT
 
 
 201
 TO CREATE OR APPROVE AN IMPLIED PRIVATE ACTION
 
 
 202
 (1) Pre-1974 lower federal court decisions implying private rights
 
 
 203
 Faced with the fact that nothing in the language of the Commodity Exchange Act, the various amendments of it over the years, and its legislative history even remotely suggest congressional intent to approve, much less create, an implied private right of action, the majority relies almost completely on the fact that prior to the 1974 amendments various lower federal courts, beginning in 1967, had implied certain types of private rights of action under the Act and that Congress' failure, in face of these decisions, to expressly extinguish or nullify these decisions must be taken as evidence of an intent sub silentio to approve the continued implication of private actions under the Act.[12] In short, the argument goes, in amending the Act in 1974 Congress had the burden of taking affirmative action to disapprove implied private rights found by some courts to have existed under the Act and, in the absence of its doing so, the holdings of these decisions may be presumed to survive.
 
 
 204
 The argument puts the cart before the horse. Where, as here, Congress has expressly provided for judicial and administrative means of enforcement, the burden is on plaintiffs to show a clear and affirmative congressional intent to approve a private right of action, not on Congress or defendants to show that the remedies provided by it are exclusive. Transamerica, supra, 444 U.S. at 19, 100 S.Ct. at 247; Securities Investors Protection Corp. v. Barbour, supra, 421 U.S. at 419, 95 S.Ct. at 1738; Amtrak, supra, 414 U.S. at 458, 94 S.Ct. at 693. The issue is whether Congress intended to approve a private right of action, not whether (as the majority frequently states, maj. opin. p. 320 n.40) it intended to "destroy" or "eliminate" a pre-existing private right, which assumes the matter in controversy. Nor may we simply presume that Congress by its silence intended to approve a "pre-existing" private right of action, since the Supreme Court has made clear that "in the absence of the clearest indication that Congress intended that" a new statute "should preserve" a pre-existing private cause of action, it would "decline" to imply one under the new statute. T. I. M. E., Inc. v. United States, supra, 359 U.S. at 475, 79 S.Ct. at 910. To hold otherwise is to stand the principles of Cort v. Ash and the more recent Supreme Court decisions on their heads. Quite apart from this fundamental defect, the argument must be rejected for the reason that a close examination of the decisions and legislative history relied on by the majority demonstrates that they do not support a sub silentio intent by Congress in 1974 to approve implied private rights of action.
 
 
 205
 In the first place the earlier decisions and legislative history do not reveal any long-recognized private cause of action in favor of speculators such as plaintiffs against contract markets or broker-dealers with whom the speculators had no customer-broker relationship. For 45 years prior to the first decision relied on by the majority the provisions of the Act were enforced solely through use of the administrative remedies made available to the Secretary of Agriculture and the Commodity Exchange Commission, the predecessor to the CFTC, and through criminal proceedings based upon violations of the Act. Despite such incidents as the manipulation of the onion futures market in the 1950's, see S.Rep.No.1631, 85th Cong., 2d Sess. 1958), reprinted at 1958 U.S.Code Cong. & Admin.News, pp. 4210, 4214, the salad oil swindle of the early 1960's, N. Miller, The Great Salad Oil Swindle, and other less publicized schemes to manipulate the market and defraud participants, and despite the implication of a private right of action under the Securities Act as early as 1944, Baird v. Franklin, 141 F.2d 238 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), no court prior to 1967 suggested that a private cause of action under the Act might exist.[13] Even the Commodity Exchange Commission believed that administrative sanctions and criminal penalties were the only means by which the Act could be enforced. See letter from Department of Agriculture, Commodity Exchange Authority, dated March 21, 1958, to counsel for the Senate Committee of Agriculture and Forestry, reprinted at 1958 U.S.Code Cong. & Admin.News, p. 4216.[14]
 
 
 206
 Goodman v. H. Hentz & Co., 265 F.Supp. 440 (N.D.Ill.1967), was the first case to break the barrier. It is significant not because it was the first but because it is the case on which all of the later decisions implying a private cause of action summarily relied. All of these were lower federal court decisions. The Supreme Court never passed upon the issue. Goodman involved a suit brought under § 4b by two customers against their broker-dealer in which they claimed they were defrauded by the broker-dealer. The court, relying on § 286 of the Restatement of Torts, found that the customers fell within the class of persons Congress intended to protect when it enacted § 4b (i. e., customers) and that violation of the section was a statutory tort for which the customers had a federal remedy. The court also relied on the dissent in Wheeldin v. Wheeler, 373 U.S. 647, 661-62, 83 S.Ct. 1441, 1450, 10 L.Ed.2d 605 (1961), which stated that private rights are "implied unless the legislature evidences a contrary intention." Finding "no indication in the Commodity Exchange Act that Congress intended not to allow private persons injured by violations access to the courts," 265 F.Supp. at 447, the court implied a private remedy.
 
 
 207
 It hardly merits discussion that Goodman, in light of current law, was wrongly decided since it did not even purport to consider, as required by the recent cases of Cannon, Redington, Transamerica, and Kissinger and earlier by Cort v. Ash, whether Congress intended to create a private right of action when it enacted § 4b. Indeed, the Court has repeatedly rejected the tort rationale relied upon in Goodman, requiring a showing of Congressional intent to approve a private right of action. See, e. g., Redington, supra, 442 U.S. at 568, 578, 99 S.Ct. at 2485, 2490, quoting Cannon, supra, 441 U.S. at 688, 99 S.Ct. at 1953. More significantly, perhaps, is that Goodman may well have been incorrectly decided even under then existing law. The proposition that a private right of action will be implied unless Congress evinces a contrary intention is unsupported by any prior holding and did not accurately reflect the state of the law as it then or later existed. Even J. I. Case Co. v. Borak, supra, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, widely considered to be the case in which the Supreme Court has gone the furthest in implying a cause of action, required more of a showing than did the Goodman court. The test, according to Borak, was whether a private right of action was necessary to effectuate Congress' intent in enacting the statute. Id. at 432, 84 S.Ct. at 1559.
 
 
 208
 Nor can we presume the correctness of the Goodman decision simply because it occurred during a period in which private rights of action were "routinely implied" by the courts. The majority overstates the extent to which courts were then implying private causes of action, ignoring such cases as Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963); T. I. M. E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959); Montana & Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951); General Committee v. M.K.T.R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943); General Committee v. Southern Pacific Co., 320 U.S. 338, 64 S.Ct. 146, 88 L.Ed. 76 (1943); Switchman's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), all of which rejected such claims of private right. And even in the area of securities, the courts denied private rights of action. E. g., Colonial Realty Corp. v. Bache & Co., 358 F.2d 178 (2d Cir.), cert. denied, 385 U.S. 817, 17 L.Ed.2d 56 (1966); O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964).
 
 
 209
 The majority contends, however, that the correctness of the Goodman decision, and the cases summarily following it, is irrelevant, reasoning that what matters instead is whether Congress perceived those cases to be correct when it enacted the 1974 amendments. But even accepting this proposition, not a single word of approval of these decisions is found in the legislative history of the 1974 or any other amendments, much less mention of any of these decisions by name. Moreover, the lower court decisions relied on by the majority do not support its position. Of the 11 cases decided prior to 1974, 8 were brought by customers against their brokers-dealers under § 4b, not by speculators like plaintiffs against broker-dealers with whom they had no relationship. See, e. g., Anderson v. Francis I. duPont & Co., 291 F.Supp. 705 (D.Minn.1968); Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D.Cal.1968), modified, 430 F.2d 1202 (9th Cir. 1970); Booth v. Peavey Company Commodity Services, 430 F.2d 132 (5th Cir. 1970); Johnson v. Arthur Espey, Shearson, Hammill & Co., 341 F.Supp. 764 (S.D.N.Y.1972); Gould v. Barnes Brokerage Co., Inc., 345 F.Supp. 294 (N.D.Tex.1972); McCurnin v. Kohlmeyer & Co., 340 F.Supp. 1338 (E.D.La.1972), affd., 477 F.2d 113 (5th Cir. 1973); Arnold v. Bache & Co., Inc., 377 F.Supp. 61 (M.D.Pa.1973). Likewise the Sixth Circuit's recent decision, Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 622 F.2d 216 (1980), relied on by the majority, is not dispositive of this case since it also involved a suit by a customer against his broker under § 4 of the Act, 7 U.S.C. § 6. Although § 4b could conceivably be construed as protecting customers against being defrauded by their brokers, it certainly does not protect others, such as plaintiffs here, against fraud or manipulation by persons with whom they had no broker-dealer relationship.
 
 
 210
 To be sure, three cases did imply a private right of action in favor of someone other than a customer against his broker. However, two are irrelevant for the purpose of inferring what Congress may have "perceived" the state of decision law on the subject to be in 1974. In United Egg Producers v. Bauer International Corp., 311 F.Supp. 1375 (S.D.N.Y.1970), the court, relying on Goodman, implied a cause of action under § 9(b) of the Act in favor of a group of commodity producers, not customers or mere traders, who sought injunctive relief, not damages, against an import company to prevent them from releasing inaccurate investment information. In Seligson v. New York Produce Exchange, 378 F.Supp. 1076 (S.D.N.Y.1974), affd. sub nom. Miller v. N.Y.P.E., 550 F.2d 762 (2d Cir.), cert. denied, 434 U.S. 823 98 S.Ct. 68, 54 L.Ed.2d 80 (1977), the court, relying on Deaktor, infra, held that a cause of action was available to a broker-dealer, not a customer or even a trader, against an exchange under § 9(b). Since that case, however, was decided after the House had passed the 1974 amendments, Congress could not have been aware of it. It therefore offers no support for the majority's theory that Congress, by relying upon it, thought it unnecessary to provide expressly for a private right of action.
 
 
 211
 Thus, plaintiffs are reduced to one case, Deaktor v. L.D. Schreiber & Co., 479 F.2d 529 (7th Cir.), revd. on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973), decided less than a year before the enactment of the 1974 amendments, as support for the private cause of action asserted here. There a trader brought suit against an exchange for a violation of § 5a(8) and § 9(b), and the court, relying on Goodman, found that § 9(b) was intended to protect the interests of the plaintiff traders and accordingly implied a cause of action under it, though not under § 5a(8). Although the majority contends that the Supreme Court's reversal of Deaktor can be read as support for the lower court's implication of a private right of action, that argument is without merit since the Court expressly declined to decide the issue and held that plaintiffs must proceed through the CFTC, not through the courts. See 414 U.S. at 115, 94 S.Ct. at 467. Where the Supreme Court has declined to reach an issue, it is serious error to parse the Court's opinion for some hidden indication that the Court actually decided the issue after all. The majority's strained interpretation of Deaktor is illusory.
 
 
 212
 In speculating as to what Congress must have "perceived" about the state of the law relating to implied rights when it overhauled the Act in 1974, one must take into account as against Deaktor, which was not finally disposed of by the Supreme Court until December 3, 1973, see 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344, the Court's decision in Amtrak, supra, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646, decided on January 9, 1974. There the Court rejected a claim of an implied private right under § 307(a) of the Amtrak Act, relying on Congress' rejection of an express remedy and its express authorization of other remedies, stating that "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies," 414 U.S. at 458, 94 S.Ct. at 693.
 
 
 213
 The majority also relies heavily on the fact that "(d)uring the 1940's, 1950's and 1960's there was a widespread, indeed almost general, recognition of implied causes of action for damages under many provisions of the Securities Exchange Act" (majority opinion, p. 296), apparently on the theory that we must infer that Congress in enacting the 1974 Amendments assumed that the courts would as readily imply a cause of action under the Commodity Exchange Act as they had under the securities laws. That argument has a number of serious flaws.
 
 
 214
 First, the Supreme Court in Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), merely acquiesced in the 25-year old acceptance by the lower courts of an implied private right of action under § 10(b) of the Securities Exchange Act. See Cannon, supra, 441 U.S. at 690-93 n.13, 99 S.Ct. at 1954 which suggests that absent that long-standing prior interpretation the Supreme Court would not have found a private right of action under § 10(b). Since there is no such long-standing history of judicially implied rights under the Commodity Exchange Act, there is simply no basis for inferring that Congress could have assumed that the Court would similarly acquiesce in a private right of action under that Act.
 
 
 215
 Second, the majority seems to suggest that, because a number of the early securities cases implied a private right of action under the securities laws even though those laws contained express remedies, Congress could assume that the courts would similarly imply a private right of action under the Commodity Exchange Act, which also contains a number of express remedies. That is simply not the case. In Baird v. Franklin, 141 F.2d 238, 244-45 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), heavily relied on by the majority, Judge Clark implied a private right of action under the Securities Exchange Act of 1934 because the express remedies were merely punitive and remedial, not compensatory. Section 14 of the Act here, in marked contrast, expressly provides for compensatory damages. Since the securities laws provide for less complete remedies than the Commodity Exchange Act, any analogy between the judicial history of private rights of action under the securities laws and the Commodity Exchange Act is bound to be of limited relevance.
 
 
 216
 Third, the majority seeks to distinguish such cases as Transamerica, supra, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146, and Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82, on the ground that the 1974 Amendments were passed well after the "great explosion" of judicially recognized private rights of action. The majority, however, ignores the fact that the sections of the Act most heavily relied on by plaintiffs, §§ 4b, 9(b) and 5(d), were all enacted in 1923 and 1936, well before any "explosion" in private rights of action. Like the statutes in Redington and Transamerica, nothing in the legislative history of 1923 or 1936 indicates that Congress intended to create a private right of action under any of the provisions relied on by plaintiffs.
 
 
 217
 As the law existed prior to 1974, then, the majority's contention that the courts had long recognized a private right of action in favor of these plaintiffs rings hollow. The Supreme Court had never spoken on the subject. No lower federal court had implied a cause of action under § 5(d), § 5a(8), or § 4a. Nor had any court implied a cause of action in favor of one not a customer against a broker-dealer under § 4b. Deaktor, which implied a cause of action in favor of a speculator against an exchange under § 9(b), had been decided less than a year before the enactment of the 1974 amendments. This decision, which was never mentioned in the congressional debates as a basis for an implied right of action, is the sole case which could conceivably be relied upon as pre-1974 authority for the proposition advanced by the majority here that Congress "perceived" the private rights of action to be available under the Act in favor of speculators against brokers or exchanges. It seems most unlikely that Congress had even heard of it, much less relied upon it, in adopting the 1974 amendments. Given the crucial importance of Deaktor to the majority's argument, Congress' failure to mention Deaktor is highly significant, despite the majority's protestations to the contrary. Absent some indication that Congress knew that a lower court had implied a private right of action in favor of a speculator against an exchange, as opposed to its possible knowledge that the court had implied a private right of action in favor of a customer against his broker under § 4b, we simply cannot presume that Congress was aware of Deaktor, let alone silently approved of the private right of action it found.
 
 
 218
 (2) References in Congress to Private Civil Suits
 
 
 219
 The majority next relies upon a few scattered references to private civil actions in the course of hearings by House and Senate Committees with respect to the proposed 1974 amendments. None of these, however, reveal any approval or ratification of such rights. Indeed the evidence is overwhelming to the contrary.
 
 The Senate
 
 220
 Not a single mention of private civil actions is to be found either in the Senate Committee Report with respect to the 1974 bill or on the Senate floor. The only references during the lengthy Senate hearings were those of Senator Clark, Professor Schotland of Georgetown University, and Ms. Judy Jackson, a representative of the Consumer Federation of America, with respect to a provision in a bill introduced by Senator Hart which would have expressly authorized private civil suits for violations of the Act, S. 2837, § 505(a), and treble damages for willful violations, § 505(b). During the Senate hearings on various proposed bills, including the Hart Bill, H.R. 13113 (the already passed House bill), S. 2485 (the Humphrey Bill) and S. 2378 (the McGovern Bill), numerous witnesses specifically addressed the Hart Bill and vigorously urged that the Committee adopt the private right of action provided by it. Commodity Futures Commission Act: Hearings Before the Senate Committee on Agriculture and Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113, supra. Professor Schotland stated that it was "hard to be emphatic enough in favor of (§ 505)" and that "private citizen action for self protection, with full judicial protections, is an enormous step toward helping assure vigorous regulatory action," id. at 737, 747. Ms. Judy Jackson noted that neither the Humphrey Bill nor the House bill contained any provision for private civil actions; id. at 369. Senator Clark, co-sponsor of the Hart Bill and a member of the Committee, id. at 205, spoke in support of private treble damages under the bill. Professor Schotland warned about the need for explicit language approving private rights of action. He stated that if Congress decided to adopt the reparations procedure and place "such virtually unprecedented responsibility and burden in this regulatory body, there should be explicit language in the statute that Federal and State courts are still open if a complainant prefers to go to trial there," id. at 737, 747.
 
 
 221
 Congress rejected the bills. Under a principle of statutory construction expressly endorsed by the Supreme Court in Amtrak, supra, 414 U.S. at 461, 94 S.Ct. at 694, a decision ignored by the majority on this point, where as here Congress has before it a specific proposal to authorize private rights of action and after full and careful consideration declines to adopt that proposal, its action must not be treated as evidence of intent to approve private rights of action, but rather as an intent to preclude them. Moreover, its action certainly negates the majority's argument that Congress intended sub silentio to encourage the lower courts to continue to imply private rights of action.
 
 
 222
 It is suggested that Congress refused to adopt the private right of action proposals because of its opposition to treble damages. But this was never a position articulated by any lawmakers, who obviously could have eliminated the treble part of the damages with the stroke of a pen and left standing the provision for compensatory damages. The Senate instead chose to reject the proposition that civil monetary damages be recoverable in any action other than a reparations proceeding.[15]The House
 
 
 223
 Turning to the history of the legislation before the House, the latter's Report with respect to the bill makes only two references to an implied private right of action, neither of which evince an intent by Congress to preserve that right. The Report stated that § 5a(8) of the 1968 amendments, which required contract markets to enforce their own rules and which was designed to strengthen self-regulation, had in fact worked to weaken it because, as the Committee was informed,
 
 
 224
 "(A)ttorneys to several boards of trade have been advising the boards of trade to reduce-not expand exchange regulations designed to insure fair trading, since there is a growing body of opinion that failure to enforce the exchange rules is a violation of the Act which will support suits by private litigants." H.R.Rep.No.93-975, supra, at 46.
 
 
 225
 The Report also stated that one of the reasons for changing the law was
 
 
 226
 "(2) Growing difficulties facing exchanges engaged in self regulatory actions as a result of private plaintiffs seeking damages against self-regulatory activities of the markets. As examples, exchanges are sued for actions taken in emergency situations even when the action has been taken at the request or order of the CEA." Id. at 48.
 
 
 227
 HUMPHREY McGOVERN HART Page 5
 -------- -------- ----
-------------------------------------------------------------------------------
 PRESENT
 FEATURES H.R. 13113 S. 2485 S. 2578 S. 2837, COMMODITY
 AS AMENDED EXCHANGE
 ACT
-------------------------------------------------------------------------------
Civil money Permits Permits Permits Civil None.
 penalties civil money money actions
 money penalties penalties may be
 penalties of $1,000 up brought by
 up to to $100,000 individuals
 $100,000. $100,000 and for treble
 (Sec. 212) but only provides damages.
 for criteria (Sec. 505)
 failure to for Provides for
 comply assessment civil money
 with a Civil penalties
 Commission action may for
 order to be violation
 cease brought by of a
 and desist individua- final
 ls order.
 from for treble (Sec. 504)
 violating damages. Provides
 the Act. (Sec. 16) Commission
 (Sec. 7) with
 authority
 to directly
 imposed a
 fine of up
 to $100,000
 issue a
 cease
 and desist
 order,
 require
 restitution,
 suspend
 registration,
 and grant
 other relief
 that a
 court of
 equity
 would have
 the right
 to grant.
 (Sec. 406)
 
 
 228
 Similar language was used by Chairman Poage when he discussed the bill on the House floor, 119 Cong.Rec. 41333 (Dec. 13, 1973).[16] Although it may demonstrate an awareness by key personnel in Congress of lower court decisions implying a cause of action under the Act, it hardly constitutes approval of those decisions. In the first place, the Supreme Court has recently reminded us that "even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history." Consumer Product Safety Commission v. GTE Sylvania, Inc., supra, 447 U.S. at 118, 100 S.Ct. at 2061. Second, the language merely recognizes a "growing body of opinion" concerning private rights of action. Had Congress intended to approve or encourage the fledgeling body of law, it could and would have indicated as much. Third, rather than extol the virtues of private rights of action, the Report and Chairman Poage emphasized the problems created by private rights and pointedly criticized private suits against exchanges for action taken by them pursuant to order or request of the CEA, now the CFTC.
 
 
 229
 I find no logical basis for reading this rather explicit language criticizing private rights of action as congressional approval of such suits, which is what the majority attempts to do. The majority argues that Congress was not criticizing private rights of action but merely the problems they created and that, desiring private suits to continue, it sought to preclude exchanges from reducing their rules in order to avoid civil liability by empowering the CFTC to require the exchanges to adopt appropriate rules. This sheer speculative extrapolation is not supported by anything in the legislative history of the amendments. Indeed it is refuted by the plain language of the House Report.[17]
 
 
 230
 A more sensible interpretation of the 1974 amendments is that Congress sought to create a uniform comprehensive, cohesive and coherent system of regulation, H.R.Rep. 93-975, supra at 1; S.Rep.No.95-850, supra, at 10, 13. Believing that private rights of action were inconsistent with that purpose, it sufficiently increased the powers of the CFTC so that it, rather than private individuals, would be responsible for monitoring the futures trading market.[18]
 
 
 231
 Intent in Enacting Reparations Procedure and Other Remedies
 
 
 232
 Both the 1974 Senate and House Reports exhaustively outline the enforcement tools available under the Act as it then stood, together with the additional remedies recommended and finally adopted. S.Rep.No.1131, 93d Cong., 2d Sess. 11-27 (1974), H.R.Rep. 93-975, supra, 33-53. There is not the slightest suggestion that the panoply of enforcement remedies provided by Congress, including reparations proceedings, was intended to supplement private civil rights, as the majority here urges. Indeed, no legislator has ever linked the reparations procedure to private causes of action or mentioned them in the same breath. Though of course it is not defendants' burden to show that Congress intended an express remedy to be exclusive, what little direct evidence there is about the purpose of the reparations procedure suggests that it and the informal arbitration procedures were intended to be exclusive. The House Report, for example, stated that the reparations procedure is
 
 
 233
 "intended as a separate remedy designed to supplement the informal 'settlement procedures' contemplated of contract markets.... It is the intent of the Committee that those complaints which can be resolved informally and settled without a formal proceeding (the reparations proceeding) through the mechanism contemplated of the contract market ... should be encouraged to resolve that matter." H.R.Rep.No.93-975, supra, at 22.
 
 
 234
 "A customer reparations proceeding before the Commission will be authorized one year after date of enactment for handling customer complaints which arise from violations of the Act, particularly those which result in monetary damages loss to the customer. The commission will have original jurisdiction to consider all such complaints which have not been resolved through the informal settlement procedures required of the contract market and registered futures associations under the bill." Id. at 3.
 
 
 235
 "The provision for this review and settlement of customers accounts should make possible full and equal justice for those who feel that they have been in some way damaged in the handling of their commodity accounts." Id. at 83. (Emphasis added). (Letter to the Committee from Department of Agriculture.)
 
 
 236
 Congress has also explicitly stated that the reparations procedure was created to "offset a suspected industry bias favoring the resolution of customer claims through arbitration," H.R.Rep.No.1181, 95th Cong., 2d Sess. 91 (1978), thus casting further doubt on the theory that the procedure was intended to supplement private rights of action. Equally revealing is the Senate's belief that where futures associations adopt arbitration procedures, thus relieving contract markets of their duty to adopt similar procedures, "aggrieved customers ... would have their choice of seeking resolution of their claims through an association arbitration or reparations proceedings, or a Commission reparations proceeding," S.Rep.No.95-850, supra, at 32, U.S.Code Cong. & Admin.News 1978 at 2120. For present purposes it is significant that the "choice" does not include a private right of action.[19]
 
 
 237
 Moreover, in the case of contract markets an implied right to recover unlimited damages in a private civil action against such markets would be inconsistent with express limitations placed by Congress on the amount of civil penalties that might be assessed against a contract market: (1) a limitation of $100,000, and (2) an amount which will not "materially impair the contract market's ability to carry on its operations and duties," § 6b of Act, 7 U.S.C. § 13a.[20]
 
 
 238
 Congress' complete failure to approve, much less to authorize, private rights of action when it exhaustively analyzed, overhauled and amended the enforcement provisions of the Act refutes the majority's claim that it somehow or other affirmatively intended such rights to continue as a supplement to the battery of enforcement weapons provided by it. Had it desired or intended this, the logical and natural procedure would have been for it to say so. SEC v. Sloan, 436 U.S. 103, 122, 98 S.Ct. 1702, 1714, 56 L.Ed.2d 48 (1977). No court has ever imposed on Congress the contrary duty, which the majority urges, of expressly stating that the remedies provided by it are exclusive.
 
 Jurisdictional Provisions
 
 239
 The majority next contends that the "savings clause" incorporated into the jurisdictional provision, § 2(a)(1) of the Act, 7 U.S.C. § 2 (§ 201 in the enacted bill), explicitly preserves the private right of action implied by the lower courts. Section 201 originated in H.R. 13113 and as passed by the House it read:
 
 
 240
 "Provided, That the Commission shall have exclusive jurisdiction of transactions dealing in, resulting in, or relating to contracts of sale of a commodity for future delivery, traded or executed on a domestic board of trade or contract market or on any other board of trade, exchange, or market; And provided further, That nothing herein contained shall supersede or limit the jurisdiction at any time conferred on the Securities Exchange Commission or other regulatory authorities under the laws of the United States or restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with the laws of the United States."
 
 
 241
 During the Senate hearings Rep. Rodino, Chairman of the House Committee on the Judiciary, criticized the provision not on the grounds that it might eliminate private rights of action but rather because the provision might be interpreted as eliminating the jurisdiction of state courts over contract claims and the jurisdiction of federal courts over antitrust claims and suits seeking review of administrative hearings. His comments are set forth in full in the margin.[21] He accordingly suggested the addition of a proviso to the effect that federal courts should not be ousted of their jurisdiction. As a result the following proviso was enacted:And provided further, That, except as hereinabove provided, nothing contained in this section shall (i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.
 
 
 242
 Other witnesses reiterated Chairman Rodino's criticisms without any reference to private rights of action. Mr. Keith Clearwater, Deputy Assistant Attorney General, Dept. of Justice, for example, stated: "There are two problems with this language. It could be interpreted to deprive the Federal Courts of their jurisdiction under the antitrust laws and to deprive Federal and State courts of jurisdiction to enforce contract and commercial law rights." Commodity Futures Commission Act: Hearings Before the Senate Committee on Agriculture and Forestry on S.2485, S.2578, S.2837 and H.R.13113, supra, at 663. See Statements of James T. Halverson, Director of Bureau of Competition, Federal Trade Commission, id. at 667-68, and Statement of Glenn Willet Clark, Professor of Law, Drake University Law School, id. at 683-84.
 
 
 243
 The majority's contention that the "savings clause" explicitly preserves a private right of action rests solely on the comment of Senator Clark, while urging the Senate to authorize private treble damage suits, that "Unfortunately, the House bill does not authorize them, but section 201 of that bill may prohibit all court actions. The staff has said that this was done inadvertently and they hope it can be corrected in the Senate." Id. at 205.
 
 
 244
 This "passing reference" by a "single legislator" is a slim reed on which to find congressional approval of a private right of action. Consumer Product Safety Commission v. GTE Sylvania, Inc., supra, 447 U.S. at 118, 100 S.Ct. at 2061; Piper v. Chris-Craft Industries, Inc., supra, 430 U.S. at 31-32, 97 S.Ct. at 944; Chrysler Corp. v. Brown, supra, 441 U.S. at 311, 99 S.Ct. 1722; see Ernst & Ernst v. Hochfelder, 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386, 47 L.Ed.2d 668 (1976). Senator Clark's concern that the House provision might prohibit "court actions" could well have been intended to refer to actions arising out of commodity contract claims. Moreover, applying the principles of Chrysler Corp., his statement must be considered with the Reports of both Houses and the statements of other witnesses and Congressmen, all of which refute the majority's contention that there is a link between the jurisdictional provision of § 201 and Congress' attitude toward private rights of action.
 
 
 245
 Given the reasons expressly advanced by Chairman Rodino and given that no witness indicated that the revision of § 201 was intended to preserve or even affect any private rights of action in federal courts, the evidence is overwhelming that Congress simply took up the task of correcting the problem noted by Chairman Rodino and others and had no intention of approving a private damage action. Had Congress intended to preserve jurisdiction of the federal courts over private suits it could easily have said so, as it did in § 6c when it granted federal jurisdiction to hear CFTC-initiated injunctive suits, and in § 14(f) when it provided for such jurisdiction to enforce judgments arising out of reparations proceedings.
 
 
 246
 The Act does not have any counterpart to the jurisdictional provision of § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, which affirmatively grants to federal courts exclusive jurisdiction of violations of the Act and of its regulations and authorizes civil suits to be brought in the district where the defendant is found or resides. In any event the "savings clause" here, which was directed exclusively to jurisdictional matters, could not preserve private damage actions, since jurisdictional provisions cannot create such rights, Redington, supra, 442 U.S. at 577, 99 S.Ct. at 2489. "The source of plaintiffs' rights must be found, if at all, in the substantive provisions of the (Act) which they seek to enforce, not in the jurisdictional provision." Id. at 577, 99 S.Ct. at 2490 (citing cases).
 
 The 1978 Amendments
 
 247
 Finally, although subsequent legislation is of very limited weight in ascertaining Congress' intent in enacting earlier laws, Transamerica, supra, 444 U.S. at 23 n. 13, 100 S.Ct. at 248 n. 13, the 1978 amendments are revealing. First, Congress did not provide expressly for a private right of action against merchants and exchanges despite its awareness that the lower courts had begun to deny private rights of action under the Act,[22] a situation which Sen. Huddleston on the floor of the Senate deemed "unfortunate." 124 Cong.Rec. 10537 (July 12, 1978). Instead, Congress proposed to alleviate the heavy burden on the reparations procedure caused by the failure of lower courts to imply private rights of action not by amending the Act to allow private suits, as we would expect if it had approved of private suits, but rather by eliminating the hearing requirement for reparations claims under $5,000. § 14(b), 7 U.S.C. § 18(b).
 
 
 248
 The failure of Congress to amend the Act is particularly significant in light of its awareness by that time of the Supreme Court's recent but well publicized adoption of somewhat stricter principles governing the implication of private causes of action. See Amtrak, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); Piper v. Chris-Craft Industries, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).[23]
 
 
 249
 Second, Congress in 1978 received testimony from the states that they were uncertain, in light of various adverse court decisions, about their ability to bring parens patriae suits for violations of the Act and to enforce their own contract and consumer fraud statutes. In sharp contrast to its 1974 refusal to authorize private suits, Congress expressly empowered the states to bring suits in federal courts to enjoin violations of the Act or to obtain monetary damages, § 6d, 7 U.S.C. § 13a-2, and expressly confirmed the ability of the states to enforce their contract and consumer fraud law. § 6d(5), 7 U.S.C. § 13a-2(5). Quite apart from the fact that Congress' express exemption of contract markets and floor brokers from liability under § 6d suggests a desire to insulate those participants from private damage liability,[24] the adoption of § 6d is a clear indication that "Congress knew how to confer a private right of action when it wished to do so." Transamerica, supra, 444 U.S. at 23 n. 13, 100 S.Ct. 248 at n. 13. Moreover, Congress recognized that express authorization for such suits was necessary if a right under the Act to institute such litigation was to exist:"Section 12 specifically authorizes the States to investigate or prosecute in a civil action violations of the Act.... Any such action must be brought in the proper Federal district court, and the Commission is given the right to intervene in the action as a party. This is a new right since States currently have no such express authority under the Act." H.R.Rep.No.95-1181, supra, at 28.
 
 
 250
 This statement is strong evidence that when Congress intended to create a right of action under the Act it did so expressly, not by implication.[25]
 
 
 251
 The Theory that Congressional Silence Amounts to Congressional Approval
 
 
 252
 Lacking any substantial support in the language or legislative history of the Act that Congress affirmatively approved private rights of action, the majority's position boils down to the theory that Congress must have been aware generally of a few lower federal court decisions implying a private right under the Act as it stood prior to 1974 and therefore found express approval of private rights unnecessary. But bearing in mind that "(i)mplying a private cause of action on the basis of Congressional silence is a hazardous enterprise, at best," Redington, supra, 442 U.S. at 571, 99 S.Ct. at 2486, any leap from congressional silence to congressional approval must be made cautiously, if at all. Moreover, it is inappropriate to rely on the presumption asserted by the majority where, as here, Congress has expressly created a number of remedies which may reasonably be viewed as exclusive and where, if Congress intended to adopt a prior judicial interpretation providing for an additional remedy, it would have said so. Finally, the body of earlier lower federal court decisional law provides a wholly inadequate basis, either in terms of relevance, weight, period of existence, or notoriety, for such an inference.
 
 
 253
 In T.I.M.E. v. United States, supra, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952, the Court expressly rejected the position advanced by the majority here. There a shipper of goods contended that it had a private cause of action under the Motor Carrier Act to recover unreasonable rates charged by a carrier in violation of the Act. After rejecting the contention that the Act granted a private right of action, in part because, as here, Congress specifically declined to enact a proposed cause of action, the Court rejected the claim that the Act must be read as preserving a pre-existing common-law or judicially implied right of action.
 
 
 254
 "The Government is able to point to only two cases in addition to the present ones, in the 24 years since passage of the Motor Carrier Act, in which courts have appeared to assume that the issue of reasonableness of past motor carrier rates was litigable, and in neither of these cases was the question given other than the most cursory attention. Under these circumstances the issue before us cannot fairly be said to be foreclosed by long-standing interpretation and understanding.
 
 
 255
 "We are told that Congress has long been aware that the Commission was of the view that a common-law action for recovery of unreasonable rates paid to a motor carrier, with referral to the Commission of the issue of unreasonableness, would lie, and that its failure to legislate in derogation of this view implied an approval and acceptance of it. But it appears that each time the Commission's views in this regard were communicated to committees of Congress, it was in connection with a request by the Commission for legislation which would have given to shippers a cause of action under the statute and granted to the Commission the authority to award reparations, and each time that request was rejected.... (W)e do not think that from the failure of Congress to grant a new authority any reliable inference can permissibly be drawn to the effect that any authority previously claimed was recognized and confirmed." 359 U.S. at 478, 79 S.Ct. at 911. (Emphasis added).
 
 
 256
 The few decisions relied upon by the majority are consistent with the foregoing, since they involved exceptionally long periods of continuous construction and not, as here, an interpretation by a lower federal court, the Seventh Circuit in Deaktor, less than a year old. In Blue Chip Stamps v. Manor Drug Stores, supra, 421 U.S. at 733, 95 S.Ct. at 1917, the Court found that a 24-year old acceptance by the lower courts of an interpretation of § 10(b) limiting the cause of action to purchasers of securities, coupled with the failure of Congress to reject that interpretation, despite the Securities and Exchange Commission's repeated urging, "argues significantly in favor of acceptance" of that interpretation. In Cannon, supra, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560, the Court, in implying a cause of action under Title IX of the Education Amendments of 1972, noted that Congress intended to create remedies under Title IX similar to those available under Title VI and found that Congress understood that the courts had implied a right of action for plaintiffs under Title VI. The Court, however, specifically disclaimed reliance on the presumption used by the majority here-that the private right of action must be presumed to exist unless expressly repealed by Congress-and instead rested its decision on what it considered to be Congress' affirmative intent to create a private right of action. Id. at 699, 99 S.Ct. 1958.
 
 
 257
 Similarly in SEC v. Sloan, supra, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148, the Court rejected the argument that Congress should be presumed to have approved a long-standing administrative construction of a statute despite Congress' reenactment of the statute without disapproval of the interpretation and the fact that on at least one occasion the relevant Senate Committee indicated that it understood and approved the interpretation. The Court noted that "we are extremely reluctant to presume general congressional awareness of the Commission's construction based only upon a few isolated statements in the thousands of pages of legislative documents. That language is a Committee Report, without additional indication of more widespread congressional awareness is simply not sufficient to invoke the presumption in a case such as this." Id. at 121, 98 S.Ct. at 1713. The Court concluded that if Congress intended to approve the prior interpretation it could have and would have said so. This principle applies with equal force in the present case.
 
 
 258
 The cases cited by the majority are not to the contrary. In Lorillard v. Pons, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), the Court found that Congress, in enacting the Age Discrimination Employment Act (ADEA) and in incorporating a number of provisions from the Fair Labor Standards Act (FLSA), intended to adopt the judicial construction of those provisions. The Court noted that because Congress exhibited a detailed knowledge of the FLSA provisions and their interpretations and a willingness to depart from those interpretations with which it disagreed, it was fair to presume that, but for the changes made in the FLSA provisions, Congress intended to incorporate fully all other remedies and interpretations of the FLSA. This is quite different from the situation in the present case where the references to the prior judicial interpretation are few and far between in the legislative history and where Congress does not exhibit detailed knowledge of that interpretation.
 
 
 259
 Reliance on Georgia v. United States, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1978), is similarly misplaced. The Court found congressional acquiescence in a prior Supreme Court decision to be persuasive only after noting that the decision was repeatedly discussed by members of Congress. Indeed, discussion of the decision took up approximately 73 pages in the House Hearings and 10 in the Senate, id. at 533 n. 5.[26]
 
 
 260
 All of these authorities are a far cry from the inference as to congressional intent which we are asked to draw in this case. As in SEC v. Sloan, reliance is placed on a few scattered undefinitive and conclusory references in thousands of pages of legislative history rather than upon repeated detailed reference to any identified Supreme Court decisions, such as existed in Georgia. Unlike the 25-year history of interpretation of § 10(b), with which the Supreme Court was faced in Superintendent of Insurance and Blue Chip Stamps, we find a brief line of lower court decisions, none of which are relevant to the issues before us except one, decided only one year before the 1974 amendments, Deaktor, knowledge of which by Congress cannot be presumed. This hardly constitutes a long-standing and well-recognized prior judicial interpretation sufficient to invoke the dubious presumption relied on by the majority here. The silence of the 1975 Congress when it amended the Securities Exchange Act (see majority opinion, supra, p. 299) in the face of Supreme Court decisions (e. g., Superintendent of Insurance and Blue Chip Stamps upholding implied rights of action) is quite different from silence in the face of one lower court decision (Deaktor), of which it may not even have had knowledge. No court has yet found a private cause of action based on §§ 5d, 5a(8) or 4a of the Act, which are invoked on this appeal.
 
 
 261
 Lastly, since it is abundantly clear that the few pre-1974 decisions were erroneous, being based on the theory of tort rather than congressional intent, it is unreasonable to suppose that Congress, absent a Supreme Court ruling, intended to compound the error by tacitly giving effect to them. Cf. Adamo Wrecking Co. v. United States, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574, 54 L.Ed. 538 (1978); SEC v. Sloan, supra, 436 U.S. at 116, 98 S.Ct. at 1711 (holding that the interpretations of an administrative agency as to its statutory authorization is entitled to deference only when thoroughly and soundly reasoned). By 1974 the Supreme Court with its decision in Amtrak had signaled a somewhat stricter approach to the implication of private rights of action, putting Congress on notice that the basic principles of construction by which private rights were to be implied was not yet finally settled.
 
 
 262
 In the last analysis the majority substitutes sheer speculation based on unsupportable presumptions for reasonable evidence of Congress' contrary intent. The issue was squarely presented to Congress in 1974 but it failed to approve an express right of action much less indicate in a long legislative history any approval of an implied one. "We are not obliged to indulge Congress in its refusal to confront the hard questions of private rights of action," Cannon, supra, 441 U.S. at 743 n. 14, 99 S.Ct. at 1955, n. 14 (Powell, J., dissenting). Under these circumstances absent some expression of approval by Congress, formal or informal, I believe we should not imply an intent on its part to create an implied right of action. Under these circumstances, creation of a private right rests with Congress, not the judiciary.
 
 
 
 [1]
 The length of our treatment, particularly the explanation of the nature of the Commodities Futures Market in Part I and the history of congressional regulation in Part III, is also partly due to the fact that when the case was argued and for some time after the majority opinion was prepared, no court of appeals had passed on the question and we anticipated being the first to do so. However, in a case decided May 12, 1980, a divided panel of the Court of Appeals for the Sixth Circuit reached the issue sua sponte and, in an excellent and succinct opinion, held, as we do, on largely the same reasoning, that there is an implied private right of action under the CEA. Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 622 F.2d 216 (1980). Although, as argued in the dissent, Curran involved a suit by a customer against a broker, the court did not limit its reasoning to that situation
 
 
 [2]
 See H.R.Rep.No.93-975, supra, at 129 (less than 3% of all futures contracts culminate in delivery); T. Hieronymus, Economics of Futures Trading 41 (1977) (less than 1%). Neither the speculative investor nor the person using the futures market as a hedge for his position in the market for the actual commodity generally desires delivery. H.R.Rep.No.93-975, supra, at 129. See Volhart Brothers, Inc. v. Freeman, 311 F.2d 52, 55-56 (5 Cir. 1962); Note, The Delivery Requirement: An Illusory Bar to Regulation of Manipulation in Commodity Exchanges, 73 Yale L.J. 171, 173 (1963)
 In occasional instances, however, people do use futures trading as an alternative market for the physical commodity. H.R.Rep.No.93-975, supra, at 132. Delivery is made through the clearing house by transfer of warehouse receipts or rights to loaded freight cars and then transported according to the purchaser's instructions. See Cargill, Inc. v. Hardin, 452 F.2d 1154, 1157 (8 Cir. 1971), cert. denied, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972).
 
 
 [3]
 Johnston, Understanding the Dynamics of Commodity Trading, 35 Bus.Law. 705, 709 (1980), states that "(a)s a general rule, for a market to be broad enough to be efficient and to accommodate the extremely large orders that come in from time to time from dealers and commercial firms, 50 to 75 percent of the open interest and volume of trading must come from speculators-this is essential for there to be a viable market."
 
 
 [4]
 We say here once and for all that our statement, in large measure, is simply what the plaintiffs contend to be the facts and is not to be read as one of facts found. Accordingly we will generally dispense with use of words such as "allegedly", "asserted" and "claimed"
 
 
 [5]
 This reads as follows:
 
 
 [44]
 02-FINAL DAY OF TRADING
 (a) On the final day of trading in the delivery month, it shall be the responsibility of each clearinghouse member who is not in a position to fulfill his contractual obligation on any maturing contract by prescribed notice and tender, to have a liquidating order entered on the Exchange floor not later than five minutes before the time established as the official close for such delivery month. All such orders shall be market orders to be executed prior to the expiration of trading.
 (b) On the final day of trading no stop orders will be accepted; no time limit or contingent orders will be accepted, and brokers will not be expected to assume responsibility for the execution of orders placed later than 15 minutes prior to the close of trading.
 (c) Cancellations that reach the trading floor after one half ( 1/2) hour prior to the time trading is scheduled to cease on the last day of trading in an expiring future may involve extraordinary problems and hence will be accepted solely at the risk of the customer.
 
 
 [6]
 For a precise statement of the motions and their disposition, see 470 F.Supp. at 1257 n.1, 1263-64
 
 
 [7]
 This provision currently reads as follows:
 (1) Excessive speculation in any commodity under contract of sale of such commodity for future delivery made on or subject to the rules of contract markets causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity. For the purpose of diminishing, eliminating, or preventing such burden, the Commission shall, from time to time, after due notice and opportunity for hearing, by order, proclaim and fix such limits on the amount of trading which may be done or positions which may be held by any person under contracts of sale of such commodity for future delivery on or subject to the rules of any contract market as the Commission finds are necessary to diminish, eliminate, or prevent such burden. In determining whether any person has exceeded such limits, the positions held and trading done by any persons directly or indirectly controlled by such person shall be included with the positions held and trading done by such person; and further, such limits upon positions and trading shall apply to positions held by, and trading done by, two or more persons acting pursuant to an expressed or implied agreement or understanding, the same as if the positions were held by, or the trading were done by, a single person.
 (2) The Commission shall in such order fix a reasonable time (not to exceed ten days) after the order's promulgation; after which, and until such order is suspended, modified, or revoked, it shall be unlawful for any person-
 (A) directly or indirectly to buy or sell, or agree to buy or sell, under contracts of sale such commodity for future delivery on or subject to the rules of the contract market or markets to which the order applies, any amount of such commodity during any one business day in excess of any trading limit fixed for one business day by the Commission in such order for or with respect to such commodity; or
 (B) directly or indirectly to hold or control a net long or a net short position in any commodity for future delivery on or subject to the rules of any contract market in excess of any position limit fixed by the Commission for or with respect to such commodity: Provided, That such position limit shall not apply to a position acquired in good faith prior to the effective date of such order.
 
 
 [8]
 This provision currently reads as follows:
 It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof-
 (A) to cheat or defraud or attempt to cheat or defraud such other person;
 (B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
 (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or exchange of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or
 (D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.
 
 
 [9]
 This provision currently reads as follows:
 (8) enforce all bylaws, rules, regulations, and resolutions, made or issued by it or by the governing board thereof or any committee, which relate to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements, and which have been approved by the Commission pursuant to paragraph (12) of section 5a of this Act; and revoke and not enforce any such bylaw, rule, regulation, or resolution, made, issued, or proposed by it or by the governing board thereof or any committee, which has been disapproved by the Commission.
 
 
 [10]
 This provision currently reads as follows:
 It shall be a felony punishable by a fine of not more than $500,000 or imprisonment for not more than five years, or both, together, with the costs of prosecution, for any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or to attempt to corner any such commodity, or knowingly to deliver or cause to be delivered for transmission through the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce or knowingly to violate the provisions of section 4, section 4b, section 4c(b) through section 4c(e), section 4h, section 4o(1), or section 19 of this Act, or knowingly to make any false or misleading statement of a material fact in any registration application or report filed with the Commission, or knowingly to omit in any application or report any material fact that is required to be stated therein. Notwithstanding the foregoing, in the case of any violation described in the foregoing sentence by a person who is an individual, the fine shall not be more than $100,000, together with the costs of prosecution.
 
 
 [11]
 While the point is of no great importance as regards this case, we take issue with the statement in the dissent, page 342, that Colonial Realty Corp. v. Bache & Co., 358 F.2d 178 (2 Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), held that violation of a rule of the New York Stock Exchange could not give rise to an implied cause of action. Our conclusion was that violation of certain types of rules would give rise to an implied cause of action, especially "when the rule imposes an explicit duty unknown to the common law", but that violation of the rule there at issue, requiring brokers to observe "just and equitable principles of trade", did not. Id. at 182-83. We likewise do not accept the statement in footnote 8 that "it is now well recognized that a private right of action may not be implied for a violation of a rule of the New York Stock Exchange," citing Jablon v. Dean Witter & Co., 614 F.2d 677 (9 Cir. 1980). Although the particular rule at issue in Jablon, the "know your customer" rule, Rule 405 of the New York Stock Exchange, seems analogous to the rule at issue in Colonial Realty and we thus have no quarrel with the result, we do not necessarily accept the broad language of the Jablon opinion. In view of our conclusion that plaintiffs have alleged violations of other sections of the Act which give rise to private claims, it is unnecessary for us now to decide whether such an action would lie for violation of NYME Rule § 44.02
 So far as concerns the dissent's citation of O'Neill v. Maytag, 339 F.2d 764 (2 Cir. 1964), as a case denying a private right of action in the securities area, that decision rested on the scope of Rule 10b-5 and in no way challenged the proposition that a private cause of action would lie if the facts came within the Rule.
 
 
 [12]
 Indeed, at the time Congress considered and passed the 1974 amendments to the CEA, the Supreme Court had never rejected a request to imply a cause of action under the federal securities laws. Pitt, Standing to Sue Under the Williams Act After Chris Craft, 34 Bus.Law. 117, 121 (1978)
 The suggestion in the dissent that the Superintendent of Insurance case was a grudging acquiescence in 25 years of lower court decisions, although finding some support in a footnote to Cannon v. Univ. of Chicago, 441 U.S. 677, 692, n.13, 99 S.Ct. 1946, 60 L.Ed.2d 560 ignores the language of the opinion in Superintendent of Insurance and the climate of the times. The Supreme Court there reversed a decision of this court refusing to apply § 10(b) under circumstances which pressed that section to its absolute limit. The Court quoted not simply in acquiescence but with strong approval the statement in Shell v. Helmsley, 430 F.2d 819, 827 (5 Cir. 1970):
 When a person who is dealing with a corporation in a securities transaction denies the corporation's directors access to material information known to him, the corporation is disabled from availing itself of an informed judgment on the part of its board regarding the merits of the transaction. In this situation the private right of action recognized under Rule 10b-5 is available as a remedy for the corporate disability.
 And all this under a statute which expressly created three private actions, §§ 9(e), 16(b) and 18, with respect to various types of securities transactions that were far more efficacious than the reparations procedure of the 1974 amendments to the CEA. See 6 Loss, Securities Regulation at 3689-73 (1969), suggesting that for this and other reasons the Borak decision would not necessarily preclude a different ruling with respect to the existence of a private cause of action under § 10(b)-a ruling which never came.
 
 
 [13]
 Indeed, in several other important cases under the Investment Company Act, defendants represented by able counsel did not even think it worthwhile to question the existence of an implied private cause of action. See, e. g., Rosenfeld v. Black, 445 F.2d 1337 (2 Cir. 1971), cert. dismissed, 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972); Moses v. Burgin, 445 F.2d 369 (1 Cir.), cert. denied, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971); Fogel v. Chestnutt, 533 F.2d 731 (2 Cir. 1975), cert. denied, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976)
 
 
 [14]
 While there are differences between the commodities and securities fields, what is relevant to the present question is the common legislative objective of insuring fair dealing for investors on what are important public markets, and the common legislative approach to attaining this objective. The analogy between the two fields has been repeatedly recognized by Congress, see, e. g., S.Rep.No.93-1131, supra, at 19; H.R.Rep.No.93975, supra, at 39. The 1936 amendments arose from an explicit concern to make protection in the commodities field as strong as it was in the securities field, lest the unscrupulous would simply transfer this operations from one market to another. H.R.Rep.No.1522, 73d Cong., 2d Sess. 2 (1934); 78 Cong.Rec. 10446 (June 4, 1934) (Remarks of Chairman Jones of the House Committee on Agriculture); 79 Cong.Rec. 8589 (June 3, 1935) (same). The analogy has been frequently accepted by the courts, see, e. g., Silverman v. CFTC, 562 F.2d 432, 438 (7 Cir. 1977) (quoting Moore, J., in Savage v. CFTC, 548 F.2d 192, 197 (7 Cir. 1977)); P. J. Taggares Co. v. NYME, 476 F.Supp. 72, 77-78 (S.D.N.Y.1979) (Weinfeld, J.); by the CFTC, see, e. g., brief amicus curiae at 12; and by the commentators, see, e. g., Markham and Meltzer, Secondary Liability Under the Commodity Exchange Act, 27 Emory L.J. 1115 (1978); Note, Private Rights of Action for Commodity Futures Investors, 55 B.U.L.Rev. 804, 821-22 (1975). Congress was not only aware of the implied right of action under the CEA in 1974, as shown below, but surely was also aware of the private right of action recognized in the analogous field of securities regulation
 
 
 [15]
 Although it is true, as stated in Justice Powell's dissent in Cannon v. University of Chicago, 441 U.S. at 735, 99 S.Ct. at 1977, that "During this same period, the Court frequently turned back private plaintiffs seeking to imply causes of action from federal statutes," 441 U.S. at 735, 99 S.Ct. at 1977, citing the same cases mentioned in Judge Mansfield's dissent, there can be no doubt that particularly in the closely related field of violations of statutes administered by the SEC, the implied cause of action was so much taken for granted that usually the issue was not even raised. See note 13 supra. There are many instances of this under the CEA itself, both before and after the 1974 amendments. See, e.g., Booth v. Peavey Company Commodity Services, 430 F.2d 132, 133 (8 Cir. 1970); Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 F.2d 1174, 1176 (2 Cir. 1977) ("It is agreed that there is an implied cause of action under the Act for a private remedy."); Hofmayer v. Dean Witter & Co., Inc., 459 F.Supp. 733, 737 (N.D.Cal.1978). In addition several courts have begun the process of delineating the precise contours of the private cause of action under the CEA, aided of course by the securities law analogy, assuming either arguendo or implicitly that such an action exists. See, e.g., Miller v. New York Produce Exchange, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977); Master Commodities, Inc. v. Texas Cattle Management Co., 586 F.2d 1352 (10 Cir. 1978); Moody v. Bache & Co., Inc., 570 F.2d 523 (5 Cir. 1978); P.J. Taggares Co. v. NYME, supra, 476 F.Supp. 72
 
 
 [16]
 The dissent's suggestion, p. 341 that victims of frauds in futures trading had never resorted to the federal courts prior to Goodman, which was "the first case to break the barrier", lacks adequate empirical basis. Judge Carter's opinion in the Salad Oil case, Seligson v. New York Produce Exchange, 376 F.Supp. 1076, 1080, rendered in 1974, tells us that this swindle of the early 1960's "led to a string of lawsuits and investigations extending over the past ten years." It is not unlikely that many counsel for defendants confronted with the array of cases under the statutes administered by the SEC, did not think it worthwhile to question the existence of a private cause of action under the CEA-just as their counterparts in well-known cases under the Investment Company Act had failed to do so, see note 13 supra
 While we think the dissent's attacks on the reasoning of Goodman are exaggerated, this is irrelevant, since the courts followed and extended it without the slightest question, and Congress necessarily regarded these decisions, stretching over seven years, as representing the law.
 16a Mr. Justice Stewart would have affirmed and allowed the action to proceed directly in the district court. 414 U.S. at 416, 94 S.Ct. 467.
 
 
 [17]
 We fail to appreciate the dissent's attempt to distinguish these two cases. With respect to Egg Producers, if implied private causes of action did not exist under the Act, there would be no cause of action for an injunction any more than there would be for damages. The Seligson decision was rendered before Senate consideration of the 1974 amendments and House repassage in the amended form. Moreover, what the dissent fails adequately to recognize is that the cases under the CEA, numerous and consistent as they are, cannot be taken in isolation but must be considered along with the vast body of law under the securities statutes which set the tone during the late '40's, the '50's, the '60's, and the early '70's, and on which the CEA decisions relied. The efforts to whittle all this away, pages 342-343, are unimpressive. We have already dealt, note 14 supra, with the argument as to the cases under Rule 10b-5. The contention that the securities legislation offered less in the way of remedies than the CEA would surprise most students of securities law; with the single exception of the 1974 reparations procedure for certain types of CEA violations, whose inadequacies are described below, they offered more. The argument that the sections of the CEA most heavily relied upon by plaintiffs were enacted before the explosion of the private right of action under the securities laws ignores the fact that the 1974 amendments to the CEA were intended to be a complete overhaul and were effected with vivid Congressional awareness of the decisions implying private causes of action under the CEA as well as the related subject of the laws administered by the SEC
 
 
 [18]
 Congress was, however, apparently aware of the pendency of at least one of these cases. See note 30 infra
 
 
 [19]
 Cases finding an implied cause of action: Milani v. ContiCommodity Serv., Inc., 462 F.Supp. 405 (N.D.Cal.1976); Shearson Hayden Stone v. Lumber Merchants, Inc., 423 F.Supp. 559 (S.D.Fla.1976); Bache Halsey Stuart, Inc. v. French, 425 F.Supp. 1231 (D.D.C.1977); Kelley v. Carr, 442 F.Supp. 346 (W.D.Mich.1977), rev'd on other grounds, Nos. 78-1091, 1092, 5542, 5460, --- F.2d ---- (6 Cir., May 16, 1980); Hofmayer v. Dean Witter & Co., 459 F.Supp. 733 (N.D.Cal.1978); Berenson v. Madda Trading Co., CCH Comm.Fut.L.Rep. P 20,689 (D.D.C.1978); Gravois v. Fairchild, Arabatzis & Smith, Inc., CCH Comm.Fut.L.Rep. P 20,706 (E.D.La.1978); Rivers v. Rosenthal & Co., Civ. Action File No. CV 178-186 (S.D.Ga.1978), appeal pending, 79-1313 (5 Cir.); Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart Inc., 465 F.Supp. 585 (N.D.La.1979); Jones v. B. C. Christopher & Co., 466 F.Supp. 213 (D.Kansas 1979); R. J. Hereley & Son v. Stotler & Co., 466 F.Supp. 345 (N.D.Ill.1979); Alken v. Lerner, Civ. Act. No. 79-0023 (D.N.J.1980); Navigator Group Funds v. Shearson Hayden Stone Inc., 487 F.Supp. 416 (S.D.N.Y.1980) (Broderick, J.); Grayson v. Conticommodity Services, Inc., 48 L.W. 2807 (D.D.C., May 23, 1980); Witzel v. Chartered Systems Corporation of New York, Ltd., 490 F.Supp. 343 (D.Minn., May 27, 1980)
 To the contrary, in addition to Judge MacMahon's opinion in this case, 470 F.Supp. 1256, see Arkoosh v. Dean Witter & Co., 415 F.Supp. 535 (D.Neb.1976), aff'd on other grounds, 571 F.2d 437 (8 Cir. 1978); Consolo v. Hornblower & Weeks-Hemphill, Noyes, Inc., 436 F.Supp. 447 (N.D. Ohio 1976); Bartels v. International Commodities Corp., 435 F.Supp. 865 (D.Conn.1977); Berman v. Bache, Halsey, Stuart, Shields, Inc., 467 F.Supp. 311 (S.D. Ohio 1979); Alkan v. Rosenthal & Co., CCH Comm.Fut.L.Rep. P 20,797 (S.D. Ohio 1979); Liang v. Hunt, 477 F.Supp. 891 (N.D.Ill.1979); Fischer v. Rosenthal & Co., 481 F.Supp. 53 (N.D.Tex.1979); Stone v. Saxon and Windsor Group, Ltd., 485 F.Supp. 1212 (N.D.Ill.1980). The three decisions from district courts in Ohio which declined to find an implied cause of action, Consolo, Berman, and Alkan, are no longer good law in that circuit in light of the Sixth Circuit's contrary decision in Curran v. Merrill Lynch, cited in note 1 supra.
 
 
 [20]
 This is:
 In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose especial benefit the statute was enacted." Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)-that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646, Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See e. g., Amtrak, supra, Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 423, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263 (1975); Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See Wheeldin v. Wheeler, 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963); cf. J. I. Case Co. v. Borak, 377 U.S. 426, 434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 394-395, 91 S.Ct. 1999, 2003-2004, 29 L.Ed.2d 619 (1971); id. at 400, 91 S.Ct. 1999, 2006, 29 L.Ed.2d 619 (Harlan, J., concurring in judgment).
 We read this in light of the later caveat in Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979) that the basic inquiry is always to plumb the intent of Congress, that the Cort factors are simply inquiries helpful in that endeavor, and that satisfaction of one or more of the Cort factors will not alone carry the day.
 
 
 [21]
 We find little force in the dissent's reliance, page 339 and footnote 11, on the failure of the 1968 Congress to enact a section of a bill introduced by Representative Fino providing an explicit right of action against exchanges. Quite apart from the usual problems of relying on actions of an earlier Congress, and much more on its failure to act, see p. 310 infra, the question of a private right of action was simply not considered by Congress in the 1968 amendment process. The bill that became the 1968 amendments, H.R. 13094, never contained a private remedy provision, such a remedy was never mentioned in either congressional report, and was never discussed in congressional debate. The dissent's picture of Congress' carefully comparing the bills and deliberately and meaningfully rejecting the provision in Rep. Fino's bill is indeed based on gossamer. Since the failure to act on the provision in 1968 is only of the slightest significance with respect to congressional intent at that time, its bearing on the effort to discern congressional intent six years later, in 1974, is infinitesimally small
 Beyond all this, when Rep. Fino introduced his bill with the explicit right of action provision, he included with his speech numerous newspaper articles about the commodities industry. One of these discussed the Great Salad Oil Swindle, and noted that two attorneys for the receiver of Ira Haupt & Co., a brokerage firm which went under in that affair, "are trying to determine whether Haupt can justifiably file suit against the exchange for failure to regulate ...." Haupt eventually did, and the court recognized an implied right of action against the exchange, see Seligson v. New York Produce Exchange, supra, 378 F.Supp. 1076. If Congress had given any consideration to Rep. Fino's bill, it could well have failed to enact the explicit remedy provision because it considered this unnecessary in light of the then judicial climate, as had turned out to be the case for Ira Haupt & Co. before the 1974 amendments were passed, see note 17 supra. This further illustrates that attempting to attach meaning to the failure of Congress, and even more so of a previous Congress, to enact legislation is a speculative enterprise indeed.
 
 
 [22]
 See, e. g., 62 Cong.Rec. 9404 (June 26, 1922) (Remarks of Chairman Tincher of the House Committee on Agriculture) ("I have never said that the sale of wheat for future delivery should be wiped out ... but have always said, and I still say, that to let a few gamblers manipulate the grain market was not only unfair to the consumer but unfair to the legitimate trader."); id. at 9412 (Remarks of Rep. Voight, a member of the Committee on Agriculture which reported out the bill) ("The bill will reduce gambling but we can not stop it altogether without hurting both consumer and producer")
 
 
 [23]
 The Court in Hill v. Wallace, supra, had noted that the tax imposed by the 1921 Act applied to sales between members of the Board of Trade in Chicago. "Looked at in this aspect, and without any limitation of the application of the tax to interstate commerce, or to that which Congress may deem, from evidence before it, to be an obstruction to interstate commerce," the Court could not sustain the Act. 259 U.S. at 68, 42 S.Ct. at 458 Congress responded with § 3, precisely focusing on the interstate aspects of futures trading. See 62 Cong.Rec. 9404 (June 26, 1922) (Remarks of Chairman Tincher of the House Committee on Agriculture) ("We have defined interstate commerce, using the language of the Supreme Court, as applying to grains and this law will not apply to any transaction except interstate transactions as defined by the court."); id. at 12723 (Sept. 15, 1922) (The Court "called attention to the fact that if grain was in interstate commerce we could reach the situation in this bill; and this bill is strictly following the dictation ... of the Supreme Court ...")
 
 
 [24]
 Representative Jones, Chairman of the House Committee on Agriculture, stated that the bill was aimed at eight to sixteen traders on the Chicago Board of Trade "who have been largely responsible for the constant fluctuations in the market ...." 78 Cong.Rec. 10446 (June 4, 1934). He later stated that the purpose of the bill was "to check manipulation of markets by certain big traders (who) rig the market to the detriment not only of the producer but also of all others engaged in legitimate transactions in various farm commodities." 79 Cong.Rec. 8589 (June 3, 1935). Another Representative considered the bill to be directed against "the speculators who deal in large quantities," 78 Cong.Rec. 10449 (June 4, 1935) (Remarks of Rep. Gilchrist); a third favored it to counter the activities of "15 or 20 big grain manipulators," and noted it "will not injure but will beneficially affect legitimate dealers," id. at 10451 (Remarks of Rep. Sabath). The Senate debates were to the same effect. The bill was designed to clip the wings of the likes of Arthur Cutten, a big grain manipulator whose activities were considered in some detail. See 80 Cong.Rec. 6160 (April 27, 1936) (Remarks of Sen. Pope). Senator Pope specifically recognized the critical role played by the typical speculator:
 it is the small traders-those who take positions in the market of less than 100,000 bushels-that not only absorb the hedging sales but who furnish the real support for future trading in grains. In the main their trading is so diffused and scattered that as a body they lend a stabilizing influence. Id. at 6164.
 
 
 [25]
 The securities cases suffice to negate the dissent's suggestion that regulated persons may not also belong to the class for whose special benefit the regulation was enacted. Here Congress made clear that it wished to regulate "bad" speculators for the benefit of good ones, as well as hedgers and simple buyers and sellers
 
 
 [26]
 While the dissent chooses to characterize this as a "passing reference", it shows the clear understanding of the writer that the Act was enacted to protect speculators and not merely hedgers
 
 
 [27]
 The only discordant note on the point that the CEA was intended to protect "speculators" appears to be Liang v. Hunt, 477 F.Supp. 891 (N.D.Ill.1979), a distinct minority view from which the dissent liberally quotes. The commentators have joined the courts' nearly unanimous chorus on this point. See Bromberg & Lowenfels, supra, § 462(1) (concluding that "the commodity laws' lack of emphasis on investors is only apparent, not real"); Note, Private Rights of Action for Commodity Futures Investors, 55 B.U.L.Rev. 804, 826 (1975) ("the statute's clear purpose-to increase existing protection of commodity futures investors")
 
 
 [28]
 The House Report also contained a letter from the Department of Justice to Chairman Poage of the House Committee on Agriculture, wherein the Department representative twice cited to the recent Supreme Court decision in Deaktor, supra, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344. The letter concerned the interrelation between exchange rules and antitrust law, and the author, discussing the doctrine of primary jurisdiction, referred to "situations where the challenged activity is alleged to violate the Commodity Exchange Act as well as antitrust laws". H.R.Rep.No.93-975, supra, at 26 (emphasis supplied). Deaktor was cited as a case, obviously brought by a private plaintiff, which alleged violations of the CEA. Any legislator who read this should thus have been aware that private individuals could sue exchanges for violations of the CEA; they had done so in Deaktor, and the Supreme Court had merely required an initial resort to the regulatory agency for its views where these would be useful
 28a The dissent chooses to make a point, footnote 16, that Chairman Poage was in error since the first decision implying a private right of action under the CEA was made in 1967 rather than 1966. We fail to see the significance of this.
 
 
 [29]
 The point was repeated later by Representative Thone, a member of the Committee on Agriculture. See 120 Cong.Rec. 10748 (April 11, 1974) ("Some observers believe that the provision of the 1968 amendments requiring exchanges to enforce their own rules, thereby implicitly giving private parties the right to sue for nonenforcement, has had a perverse effect. To avoid risk of litigation, exchange authorities have been encouraged to reduce rather than strengthen rules designed to insure fair trading")
 
 
 [30]
 The reference was apparently to Case & Co., Inc. v. Board of Trade, supra, 523 F.2d 355, see p. 301 supra
 
 
 [31]
 The dissent relies heavily on a chart introduced during the Senate Hearings, reproduced at footnote 15, to support the conclusion that Congress did not preserve the previously recognized private right of action in 1974. The chart was not prepared by Congress, the relevant Senate committee, or even a single legislator, but rather by the committee staff. There is no suggestion that in preparing the chart the staff went beyond the explicit provisions of the CEA; the chart does not purport to deal with the broad subject of civil money "damages", but only with the subject of civil money "penalties". If the chart had attempted to deal with the broader subject of damages, it could have reached only one conclusion, namely, that there was an implied private right of action, since this was the unanimous view of the courts prior to the 1974 amendments
 
 
 [32]
 The dissent argues that none of the pre-1974 cases, with the exception of Deaktor, was expressly cited to by Congress and that Congress' failure to mention Deaktor is "highly significant" (p. 344). We fail to see why. As we have developed, there is a plethora of evidence that Congress was well aware in 1974 that courts had consistently implied private rights of action under the CEA. This fact was brought out in the House Report, congressional debate, and hearings before both houses, and was crucial to an understanding of specific aspects of the bill. In light of this it is quite irrelevant that specific case names or citations were not mentioned. In all likelihood this was simply because no one particular case was crucial. Every pre-1974 case confronting the question had found an implied right of action without limitation in the opinions to the specific relationships at issue-a result foreordained by the history of decisions under the securities laws-and Deaktor, which itself had long been foreshadowed by Baird v. Franklin, supra, 141 F.2d 238, decided nearly thirty years before, thus was not a novelty
 
 
 [33]
 These are FCM's and certain persons associated with a FCM, §§ 4d, 4k; floor brokers, § 4e; and commodity trading advisors and pool operators, § 4m
 
 
 [34]
 See Hearings on Review of Commodity Exchange Act and Discussion of Possible Changes Before the House Committee on Agriculture, supra, at 121; Hearings on H.R. 11955 Before the House Committee on Agriculture, supra, at 123; Hearings on S. 2485, S. 2578, S. 2837, and H.R. 13113 Before the Senate Committee on Agriculture and Forestry, supra, at 317
 
 
 [35]
 The dissent argues, despite all these contrary indications, that the reparations procedure was designed to be the exclusive private remedy beyond informal settlement. In support of this it quotes a letter from Earl Butz, Secretary of Agriculture, published in the House Report, which states that the reparations procedure "should make possible full and equal justice for those who feel that they have been in some way damaged in the handling of their commodity accounts." The dissent underscores this language, although it is not at all clear what about it suggests that reparations were intended to preclude private actions rather than constitute an additional remedy for aggrieved persons to whom the burden of litigation might be prohibitive. In any event it is irrelevant to our case. The plaintiffs seeking relief before us are not complaining about the handling of their accounts but rather of broad market manipulation. The dissent further stresses a passage from the House Report where it is stated that the Commission "will have original jurisdiction to consider all such complaints" which have not been resolved informally. Again, nothing in this suggests that Commission jurisdiction of reparations proceedings was meant to preclude the jurisdiction of the courts which had been widely recognized. The dissent also relies on the ceiling for civil penalties against exchanges in § 6b of $100,000, arguing that allowing private recovery for "unlimited" damages would be inconsistent with this ceiling. Penalties and damages, however, are quite different in nature. The former are punitive and some limit on the regulator's discretion to impose them is necessary. The latter are remedial and naturally limited to the loss caused by the defendant. Further, the dissent's argument proves too much. There is a limit of $100,000 on the fines which can be imposed on a FCM under § 6(b), but the FCM's are subject to "unlimited" private recovery in reparations. Congress obviously saw no inconsistency between allowing recovery for actual damages and limiting fines. Finally the dissent states that under § 6b fines against exchanges are limited to "an amount which will not 'materially impair the contract markets' ability to carry on its operations and duties.' " P. 349. Rather the CFTC is required to consider whether a fine will have this effect; the only ceiling in § 6b is the $100,000 maximum, which, incidentally, is not an "overall" limitation as the dissent states but rather a limit per violation. (For example, each day of failure to comply with a cease and desist order is a separate violation, § 6b). Concern for an FCM's ability to carry on business is specifically required to be considered in § 6(d), yet FCM's are subject to full damages in reparations
 
 
 [36]
 Plaintiffs do not seek to base their right of action on this jurisdictional provision, but rather point to it as evidencing a congressional concern to preserve existing rights of action. Appellees' criticism, derived from Touche Ross & Co. v. Redington, supra, 442 U.S. at 577, 99 S.Ct. at 2489; that plaintiffs' rights must be found in substantive and not jurisdictional provisions, is therefore inapt
 
 
 [37]
 See also testimony of Deputy Assistant Attorney General Clearwater of the Antitrust Division, id. at 663, to which Chairman Talmadge responded: "I have read your statement in its entirety, and I doubt that this committee, and I doubt the House had in mind depriving either Federal courts or (sic) jurisdiction in antitrust matters, or any other matter, and certainly not State courts." Id. at 664 (emphasis supplied)
 
 
 [38]
 Defendants and the dissent suggest that the failure to enact these bills is evidence of legislative intent to repeal the private right of action. This suggestion is unpersuasive. None of the bills provided a simple private right of action for actual damages. Rather, two of the proposals, H.R. 11195 and S. 2378, would have expanded the previously judicially recognized right of action by providing for treble damages for any violation; and one bill, S. 2837, provided treble damages for a willful violation and actual damages for nonwillful violations. The dissent's argument that it would have been simple to change the bills so as to eliminate the provision for treble damages ignores that trebling was what the proposers wanted. Simple damages were recoverable under existing law. We have not "ignored" the discussion in the Amtrak case, 414 U.S. at 461, 94 S.Ct. at 694, as the dissent charges, p. 345, where Congress failed to adopt an amendment that would have altered the interpretation which the Secretary of Transportation had placed on the proposed act. It is simply inapposite
 
 
 [39]
 We find little relevance in T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), on which the dissent heavily relies. There Congress had deliberately withheld from the I.C.C. the power to award reparations for past unreasonable motor carrier rates, in sharp contrast to what it had done with regard to rail and water rates. The issue was whether a shipper could circumvent the congressional policy by suit in the courts, although the Abilene doctrine, Texas & Pacific R. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), would require the courts to refer the issue of reasonableness to the Commission. The Court concluded, although by the narrowest margin, that "It would be anomalous to hold that Congress intended that the sole effect of the omission of reparations provisions in the Motor Carrier Act would be to require the shipper to bring two lawsuits instead of one, with the parties required to file their complaint and answer in a court of competent jurisdiction and then immediately proceed to the I.C.C. to litigate what would ordinarily be the sole controversial issue in the suit", 359 U.S. at 474, 79 S.Ct. at 910-although some commission cases and two district court cases which had given only "cursory attention" to the problem had held this might be done. Unlike the 1974 amendments to the CEA, there had been no comprehensive revision of the Motor Carrier Act after consistent judicial interpretation that it did permit reparations suits. The only communication of the Commission's views to Congress was in connection with a request that it be given reparations authority, on which Congress had not acted. In our case Congress deliberately left in place a series of eleven thoroughly considered decisions, in line with Supreme Court decisions in a closely related field, stretching out over seven years. Moreover, on the very point that concerned the Supreme Court in T.I.M.E., Inc., namely, that the Abilene doctrine would involve the agency in an area where Congress had denied it power and thus circumvent congressional policy, there is no such conflict here. Indeed, the Supreme Court had ruled in Deaktor before the 1974 amendments were enacted that in a suit on an implied cause of action under the CEA, the court should stay the action pending resort to the agency if this seemed desirable to preserve uniformity
 
 
 [40]
 Requiring states to proceed in federal court and to notify the FCTC does not demonstrate that the 1978 Congress intended to eliminate the private suit for damages which had been recognized by its predecessors four years previously. The states were expected to act largely in an enforcement role, much as did the FCTC; moreover it would be incongruous to allow a state to proceed as parens patriae in its own courts for a violation of federal law. Sufficient means to obtain uniformity in private litigation were afforded by the controlling effect of federal law in all CEA litigation and the possibility of referral to the CFTC approved by the Supreme Court in Deaktor. Beyond this the dissent's reliance on such a slender reed as the inference to be drawn from the 1978 Congress' having required parens patriae suits to be brought in federal courts with prior notice to the CFTC is a prime example of the unreliability-frequently noted by the Supreme Court-of relying on the thinking of a later Congress as a guide to the intentions of a former one
 
 
 [41]
 The list of CEA protections in the 1978 Senate Report, S.R.No.95-980, supra at 12-13, which the dissent, note 25, sees as indicative of a congressional belief that no private right of action existed, included only those protections expressly provided by the CEA, and is not at all inconsistent with the view, clearly held by the 1974 Congress, that other judicially implied protections existed. See Navigator Group Funds, supra, note 19, at 423
 
 
 [42]
 The plaintiffs in the consolidated actions before us include both persons who traded through agents, who would be within this example, and persons who traded directly for their own account. See National Super Spuds, Inc. v. NYME, 77 F.R.D. 361, 370 (S.D.N.Y.1977). It is not clear in every case, however, which plaintiffs fall within which group
 
 
 [1]
 Although the Department of Justice in a letter to the House Committee, dated January 30, 1974, H.R.Rep.93-975, supra, at 25, 26, briefly cited the Supreme Court's decision in Deaktor, the Department cited the case not for the proposition that private rights of action exist under the Act-indeed the Supreme Court's decision did not even address private rights of action-but rather for the totally different purpose of persuading Congress not to enact a blanket antitrust exemption for the exchanges. There is nothing in the legislative history suggesting that Congress was aware that the lower court in Deaktor had implied a private right of action under the Act
 
 
 [2]
 As a result of the CFTC investigation, Simplot and his various companies entered a consent decree pursuant to which they were assessed a fine of $90,000, and prohibited from trading futures contracts for six years. Similarly, Taggares and his companies entered into a consent decree pursuant to which they were assessed a fine of $15,000 and prohibited from trading futures contracts for four years. CFTC investigations against various long traders and certain agents of brokers are still pending. Although the CFTC has not conducted an investigation of the defendant brokers here, the Clearing House Committee of the Exchange assessed heavy penalties against defendant Clayton for its failure to comply with Exchange Rule § 44.02, which requires members of the exchange who are not in a position to make delivery of a commodity to enter a liquidating order not later than five minutes before the closing of trading
 
 
 [3]
 Here the CFTC administrative proceeding against the New York Mercantile Exchange resulted in a consent decree and a $50,000 civil penalty
 As for defendants Simplot and Taggares, the majority claims (opinion, p. ----) that it is "unimaginable" that Congress could have intended to relieve such defendants from large civil liability. The majority misses the point. Whether a private right of action exists against such purchaser-speculators as Simplot and Taggares is not at issue in this case. More significantly, it escapes me how the majority can claim that we are somehow "withdrawing" a pre-existing private right of action against defendants like Simplot and Taggares, in light of the fact that no case has ever held that a private right of action exists in favor of one speculator against a purchaser-speculator. There is simply no remedy for us to "withdraw."
 
 
 [4]
 As administrative agencies for obvious reasons are wont to do, the CFTC here contends that the implication of private rights of action is necessary to effectuate the purposes of the statute and claims that its views on the matter are entitled to considerable deference. The Supreme Court, however, has consistently rejected such claims. In Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 41 n.27, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1976), the Court stated with respect to the SEC's position on the need for private rights of action that the SEC's "presumed 'expertise' in the securities law field is of limited value when the narrow legal issue is one peculiarly reserved for judicial resolution, namely whether a cause of action should be implied by judicial interpretation in favor of a particular class of litigants. Indeed, in our prior cases relating to implied causes of action, the Court has understandably not invoked the 'administrative deference' rule, even when the SEC supported the result reached in the particular case. J. I. Case Co. v. Borak, 377 U.S. 426 (84 S.Ct. 1555, 12 L.Ed.2d 423) (1964); Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6 (92 S.Ct. 165, 30 L.Ed.2d 128) (1971)."
 Moreover, the Supreme Court has significantly rejected the implication of a private right of action, despite the urgings of the relevant administrative agency, in such cases as Transamerica, supra, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146; Redington, supra, 422 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82; Piper, supra; Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 738, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1974); T. I. M. E., Inc. v. United States, supra, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952. Although an agency's interpretation of the statute under which it operates is entitled to some deference, "this deference is constrained by our obligation to honor the clear meaning of the statute, as revealed by its language, purpose and history." Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (quoting Teamsters v. Daniel, 439 U.S. 551, 556 n.20, 99 S.Ct. 790, 800 n.20, 58 L.Ed.2d 808 (1979)).
 
 
 [5]
 Section 9(b) reads:
 "(b) It shall be a felony punishable by a fine of not more than $500,000 or imprisonment for not more than five years, or both, together with the costs of prosecution, for any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner any such commodity, or knowingly to delivery or cause to be delivered for transmission through the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, or knowingly to violate the provisions of section 6, 6b, 6c(b) through 6c(e), 6h, 6o(1), or 23 of this title, or knowingly to make any false or misleading statement of a material fact in any registration application or report filed with the Commission, or knowingly to omit in any application or report any material fact that is required to be stated therein. Notwithstanding the foregoing, in the case of any violation described in the foregoing sentence by a person who is an individual, the fine shall not be more than $100,000, together with the costs of prosecution."
 
 
 [6]
 As stated by this court in Miller v. New York Produce Exchange, 550 F.2d 762, 768 (2d Cir. 1977), "the ultimate aim and intent of the Act is the elimination of wrongful conduct on the part of the traders. It is they, not the exchanges, who manipulate commodity markets."
 
 
 [7]
 The majority mistakenly relies on a statement in the 1978 House Report to the effect that under the 1936 amendments "the community protected under the federal commodities law was expanded to include speculators," H.R.Rep.No.1181, 95th Cong., 2d Sess. 84 (1978). Quite apart from the fact that the quote comes from a law review article simply incorporated into a subsequent House Report (1978) and is therefore not entitled to the weight normally given to committee reports, see Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. at 117, 100 S.Ct. at 2060, (post-hoc statement of a subsequent conference committee report not entitled to much weight in discerning the intent of an earlier Congress) and Southeastern Community College v. Davis, 442 U.S. 397, 411 n.11, 99 S.Ct. 2361, 2370, n.11, 60 L.Ed.2d 980 ("(t)hese isolated statements by individual Members of Congress or its committees, all made after the enactment of the statute under consideration, cannot substitute for a clear expression of legislative intent at the time of enactment"), the statement simply does not support plaintiffs' position here. Even assuming that the legislative history does show an intent to offer some protection to speculators, there is no suggestion that Congress enacted the statute for the especial benefit of speculators or intended to confer a private right of action in favor of speculators. Indeed, the legislative history is just to the opposite; Congress was primarily concerned about producers and consumers
 The majority's reliance on our decision in Ames v. Merrill Lynch, Pierce, Fenner & Smith, 567 F.2d 1174 (2d Cir. 1977), as supporting a private right of action is similarly misplaced. There the dispute involved a customer and his broker and we declined to compel arbitration, noting that "on this appeal, we are not called upon to decide whether the complaint states a claim for relief." Id. at 1176. Thus, the court's passing statement that the Act was enacted for the protection of "investors" has no bearing whatsoever on the question before us, whether the Act was designed for the especial protection of these plaintiffs, who are speculators, not customers.
 Footnote 25 of the majority opinion suggests that regulated persons may belong to the class for whose special benefit a statute is enacted, with which we do not disagree. However, where (as here) Congress has specifically enumerated the persons for whose benefit the statute has been enacted (i. e., the public, producers, consumers, shippers, dealers, millers and hedgers) but has studiously omitted speculators, we may reasonably infer that Congress did not intend to include speculators among the benefited group.
 
 
 [8]
 Some of the plaintiffs here also allege that the defendant brokers have violated § 4a of the Act, 7 U.S.C. § 6a. Section 4a states in relevant part that "Excessive speculation in any commodity under contracts of sale of such commodity for future delivery ... causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity " and authorizes the CFTC to fix quantitative limits on trading "for the purpose of diminishing, eliminating, or preventing such burden. ..." (Emphasis added). The CFTC has set by regulation certain limits on short trading which are alleged to have been violated by the short sellers with the knowledge of their brokers. 17 C.F.R. § 150.10
 No court has ever found a private cause of action to exist under § 4a. The section serves as a general prohibition against excessive speculation in commodity futures and its purpose-the removal of the burden of excessive speculation on interstate commerce in order to stabilize the price of the commodity itself, not the price of the future contract-is clearly described. The plain language of the section, then, indicates that it was designed for the protection of the general public. Nor is there any suggestion that Congress intended to confer any private right of action upon any person, let alone a speculator, who might be claimed to be damaged as a consequence of a violation of the section. See Transamerica, supra, 444 U.S. at 19, 100 S.Ct. at 247; Kissinger, supra, 445 U.S. at 148, 100 S.Ct. at 967. Only one case has even addressed the issue of an implied cause of action under § 4a and it concluded that investors were not within the class of persons for whose especial benefit the statute was created, reasoning that "the excessive speculation provision is primarily intended to protect outsiders from the activities of all speculators, not speculators from themselves." Liang v. Hunt, 477 F.Supp. 891, 893 (N.D.Ill.1979).
 Plaintiffs also charge that the defendant brokers violated Exchange Rule § 44.02 by failing to have liquidating orders placed within five minutes after the close of the trading limits even though they knew or should have known that their customers could not deliver potatoes. Since it is now well recognized that a private right of action may not be implied for a violation of a rule of the New York Stock Exchange, Jablon v. Dean Witter & Co., 614 F.2d 677 (9th Cir. 1980), it is not surprising that the majority makes no effort to claim that plaintiffs here have a cause of action against the brokers for their alleged violation of Exchange Rule § 44.02. Accordingly, we need not address the issue.
 
 
 [9]
 Section 5 provides in relevant part:
 "The Commission is hereby authorized and directed to designate any board of trade as a 'contract market' when, and only when, such board of trade complies with and carries out the following conditions and requirements:
 a. (when it is located in a terminal market where any cash commodity is sold in sufficient quantities so that futures contracts fairly reflect the general value of the commodity)
 b. (when it provides for the filing of reports concerning the transactions occurring on the exchange)
 c. (when it provides for the prevention of the dissemination of false information by the board or any member)
 d. When the governing board thereof provides for the prevention of manipulation of prices and the cornering of any commodity by the dealers or operators upon such board ...."
 
 
 [10]
 Section 5a(8), 7 U.S.C. § 7a, reads in relevant part:
 " § 5a Duties of contract markets
 "Each contract market shall-
 "(8) enforce all bylaws, rules, regulations, and resolutions, made or issued by it or by the governing board thereof or any committee, which relate to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements, and which have been approved by the Commission pursuant to paragraph (12) of this section; and revoke and not enforce any such bylaw, rule, regulation, or resolution, made, issued, or proposed by it or by the governing board thereof or any committee, which has been disapproved by the Commission; ..."
 In addition to subsection (8), § 5a requires contract markets to (1) furnish the CFTC with copies of its by-laws and regulations, keep records of all of the proceedings of its governing board, (2) require the operators of the warehouses to keep records and make them available for inspection by the CFTC, (3) obey CFTC orders concerning the delivery of the cash commodity, (4) require the party making delivery to furnish notice of intended delivery to the party obligated to accept delivery, (5) require that warehouse receipts be accepted as satisfaction of debt, (6) enforce its by-laws and regulations relating to the minimum financial standards required of those future commission merchants who are members of the market, (7) permit delivery of any commodity in a location which will tend to prevent price manipulation, (8) provide for an arbitration procedure for customer grievances, § 5a(11), and (9) submit to the CFTC for approval its by-laws, rules regulations and resolutions. § 5a(12).
 
 
 [11]
 Significantly, the 1968 amendments consisted of 27 sections. Of these, 13 sections and 3 subsections are identical to H.R. 9178. They are §§ 1(a), 1(b), 3, 6, 7(a), 9, 10, 11, 13, 14, 15, 18, 19, 22, 30, 34. Eight sections and 2 subsections are altered versions of present law; H.R. 9178, §§ 2, 4, 5, 7(b), 8, 12(b), 16, 20, 24, 25; 82 Stat. 26, et seq. (1968). This indicates, of course, that Congress acted with discrimination and care in rejecting § 32, the provision authorizing private damage suits
 
 
 [12]
 Anderson v. Francis I. duPont & Co., 291 F.Supp. 705, 710 (D.Minn.1968); Hecht v. Harris, Upham & Co., 283 F.Supp. 417, 437 (N.D.Cal.1968), modified, 430 F.2d 1202 (9th Cir. 1970); United Egg Producers v. Bauer International Corp., 311 F.Supp. 1375, 1384 (S.D.N.Y.1970); Booth v. Peavey Company Commodity Services, 430 F.2d 132, 133 (8th Cir. 1970); McCurnin v. Kohlmeyer & Co., 340 F.Supp. 1338, 1343 (E.D.La.1972), affd., 477 F.2d 113 (5th Cir. 1973); Gould v. Barnes Brokerage Co., Inc., 345 F.Supp. 294, 295 (N.D.Tex.1972); Johnson v. Arthur Epsey, Shearson, Hammill & Co., 341 F.Supp. 764, 766 (S.D.N.Y.1972); Arnold v. Bache & Co., 377 F.Supp. 61, 65 (M.D.Pa.1973); Deaktor v. L. D. Schreiber & Co., 479 F.2d 529, 534 (7th Cir.), revd. on other grounds sub nom., Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973) (per curiam); Seligson v. New York Produce Exchange, 378 F.Supp. 1076, 1084 (S.D.N.Y.1974), affd. sub nom., Miller v. New York Produce Exchange, 550 F.2d 762 (2d Cir.), cert. denied, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977)
 
 
 [13]
 The majority opinion (footnote 16) chooses to interpret our statement as implying that "victims of frauds in futures trading had never resorted to the federal courts prior to Goodman (infra)", whereas we actually state that prior to that decision no court had held that a private cause of action under the Act would be recognized. There may well have been lawsuits, but the legal basis of the claims made in these suits is not reported and, more important, prior to 1967 no court to our knowledge ever passed on the issue here, i. e., the existence of an implied private right of action
 
 
 [14]
 The letter reads in relevant part:
 "Dear Mr. Stanton (Counsel on Agriculture and Forestry, United States Senate.)
 "You requested a memorandum concerning the effect of the absence from these bills of any provision to amend section 9 of the Commodity Exchange Act so as to make a violation of proposed section 4j a violation of the penal provisions of the act.
 "As you recognize, in the absence of a provision subjecting violations of the proposed section to the criminal provisions of the statute, it would appear that the sole means of enforcement afforded by the act would be by way of administrative complaints. (Emphasis added).
 "Sincerely,
 Rodger R. Kaufman,
 Administrator."
 
 
 [15]
 Indeed, the Senate had before it a chart comparing the provisions of the four bills under consideration, a chart that omitted any reference to the possibility that private damage suits were available under the existing Act. The comparison chart reads in pertinent part:
 Commodity Futures Commission Act: Hearings before the Senate Committee on Agriculture and Forestry on S. 2485, S. 2578, S. 2837 and H.R. 13113, supra, at 194. Representative Neal Smith introduced a bill in the House, which like Senator McGovern's bill, expressly created an action for treble damages. H.R. 11195, 93d Cong., 1st Sess. § 17 (1973). In 1974, Rep. Smith introduced a similar bill which provided for the reparations procedure which was eventually enacted as § 14, but deleted the provision for treble damages. H.R. 11195, 93d Cong., 2d Sess. (1974).
 
 
 [16]
 Chairman Poage also stated on the House floor that "when the Commodity Exchange Act was enacted, courts implied a private remedy for individual litigants in the Commodity Exchange Act." 119 Cong.Rec. 41333 (Dec. 13, 1973). He, of course, erred; a private right of action was not implied by a lower court until 1967
 
 
 [17]
 Chairman Poage himself retreated on the significance of private rights of action. In December, 1973, when he introduced the bill to the House he claimed that the threat of private suits was one reason why the exchanges had cut back on their rules. On April 11, 1974, however, when he presented the bill from his Committee to the House for approval he stated "Regulation by the exchanges is not working as well as it should, and partly as a result of technicalities of present law the exchanges may be cutting back on their self-regulatory activities when they should be increasing their efforts in todays markets." 120 Cong.Rec. 10736. (Emphasis added)
 Private rights of action hardly constitute "technicalities of present law." Thus, on the day in which Congress' attention was most focused on the Commodity Exchange Act-in fact it was the day the House passed the bill-not one word was mentioned about private rights of action. It strains credulity to suggest, as the majority does, that Congress somehow relied on private rights of action when it enacted the 1974 amendments.
 
 
 [18]
 The majority also relies on the cursory objections to private rights of action raised by one or two representatives of the commodities industry in the House hearings, see, e. g., Commodity Futures Trading Act of 1974: Hearings Before the House Committee on Agriculture on H.R. 11955, 93d Cong., 2d Sess. 249 (1974). The majority reads far too much in the "failure" of Congress to respond to these scattered, vague and unfocused comments. As stated by the Supreme Court in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1975):
 "Remarks of this kind made in the course of legislative debate or hearings other than by persons responsible for the preparation or the drafting of a bill are entitled to little weight. See, e. g., United States v. United Mine Workers, 330 U.S. 258, 276-277 (67 S.Ct. 677, 687-88, 91 L.Ed. 884) (1947); United States v. Wrightwood Dairy Co., 315 U.S. 110, 125 (62 S.Ct. 523, 86 L.Ed. 486) (1942). This is especially so with regard to the statements of legislative opponents who '(i)n their zeal to defeat a bill ... understandably tend to overstate its reach.' NLRB v. Fruit Packers, 377 U.S. 58, 66 (84 S.Ct. 1063, 12 L.Ed.2d 129) (1964). See Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-395 (71 S.Ct. 745, 95 L.Ed. 1035) (1951)."
 
 
 [19]
 The few comments relied upon by the majority as evidence of Congress' intent to approve a private right of action are also too vague and abstruse to entitle them to any appreciable weight. First, the majority overstates the significance of Chairman Poage's statement that the act "sets up new consumer protection features." 120 Cong.Rec. 10737 (April 11, 1974). It is not surprising that Chairman Poage used the term "new" to describe the Act's enforcement provisions, including the CFTC's authority to bring suits and levy civil penalties and the reparations procedure, since these provisions were "new." By the use of the term "new" Chairman Poage did not mean that the remedies were "in addition to" or "supplementary" to implied private right of action. At most he meant that the remedies were in addition to the express remedies already contained in the Act. Had he intended that these remedies supplement implied private rights of action, he would have said so directly, not through an ambiguous reference to "new" remedies
 Similarly, the majority places unjustified weight on two comments of Senator Talmadge on the Senate floor. On September 9, 1974, while discussing the exclusive jurisdiction provision, § 201 of the House bill, discussed more fully infra, he stated:
 "In establishing this Commission, it is the committee's intent to give it exclusive jurisdiction over those areas delineated in the act. This will assure that the affected entities-exchanges, traders, customers, et cetera-will not be subject to conflicting agency rulings. However, it is not the intent of the committee to exempt persons in the futures trading industry from existing laws or regulations such as the antitrust laws, nor for the Commodity Futures Trading Commission to usurp powers of other regulatory bodies such as those of the Federal Reserve in the area of banking or the Securities and Exchange Commission in the field of securities.
 "The vesting in the Commission of the authority to have administrative law judges and apply a broad spectrum of civil and criminal penalties is likewise not intended to interfere with the courts in any way. It is hoped that giving the Commission this authority will somewhat lighten the burden upon the courts, but the entire appeal process and the right of final determination by the courts are expressly preserved." 120 Cong.Rec. 3049.
 The majority also errs in assuming that the first sentence of the second paragraph indicates that Congress approved private rights of action. That sentence refers to the "savings clause" added by Congress to the exclusive jurisdiction provision. Congress added that clause not to approve private rights of action but rather to insure that the exclusive jurisdiction granted to the CFTC would not interfere with federal court jurisdiction over such matters as antitrust suits and enforcement actions taken by other regulatory agencies or with state court jurisdiction over contract and common law claims. Senator Talmadge's later comments about the jurisdictional provision are fully consistent with that view. He further stated in pertinent part:
 "In addition, the conferees wished to make clear that nothing in the Act would supersede or limit the jurisdiction presently conferred on courts of the United States or any state. This Act is remedial legislation designed to correct certain abuses which Congress found to exist in areas that will now come within the jurisdiction of the Commodity Futures Trading Commission. Congress was aware that there have been ongoing efforts by various state and federal regulators to prevent some of these abuses. Accordingly, section 412 was included in the bill to make clear that all pending proceedings, including ongoing investigations, as well as court proceedings, should continue unabated by any provision of the Act. This also is necessary in order to prevent the creation of any regulatory gaps, particularly during the time between the adoption of this legislation and the full implementation of its provisions by the Commodity Futures Trading Commission. During the course of our deliberations, we learned, for example, that the SEC has a number of such matters currently under investigation. We would expect that those investigations will continue and any proceedings resulting therefrom will not be affected by the passage of this Act." 120 Cong.Rec. 34997 (Oct. 10, 1974).
 Though the majority reads this language as approval of private rights of action, the paragraph read as a whole belies that interpretation. Nothing in the language even remotely refers to private rights of action. Instead, Senator Talmadge was focusing exclusively on the effect of the provision for exclusive jurisdiction on existing court actions brought by various regulatory agencies.
 Thus, the second paragraph of Senator Talmadge's September 9, 1974, statement is easily explained. Given the grant of exclusive jurisdiction to the CFTC, it was indeed hoped that the load on the courts would be lightened. Yet, Senator Talmadge was also aware that Congress did not intend to relieve the federal courts of the burden of hearing appeals of the reparations proceeding as well as antitrust and regulatory matters or to relieve the state courts of hearing contract and common law matters.
 
 
 [20]
 Moreover, when Congress in 1978 authorized states to bring actions in the federal courts either in law or equity or both against those who violate the Act, § 6d of the Act, 7 U.S.C. § 13a-2, it expressly exempted contract markets and floor brokers from liability, thus indicating an intent to lodge primary responsibility for the enforcement of the Act with the CFTC and to insulate contract markets and floor brokers from the large damage suits that arise out of private suits, including parens patriae suits. The majority argues that contract markets were excluded only because Congress was concerned about off-market abuses. I disagree. While Congress may well have been concerned about off-market abuses, the legislative history clearly demonstrates that Congress exempted contract markets not because of its concern about off-contract market abuses but because it desired the CFTC to retain exclusive jurisdiction over those markets in order to guarantee national uniformity in the development of standards governing commodity futures trading. Contrary to the majority's suggestion (footnote 35) there is a difference between the award of damages under § 14 and an award of damages in a private civil suit. In enacting the former, Congress may well have intended the CFTC in the first instance to develop some guidelines for the award of damages which would minimize the likelihood of inconsistent awards popping up around the country, as often happens in private civil suits
 The House Report, for example, stated "the Commission should continue to have sole authority for the creation of a nationally uniform body of standards governing activities relating to commodity futures trading," H.R.Rep.No.95-1181, supra, at 14, and that with respect to § 6d "The power to enforce the requirements of the Act with respect to the organized exchanges remains solely with the Commission." Id. at 14. The Report concluded:
 "The Committee views the creation of these rights of action in the States as a necessary supplement to the Commission's enforcement activities. In the event of a State suit, the Commission could intervene in the action or institute its own administrative disciplinary proceeding, or both, as would be the case if the Commission had initiated the action in Federal court." Id. at 14.
 To insure that such actions would not proceed without the opportunity for CFTC involvement, Congress specifically required the States upon instituting any suit under § 6d to notify the CFTC and gave the CFTC the right to intervene. § 6d(2). The importance to Congress of assuring a nationally uniform body of standards is further emphasized by its refusal to permit the States to bring actions in State courts under State statutes identical to the Commodity Exchange Act. "The committee was concerned that, despite safeguards in the Act, the possibility existed that in time there would be separate bodies of State court decisions among the various States that would cause confusion and disruption among the regulated persons." Id. at 16.
 The legislative history in the Senate, moreover, reinforces the view that Congress desired the CFTC to retain exclusive jurisdiction over contract markets. The Senate Report reads with respect to § 6d:
 "This authority is subject to the qualification that such State actions may not be brought against a contract market or floor broker designated or registered as such with the Commission. The intent of the section is to provide States with the tools to combat fraudulent and other unlawful activity directed at their residents. Plenary authority to register, regulate, and discipline the contract markets and the 'locals' whose activities are generally of the character of pit trading rather than customer contact is reserved to the Commission." S.Rep.No.95-850, supra at 25, U.S.Code Cong. & Admin.News 1978 at 2113.
 So concerned was the Senate Committee that the "body of decisional law developed under this section (§ 6d) would be coherent and consistent with national policy" that it required any State proceeding under § 6d to obtain approval from the CFTC, id. at 26, though the Senate later amended that section, requiring instead the notification procedure mentioned just above. Confirming the view that § 6d was a specific and limited exception to the general rule of CFTC exclusive jurisdiction, Senator Bellmon explained on the Senate floor why contract markets and brokers were excluded: "The Federal preemption doctrine has merit regarding the regulation of commodity markets and brokers. However, there is no justification for tying the hands of the States when they wish to stop fraudulent practices occurring within their borders." 124 Cong.Rec. S10561 (July 12, 1978). Contrary to the majority's suggestion (opinion, p. 318), the identity of the plaintiff in such action is quite relevant. In order to assure national uniformity, Congress permitted only the CTFC or the States, under limited circumstances, to bring suit, not private individuals.
 In light of Congress' cautious and careful approach to parens patriae suits under § 6d, including the insulation of contract markets from those suits, it would be anomalous for Congress to have approved private suits against contract markets and floor brokers. It is unlikely that Congress would have required States to notify CFTC of any action brought under § 6d while at the same time permitting private suits to blossom all over the country without the CFTC's knowledge. Securities Investor Protection Corp. v. Barbour, 421 U.S. 419, 420-21 n. 3, 95 S.Ct. 1738, 1739 n. 3 (1974) ("anomalous for Congress to have centralized SEC suits (against the SIPC) for the apparent convenience of the SIPC while exposing the corporation to substantively identical suits by investors 'in any court, State or Federal' ").
 The majority's reliance on the statement of Senator Leahy to the effect that contract markets were exempted from § 6d, in part because of the deterrent effect of private suits, 124 Cong.Rec. S16527 (Sept. 28, 1978), is misplaced. Since Congress was well aware by 1978 that the lower courts had begun to deny private rights of action under the Act, 124 Cong.Rec. S10537 (July 12, 1978) (Statement of Senator Huddleston), Senator Leahy's statement must be characterized as a hope and a prayer. Moreover, the explanation rings hollow since it would apply equally well to those traders subject to parens patriae suits who, under the view adopted by Senator Leahy at least, were also subject to private causes of action. Had Congress in fact believed that traders and contract markets were subject to private rights of action, it would have been far less likely to enact a parens patriae provision subjecting traders to suit by the States. Nor would it have been as concerned as it was about exempting contract markets from those suits.
 
 
 [21]
 Chairman Rodino's statement reads in relevant part:
 "This double proviso could be construed to raise a question of federal pre-emption of the commodity futures industry and, therefore, unnecessarily raises a question of federal-State relationships. Many of the millions of commodity futures contracts are presently enforceable in State courts under recognized commercial law and contract principles. This double proviso could, in effect, deprive State courts of their current jurisdiction. There does not appear to be any legislative intention or established need to achieve this pre-emption....
 "In addition, this double proviso could possibly be read as an attempt to oust even federal courts of jurisdiction. The first proviso confers 'exclusive jurisdiction' on the Commission for commodity transactions. Exceptions to this exclusive jurisdiction are carved out in the second proviso without, however, referring to federal district courts. That such a result was not intended in the House is readily apparent from the House action striking the original antitrust exempting provision: antitrust laws are to apply to commodity transactions and, of course, federal courts play an instrumental role in promoting as well as protecting the national policies expressed already in the antitrust laws. Arguably, too, if jurisdiction of federal courts were to be withdrawn also, the Commission decisions on commodity transactions would be nonreviewable by the judiciary raising, thereby, serious questions of administrative and constitutional law.
 "If it appears advisable to retain rather than to delete the double proviso of Section 201(B) of H.R. 13113, it would seem reasonable to amend the second proviso appropriately to define the jurisdiction, including antitrust jurisdiction, of federal courts for commodity transactions. In this regard, the second proviso could be amended to provide:
 "And provided further, that Nothing therein contained shall supersede or limit the jurisdiction at any time conferred on the Securities Exchange Commission or other regulatory authorities and on federal court...." Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture and Forestry on S. 2485, S. 2578, S. 2837 and H.R. 13113, supra, at 259-60.
 
 
 [22]
 The following cases, in addition to Judge MacMahon's opinion in this case, 470 F.Supp. 1256, have refused to imply a private cause of action under the Commodity Exchange Act: Arkoosh v. Dean Witter & Co., 415 F.Supp. 535 (D.Neb.1976), affd. on other grounds, 571 F.2d 437 (8th Cir. 1978); Consolo v. Hornblower & Weeks-Hemphill, Noyes, Inc., 436 F.Supp. 447 (D.Ohio 1976); Bartels v. International Commodities Corp., 435 F.Supp. 865 (D.Conn.1977); Berman v. Bache Halsey Stuart, Shields, Inc., 467 F.Supp. 311 (S.D.Ohio 1979); Alkan v. Rosenthal & Co., CCH Comm.Fut.L.Rep.Par. 20,797 (S.D.Ohio 1979); Liang v. Hunt, 477 F.Supp. 891 (N.D.Ill.1979); Fischer v. Rosenthal & Co., 481 F.Supp. 53 (N.D.Tex.1979); Stone v. Saxon and Windsor Group, Ltd., 485 F.Supp. 1212 (N.D.Ill.1980)
 
 
 [23]
 The majority responds that Congress' omission is not significant, reasoning that Congress could not have been aware in 1978 of the Supreme Court's retreat from a liberal view of implied rights of action. But, as the Court recognized in Cannon, supra, 441 U.S. at 698, 99 S.Ct. 1958, Cort v. Ash and other cases decided prior to 1978 had signaled a stricter approach
 
 
 [24]
 See supra note 20
 
 
 [25]
 Equally telling is the complete absence of any mention of a private right of action in the exhaustive Senate and House Committee Reports on the 1978 amendments, which purported to list all of the private remedies available under the Act. S.Rep.No.95-850, supra, at 12-13; H.R.Rep. No. 95-1181, supra, (158 pages discussing the Act, its history and its enforcement provisions without a mention of private rights of action). This conspicuous omission suggests, of course, that Congress did not believe a private right of action to be available
 
 
 [26]
 The other cases cited by the majority are likewise easily distinguishable. In the first place, none of them involves private rights of action and we have been instructed by the Supreme Court to go slow in inferring that Congress by its silence intended to approve a private right of action. Redington, supra, 442 U.S. at 571, 99 S.Ct. at 2486. Second, the cases all involve situations where the prior judicial interpretation is far more longstanding and pervasive than the one year old history of Deaktor here, see, e. g., Van Vranken v. Helvering, 115 F.2d 709 (2d Cir. 1940), cert. denied, 313 U.S. 585, 61 S.Ct. 1095, 85 L.Ed. 1541 (1941), and Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071 (1930), or where, unlike the situation here, there have been numerous specific references in the legislative history to the prior interpretation. Bennett v. Panama Canal Co., 475 F.2d 1280 (D.C.Cir.1973)